## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | **Jointly Administered under Case No. 08-46617** |
| Polaroid Corporation, et al., | Court Files No.'s: |
| Debtors. | 08-46617 (GFK) |
| (includes: | |
| Polaroid Holding Company; | 08-46621 (GFK) |
| Polaroid Consumer Electronics, LLC; | 08-46620 (GFK) |
| Polaroid Capital, LLC; | 08-46623 (GFK) |
| Polaroid Latin America I Corporation; | 08-46624 (GFK) |
| Polaroid Asia Pacific LLC; | 08-46625 (GFK) |
| Polaroid International Holding LLC; | 08-46626 (GFK) |
| Polaroid New Bedford Real Estate, LLC; | 08-46627 (GFK) |
| Polaroid Norwood Real Estate, LLC; | 08-46628 (GFK) |
| Polaroid Waltham Real Estate, LLC) | 08-46629 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

## NOTICE OF MOTION, MOTION FOR EXPEDITED HEARING AND MOTION FOR AUTHORIZATION TO SELL DEBTOR'S SHARES OF STOCK IN NIPPON POLAROID KABUSHIKI KAISHA (NPKK) FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND OUTSIDE THE ORDINARY COURSE OF BUSINESS PURSUANT TO 11 U.S.C. § 363

TO:     The entities specified in Local Rule 9013-3

1.      PBE Corporation, formerly known as Polaroid Corporation (the "**Debtor**")[1] through its undersigned attorneys, respectfully move the Court for the relief requested herein and give notice of hearing.

---

[1] On June 19, 2009, the above-captioned Debtors filed documents with the appropriate offices of the Secretary of State for the purpose of changing their corporate names to omit the reference to the word "Polaroid." The Debtor Polaroid Corporation is now "PBE Corporation.

2.     The Court will hold a hearing of this Motion before the Honorable Gregory F. Kishel, United States Bankruptcy Judge, at 1:30 p.m. on Thursday, August 27, 2009, in Courtroom 2A, at the United States Courthouse, 316 N. Robert Street, St. Paul, Minnesota.

3.     Local Rule 9006-1(b) provides that any response to this motion must be filed and served by delivery not later than Monday, August 24, 2009, which is three (3) days before the time set for the hearing (excluding Saturdays, Sundays, and holidays), or filed and served by mail not later than Tuesday, August 18, 2009, which is seven (7) days before the time set for the hearing (excluding Saturdays, Sundays and holidays). **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING**

4.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Bankruptcy Rule 5005 and Local Rule 1070-1.  This is a core proceeding.  Petitions commencing the Chapter 11 cases of the above-captioned debtors (the "**Debtors**," and the "**Cases**") were filed on December 18, 2008 (the "**Petition Date**").  Venue of these Cases and this motion in this district are proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Cases are now pending before this Court.

5.     This Motion arises under 11 U.S.C. § 363 and Federal Rule of Bankruptcy Procedure 6004.  This Motion is filed under Fed. R. Bankr. P. 9014 and Local Rule 9013.  The Debtor seeks authorization to sell all of the issued and outstanding shares of capital stock of Nippon Polaroid Kabushiki Kaisha ("**NPKK**"), a wholly-owned subsidiary corporation of the Debtor organized under the laws of Japan, to Frontiers Corporation ("**Frontiers**"), a corporation organized under the laws of Japan owned by Yuta Ito, ("**Owner**" or "**Ito-san**") the current General Manager of NPKK and the owner of all the issued and outstanding capital stock of

Frontiers, pursuant to a Stock Purchase Agreement ("**Purchase Agreement**") by and among the Debtor and Frontiers. A true and correct copy of the Purchase Agreement is attached hereto as Exhibit A. The Debtor further requests that such sale be free and clear of any liens, claims, interests and encumbrances and outside of the ordinary course of business pursuant to 11 U.S.C. § 363.

## BACKGROUND

6.     The Debtors filed voluntary petitions for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors continue to operate as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. No bankruptcy trustee or examiner has been appointed in these Cases. On January 8, 2009, a committee of unsecured creditors was appointed pursuant to § 1102 of the Bankruptcy Code (the "**Committee**").

Polaroid's Businesses

7.     Polaroid was founded in 1937 by Edwin H. Land, a pioneer in instant film, camera and camera accessories. The company initially focused on the development and sale of polarized sunglasses and lenses and, in 1939, sold more than one million pairs of sunglasses. In 1948, Polaroid introduced the first commercial instant film camera, and since that time, has been a recognized technological leader and innovator in the instant film and camera industry and more recently a leading consumer electronics company.

8.     Polaroid was acquired by Petters Group Worldwide, LLC ("**PGW**") in April 2005 and PGW owns 100% of the Debtor's equity. PGW is owned 100% by Thomas J. Petters ("**Petters**").

Events Leading to Chapter 11 Filings

9.     Despite having one of the most recognized brand names in the world, the Debtors

experienced a decline in net sales over the past several years, coupled with increasing operational and product development costs. The Debtors sustained substantial operating losses since the business was acquired in April of 2005 and the company funded these losses primarily through the use of existing cash resources, favorable one-time cash flow impacts from the wind-down of the instant film business and the sale of other assets, including real estate. Prior to the commencement of the bankruptcy cases, the Debtors implemented cost-saving measures aimed at reducing overhead and increasing operational efficiencies. Nevertheless, the company's cash resources had been strained. Substantial capital requirements were necessary in order to return the company to profitability.

10.     The Debtors were unable to obtain needed financing due to, among other things, the business dealings of PGW's sole shareholder, Thomas J. Petters, and his affiliated entities. These business dealings included the imposition of burdensome contractual commitments in the months preceding the bankruptcy filings. The Debtors' assets were pledged in favor of the Acorn Capital Group, LLC, either on its own account or for the account of certain investors (collectively, "**Acorn Capital**"), and Ritchie Capital Management, L.L.C., either on its on account or for the account of certain investors (collectively, "**Ritchie Capital**"), to secure substantial third-party debts and investments for which the Debtors received no or inadequate consideration. The Debtors have filed adversary proceedings to avoid and recover liens and other assets of the Debtors fraudulently transferred to and for the benefit of Acorn Capital and Ritchie Capital and the disallowance, subordination and/or recharacterization of claims asserted against the Debtors' bankruptcy estates.

11.     In light of the above, the above-captioned Debtors were forced to seek relief under Chapter 11 of the Bankruptcy Code.

4

<u>Events Since Chapter 11 Filing</u>

12.     On January 28, 2009, the Debtors filed a motion with the Court requesting, among other things, court approval of certain auction and bidding procedures and the approval of the sale of substantially all of their assets outside the ordinary course of business ("**Sale Motion**"). By order dated February 18, 2009, and supplemental orders that were entered in these cases in furtherance thereof, the Court approved the auction and bidding procedures and authorized the Debtors to sell all or substantially all of its assets outside the ordinary course of business ("**Bidding Procedures Orders**").  Pursuant to the Bidding Procedures Orders, the Debtors conducted an auction for the sale of its assets (the "**Auction**").  The Auction concluded on April 16, 2009.  At the conclusion of that Auction, PLR Acquisition, LLC ("**PLR**"), a joint venture between Hilco Consumer Capital Corp. ("**Hilco**") and Gordon Brothers Brands, LLC ("**GBB**"), was designated as the successful bidder ("**Successful Bidder**").  The Court entered an order granting the Sale Motion on April 17, 2009 and approving the sale of certain assets to the Successful Bidder.  On May 8, 2009, the Debtors filed a Notice of Closing with the Court, indicating that the sale transaction approved by the Court closed on May 7, 2009 (the "**Closing Date**").

13.     Pursuant to the Bidding Procedures Orders, extensive notice of the sale of all or substantially all of the Debtors' assets, including NPKK, was previously provided to creditors and interested parties.  Such notice included service by mail directly to more than 1,500 creditors and interested parties, public notices of the Sale Motion and Auction were placed in the national edition of the New York Times as well as the Star Tribune on March 9, 2009, and information about the Sale Motion and Auction was, prior to the closing on the sale transaction, available on the polaroid.com website.

14.     Pursuant to the asset purchase agreement with the Successful Bidder (the "**APA**"), a number of assets owned by the Debtors were excluded from the sale (the "**Excluded Assets**"), such as the shares of NPKK and remain property of these estates.  It is necessary that the Debtor be able to monetize such Excluded Assets, such as NPKK, as promptly and as efficiently as possible in order to maximize the value of the bankruptcy estate for the benefit of all constituencies.

## RELIEF REQUESTED

15.     In 1960 Polaroid established NPKK, a Japanese corporation with its principal office located Tokyo, Japan that, for 49 years, has been Polaroid's distribution partner in Japan. NPKK has been responsible for maintaining market share for Polaroid instant film and photography in Japan and selling Polaroid branded products in that market.  NPKK has more than 200 business accounts with Japanese customers.  The Debtor currently owns and controls 100% of issued and outstanding shares of NPKK's capital stock (the "**NPKK Stock**").

16.     NPKK is currently managed by Ito-san, who has close to 30 years experience in management positions in the Japanese market.  The primary business of NPKK was instant film related products until 2005, when under the ownership of the PGW, NPKK expanded modestly into Consumer Electronics.  Coinciding with the wind-down of the traditional instant film business, NPKK also began to sell on a limited basis the PoGo™ products as the next generation of digital instant products.

17.     As part of the Debtor's continuing efforts to monetize its assets to benefit the estate and its creditors, the Debtor has determined, subject to Court approval, to sell its stock in NPKK to Frontiers.  Based on consultation with its legal and financial advisors, analysis of NPKK's most recent financials, a true and correct copy of which is attached hereto as Exhibit B, and after considering all available alternatives, including the significant costs, delay, likely

6

recoveries and tax considerations in connection with a liquidation under Japanese law, the Debtor has deemed it advisable and in the best interest of the estate and all constituencies to sell the NPKK Stock to Frontiers for $1.0 million (the "**Purchase Price**").

18.　　The NPKK Stock is being sold to Frontiers subject to higher and better offers. Any competing offer(s) must be received by the Debtor no later than 5:00 p.m on Monday, August 24, 2009. The Debtor, in its discretion, and after consultation with the Committee as well as its legal and financial advisors, will determine which competing offer, if any, provides the highest and best value to the estate. At the hearing on this Motion, the Debtors intend to seek authorization by this Court to sell the NPKK Stock to the party providing the highest and best value to the estate (the "**Buyer**").

19.　　The Debtor believes the value of NPKK can be best realized through a sale to Frontiers pursuant to the Purchase Agreement. It is anticipated that as a result of a sale to Frontiers, NPKK could remain the distribution partner in Japan for PLR, which the Debtor believes will add value to the estate's equity interest in the go-forward Polaroid business ("**New Polaroid**") by keeping open a key market for Polaroid branded products. Frontiers has been in negotiations with Global Industrial Services, Ltd. ("**Global**"), a licensee of PLR for consumer electronic products, a regarding a distribution arrangement that may provide additional benefits to the estate as a holder of an equity interest in New Polaroid.

20.　　The Debtor has been attempting to find a buyer for NPKK since before the Petition Date, and as part of the Sale Motion and Auction process, as well as since, but has received no other offers for NPKK. The Purchase Agreement was negotiated, proposed and entered into by the Debtors and Frontiers without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor Frontiers has engaged in any conduct that would

cause or permit either the Purchase Agreement or any other related agreement to be avoided under section 363(n) of the Bankruptcy Code.

21.     Absent a sale to Frontiers, the only remaining alternative to the sale of NPKK as a going-concern is to cease operations and liquidate the company.  The Debtors believe the risks, delay, costs and expenses that would be incurred in liquidating NPKK would be onerous and substantially reduce the value of NPKK and the NPKK Stock returned to the estate.  Ceasing operations would also be detrimental to the estate's equity interest in New Polaroid as such actions would tarnish the brand in Japan and likely diminish New Polaroid's ability to re-introduce Polaroid branded products into Japan in the future.    In addition, if NPKK were liquidated, under the laws of Japan, NPKK would be placed under the supervision of a Japanese court-appointed receiver, which would restrict NPKK's cash and liquid assets to ensure service, warranty and other obligations of NPKK are honored.  This process would take a substantial number of years to complete and would deprive the bankruptcy estate and its creditors of the substantial and immediate value that a sale of NPKK as a going concern to Frontiers would provide.

22.     At the time of the Auction in March, 2009, the Debtor and its financial professionals estimated the value of NPKK at approximately $1.2 million.  That estimated value has decreased since the time of the Auction due to the estimated warranty and service costs that NPKK will continue to bear as a result of regulation by the Japanese Government, other expenses incurred by NPKK.  To the extent Frontiers is able to negotiate a distribution agreement with Global, however, the Debtor and the estate may benefit from such agreement as a result of the Debtor's equity interest in New Polaroid.  Accordingly, the Debtor has determined that, in its business judgment, the $1 million being paid by Frontiers is a fair market price for the

Debtor's stock in NPKK. In light of potential claims against, and obligations of, NPKK the Debtors believe the value obtained is fair and reasonable.

23. In addition, and in connection with such sale of NPKK Stock to Frontiers, NPKK anticipates entering a Receivable Transfers Agreement, in a form reasonably satisfactory to each of the parties, through which NPKK and other non-debtor subsidiaries of the Debtor will set-off certain inter-company accounts and obligations, which likely will reduce potential claims against the Estate.

24. The Debtor seeks authority to transfer its entire right, title and interest in the NPKK Stock to the Buyer in accordance with the Purchase Agreement free and clear of all liens, claims, encumbrances and interests under 11 U.S.C. § 363(f). The Debtor does not believe that there are currently any liens or other security interests attached to the NPKK Stock, other than asserted blanket security interests granted to Petters Company, Inc. ("**PCI**"), Petters Company, LLC ("**PCLLC**") and Petters Capital, LLC ("**Petters Capital**," and collectively the "**Asserted Secured Claims**" or "**Asserted Secured Claimants**").[2] The Debtor has scheduled such Asserted Secured Claims as disputed. Such liens, even if valid and enforceable, would not preclude approval of the proposed sale. Such Asserted Secured Claimants are adequately protected by having their interests that are secured by liens, security interests and similar encumbrances, if any, attach to the net proceeds of such sale ultimately attributable to the property against or in which they assert such claim or interest, with the same validity, priority and effect and to the same extent that existed immediately prior to the consummation of the sale and in all cases subject to any and all rights, claims and defenses that the Debtor or the

---

[2] In the 2005 acquisition Polaroid, PGW acquired all of assets of "Polaroid," including the Collection, from OEP Imaging Corp. and OEP Imaging Corp. previously acquired the assets of "Polaroid" free and clear of all liens, claims and encumbrances in a court authorized § 363 sale. In re Polaroid Corporation, et al., Bky. Case No. 01-10864 (Bankr. D. Del.), Docket No. 1249 dated July 3, 2002. Thus, the items in the Collection were acquired by the Debtors free and clear of liens, claims or encumbrances that may have existed at that time.

bankruptcy estate may have with respect thereto.

25.     Therefore, in exercise of its business judgment, after lengthy negotiations, and upon consultation with legal and financial advisors, the Debtor believes that selling the NPKK Stock to the Buyer free and clear of liens, claims, interests and encumbrances will best maximize the value of the NPPK Stock for the benefit of the estate, its creditors and all other constituencies.  Since the Closing, the Debtors' operations have been substantially curtailed, the "Polaroid" brand was sold and the Debtor does not have an independent business need for continued operation of NPPK.  NPKK is an Excluded Asset that is currently property of the bankruptcy estate.  Therefore, in its best business judgment, the Debtor seeks authorization to sell the NPKK Stock to the Buyer free and clear of any liens, claims, interests and encumbrances and believes such transaction will best realize the value of the NPKK Stock for the benefit of the estate, its creditors.  To the extent that any other party emerges with a higher and otherwise better offer prior to the hearing, the Debtor reserves the right to seek authority to consummate such a transaction without further notice and hearing.

## **EXPEDITED RELIEF**

26.     Expedited relief is necessary to ensure the Debtor's ability to monetize the NPKK Stock.  The Debtor anticipates conversion of these cases to cases under chapter 7 of the bankruptcy code in the near future.  The Debtor believes it is in the best interest of all constituents to consummate the transaction contemplated by the Purchase Agreement in the most expeditious manner possible prior to such conversion.  Notice of this motion is being served 15 days prior to the hearing, rather than the 20 days required; however, this is more than the 14-day service requirement for most types of motions.

27.     The Debtor has previously provided extensive notice of the sale of its assets in connection with the sale process and believes that the notice being provided of this motion

provides a sufficient amount time for any party to respond to this Motion if any party so desires. Accordingly, for the above reasons, the Debtor respectfully asserts that cause exists to hear the Motion on an expedited basis. The Debtor believes that the notice provided to creditors provides a sufficient amount time to respond to this Motion will not prejudice any party entitled to notice and provides sufficient opportunity for such creditors to file responses to this motion if any party desires.

28.     If testimony is needed at the hearing on this motion, the Debtor hereby give notice that Robert J. McDonough, Senior Vice President, Finance, and/or other employees or advisors to the Debtors or their affiliates may testify as to the factual matters raised in the Motion. The business address for Mr. McDonough is 300 Baker Avenue, Concord, Massachusetts 01742.

WHEREFORE, the Debtor respectfully requests the court enter an order authorizing the sale of the NPKK Stock to Frontiers, or any other higher and otherwise better offer, and that such sale be free and clear of all liens, claims and encumbrances and granting such other relief as may be just and equitable.

DATED: August  12, 2009

**LINDQUIST & VENNUM P.L.L.P.**


By   /e/ George H. Singer
     James A. Lodoen (#173605)
     George H. Singer (#262043)

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)
www.lindquist.com

**ATTORNEYS FOR
THE DEBTOR**

## VERIFICATION

I, Robert J. McDonough, Senior Vice President of Finance of the PBE Corporation, declare under penalty of perjury that the facts set forth in the preceding Motion for Authorization to Sell Debtor's Shares of Stock in Nippon Polaroid Kabushiki Kaisha (NPKK) Free and Clear of Liens, Claims, Interests and Encumbrances and Outside the Ordinary Course of Business Under 11 U.S.C. § 363 are true and correct according to the best of my knowledge, information and belief.

Executed on: _Aug. 12_ , 2009

_____
Robert J. McDonough

# Exhibit A

**STOCK PURCHASE AGREEMENT**

**by and among**

**PBE CORPORATION,**

**FRONTIERS CORPORATION,**

**and**

**Yuta Ito**

**Dated as of August 7, 2009**

STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "Agreement") is made and entered into as of August 7, 2009, by and among PBE Corporation, a Delaware corporation formerly known as Polaroid Corporation ("Seller"),   Frontiers Corporation, a corporation organized under the laws of Japan ("Purchaser"), and Yuta Ito, the owner of all of the issued and outstanding capital stock of Purchaser (the "Owner").

RECITALS

WHEREAS, Seller is a debtor-in-possession under Title 11 of the United States Code, 11 U.S.C. §101 et seq (the "Bankruptcy Code") and has filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 18, 2008 in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court," the bankruptcy case initiated by Seller as described in this Recital shall collectively be referred to as the "Bankruptcy Case");

WHEREAS, Seller owns all of the issued and outstanding shares of capital stock of Nippon Polaroid Kabushiki Kaisha, a corporation organized under the laws of Japan (the "Company"), consisting of 230,400 shares of capital stock (the "Shares"); and

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Shares upon the terms and subject to the conditions set forth herein and in accordance with the Bankruptcy Code.

AGREEMENT

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements set forth herein, and intending to be legally bound hereby, the parties hereby agree as follows:

ARTICLE 1
DEFINITIONS

Section 1.1    Certain Defined Terms.   For purposes of this Agreement, the following terms shall have the following meanings:

"Affiliate" has the meaning given that term in Section 101(2) of the Bankruptcy Code.

"Claim" has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia*, all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"European Receivables" means those certain receivables recorded on the books of the Company reflecting obligations of (i) Polaroid International B.V., (ii) Polaroid Trading BV, (iii) Polaroid Consumer Electronics Europe BV or (iv) any of their European Affiliates to the Company, which are the subject of the Receivables Transfer Agreement (as defined in Section 2.5(a)(ii) below) by and between the Company and Seller.

"Governmental Authority" means any foreign, federal, state, local or other government, governmental, regulatory or administrative authority, agency or commission, self-regulatory organization, or any court, tribunal or judicial or arbitral body.

"Lien" means, with respect to any asset or property, any lien, mortgage, pledge, hypothecation, charge, security interest or encumbrance of any kind in respect of such asset or property.

"Person" means any natural person, legal entity or Governmental Authority.

ARTICLE 2
PURCHASE PRICE; CLOSING

Section 2.1    Purchase and Sale of Shares.    Upon the terms and subject to the conditions of this Agreement, at the Closing (as defined in Section 2.3 below), Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, the Shares.

Section 2.2    Purchase Price.    The aggregate purchase price for the Shares (the "Purchase Price") shall be $1,000,000 United States Dollars (US $1,000,000).

Section 2.3    Closing.    The closing of the purchase and sale of the Shares (the "Closing") shall take place (i) at the offices of Lindquist & Vennum PLLP, counsel to Seller, at 10:00 a.m., local time, as promptly as practicable following the satisfaction or waiver of all of the conditions set forth in Section 5.11 hereof, or (ii) at such other location, date and time as may be mutually agreed upon by Seller and Purchaser (the "Closing Date").

Section 2.4    Payment of the Purchase Price.    As payment in full for the Shares being purchased by Purchaser under this Agreement, at the Closing, Purchaser shall deliver (and Owner shall cause Purchaser to deliver) the Purchase Price to Seller by wire transfer of immediately available funds to the bank account specified by Seller in writing.

Section 2.5    Closing Deliveries.

(a)    At the Closing, Seller shall deliver to Purchaser the following:

(i)    a stock certificate or stock certificates evidencing the Shares, accompanied by duly executed stock powers in form and substance reasonably satisfactory to Purchaser;

(ii)    the Receivables Transfer Agreement, in a form reasonably satisfactory to each of the parties hereto (the "Receivables Transfer Agreement"), duly executed by Seller; and

(iii)     letters of resignation duly executed by the members of the Board of Directors of the Company (except for the Owner) and the statutory auditor of the Company in such forms as the Owner will reasonably request.

(b)     At the Closing, Purchaser shall deliver, or cause to be delivered, to Seller the following:

(i)     the Purchase Price, payable in accordance with Section 2.4; and

(ii)     the Receivables Transfer Agreement, duly executed by Purchaser.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser as follows:

Section 3.1     Authorization; Enforceability.   The execution, delivery and performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby are, or will be as of the Closing Date, within Seller's corporate powers and have been duly authorized and approved by all necessary corporate action on the part of Seller, subject to receipt of the Bankruptcy Court's approval.   This Agreement has been duly executed and delivered by Seller and, assuming due authorization, execution and delivery by Purchaser, and, subject to the Bankruptcy Court's approval of this Agreement, constitutes, or will when executed and delivered constitute, the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms.

Section 3.2     Capitalization; Ownership of Shares.   The authorized capital stock of the Company consists of 230,400 shares of a single class of capital stock, all of which shares (constituting the Shares) are issued and outstanding and owned by Seller.   On the Closing Date, Seller will have, and, upon delivery to Purchaser of the instruments contemplated by Section 2.5(a)(i), and subject to the terms of the order of the Bankruptcy Court approving the transactions contemplated hereby, Seller will thereby transfer to Purchaser, good and valid title to the Shares, free and clear of all Liens (other than Liens for taxes, assessments and other similar charges that are not yet due and payable).

Section 3.3     No Brokers.   No broker, finder, investment banker or other intermediary is entitled or has claimed to be entitled to any fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Seller.

Section 3.4     Disclaimer of Other Representations and Warranties.   Except as expressly set forth in this Article 3, Seller makes no representation or warranty, express or implied, at law or in equity, in respect of the Shares or the Company (or any of its assets, liabilities or operations) and any such other representations or warranties are hereby expressly disclaimed. Purchaser and Owner hereby acknowledge and agree that, except to the extent specifically set forth in this Article 3, Purchaser is acquiring the Shares on an "as-is, where-is" basis.

# ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF PURCHASER AND OWNER

Purchaser and Owner hereby represent and warrant to Seller as follows:

Section 4.1    Organization and Good Standing; Capacity.

(a)    Purchaser (i) is a corporation organized, validly existing and in good standing under the laws Japan and (ii) has all necessary power and authority to own or lease its assets and properties and to carry on its business as currently conducted.

(b)    Owner has the requisite legal capacity, power and authority to execute and deliver this Agreement and each ancillary agreement to which Owner is a party, to perform his obligations hereunder and thereunder and to consummate the transactions contemplated hereby.

Section 4.2    Authorization; Enforceability.    The execution, delivery and performance by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated hereby are within Purchaser's powers and have been duly authorized and approved by all necessary corporate action on the part of Purchaser.    This Agreement has been duly executed and delivered by Purchaser and Owner and, assuming due authorization, execution and delivery by Seller, constitutes the legal, valid and binding obligation of Purchaser and Owner, enforceable against them in accordance with and subject to its terms.

Section 4.3    No Conflicts; Required Consents.

(a)    The execution and delivery by Purchaser and Owner of this Agreement do not, and the consummation by Purchaser and Owner of the transactions contemplated hereby will not, (i) conflict with or violate any provision of the organizational or governing documents of Purchaser, (ii) conflict with, violate, result in a breach of the terms, conditions or provisions of, constitute a default or an event that, with notice or lapse of time or both, would become a default under, give to others any rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any lien or encumbrance upon any assets or properties of Purchaser or Owner, any contract (whether written or verbal) to which Purchaser or Owner is a party or by which Purchaser or Owner, or any of their respective assets or properties is bound, or (iii) conflict with or violate any law or order binding upon or applicable to Purchaser or Owner, or any of their respective assets or properties.

(b)    No consent, approval or authorization of, or registration, declaration or filing with, or notification to, any Governmental Authority in Japan is required to be obtained, made or given by the Seller as a result of its execution, delivery and performance of this Agreement or its consummation of the transactions contemplated hereby.

Section 4.4    Availability of Funds; Ownership of Purchaser; Solvency.    At the Closing, assuming Seller complies with its covenants and agreements contained herein, Purchaser will have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to pay the Purchase Price and the other amounts payable pursuant to this Agreement.    Owner owns all of the issued and outstanding capital stock of Purchaser.

After giving effect to the transactions contemplated hereby, Purchaser will have sufficient resources to pay, and will pay, obligations as they come due in the ordinary course of business.

Section 4.5    Investment Intent.   Purchaser is acquiring the Shares as an investment for its own account and not with a view to the distribution thereof.   Purchaser shall not sell, transfer, assign, pledge or hypothecate any of the Shares in the absence of registration under, or pursuant to an applicable exemption from, federal and applicable state securities laws.

Section 4.6    No Broker.   No broker, finder, investment banker or other intermediary is entitled to any fee or commission in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of Purchaser or Owner.

Section 4.7    Independent Investigation.   Purchaser and Owner have undertaken such investigation and have been provided with and have evaluated such documents and information as they have deemed necessary to enable them to make an informed and intelligent decision with respect to their execution, delivery and performance of this Agreement.   Purchaser and Owner agree to accept the Company in the condition it is in on the Closing Date based upon their own inspection, examination and determination with respect thereto as to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in Article 3 of this Agreement.

ARTICLE 5
COVENANTS

Section 5.1    Expenses.   Except as otherwise expressly provided herein, each party shall bear and pay all of its costs and expenses (including the fees and expenses of its counsel, accountants and other advisors) incurred in connection with this Agreement and the transactions contemplated hereby.

Section 5.2    Further Assurances.   At any time and from time to time following the Closing, as and when requested by any party, each party shall execute and deliver, or cause to be executed and delivered, such other documents and instruments and shall take, or cause to be taken, such further or other actions as such other party may reasonably request or as otherwise may be necessary or desirable to evidence and effectuate the transactions contemplated hereby.

Section 5.3    Reasonable Best Efforts.   The parties will use reasonable best efforts to take all actions and to do all things necessary, proper, or advisable in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the closing conditions set forth in Section 5.11 herein).

Section 5.4    Taxes Related to Purchase of the Shares.    All taxes in connection with the transfer of the Shares, and all recording charges, registration fees, conveyance fees and other fees and charges (collectively, "Transaction Taxes"), that may be imposed outside of the United States of America by reason of the sale, transfer assignment and delivery of the Shares shall be borne by Purchaser and Owner.   Purchaser, Owner and Seller shall cooperate to (a) determine the amount of any Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and (b) prepare and file any and all required tax returns for or with respect to such Transaction Taxes with any and all appropriate Governmental Authorities.   Without the

prior written consent of Seller (which Seller may provide or withhold in its sole and absolute discretion), Purchaser shall not be entitled to make an election under Section 338 of the U.S. Internal Revenue Code of 1986, as amended, with respect to Purchaser's acquisition of the Shares.

Section 5.5    Cooperation on Tax Matters.

(a)    Purchaser and Seller shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Company as is reasonably necessary for the preparation and filing of any tax return, claim for refund or other required or optional filings relating to tax matters, for the preparation for and proof of facts during any tax audit, for the preparation for any tax protest, for the prosecution or defense of any suit or other proceeding relating to tax matters and for the answer to any Governmental Authority relating to tax matters.

(b)    Purchaser shall retain possession of all accounting, business and financial records and information relating to the Company for a period of at least five (5) years from the Closing Date.   Purchaser shall give Seller notice and an opportunity to retain any such records in the event that Purchaser determines to destroy or dispose of them after such period.   In addition, from and after the Closing Date, Purchaser shall, to the extent permitted by applicable law (such as the Personal Information Protection Law of Japan), provide access to Seller and its representatives (after reasonable notice and during normal business hours and without charge) to the books, records, documents and other information relating to the Company as Seller may reasonably deem necessary to (i) properly prepare for, file, prove, answer, prosecute and/or defend any such tax return, claim, filing, tax audit, tax protest, suit, proceeding or answer, (ii) administer or complete the Bankruptcy Case of Seller under Chapter 11 of the Bankruptcy Code, or (iii) pursue any claim.

Section 5.6    Access.   For the period commencing on the Closing Date and ending on the later of (x) the closing of the Bankruptcy Case and (y) five (5) years after the Closing Date (the "Access Period"), Seller and its representatives shall, to the extent permitted by applicable law (such as the Personal Information Protection Law of Japan),   have reasonable access to, and shall have the right to photocopy at its own expense, all of the following (to the extent the same are transferred to Purchaser hereunder):   books and records, including any computerized databases and files and programs and associated software relating to the pre-Closing operations of the business of the Company as they existed as of the Closing Date, including (i) the evaluation, allowance, distribution and defense of any and all claims brought against Seller, any of its Affiliates or their estates, and (ii) employees' records or other personnel and medical records, as of the Closing Date, required by law, legal process or subpoena.   During the Access Period, Purchaser agrees to provide Seller and any of its representatives, upon reasonable request and notice, with reasonable access to employees of Purchaser (who may be former employees of Seller or the Company) for purposes of, among other things, winding down Seller's estate and completing the Bankruptcy Case.   Access pursuant to this Section 5.6 shall be afforded by Purchaser upon receipt of reasonable advance notice, during normal business hours.   Seller and its representatives agree to treat confidentially any information obtained pursuant to this Section 5.6, including the books and records.   If Purchaser shall desire to dispose of any such books and records upon or prior to five (5) years after the Closing Date, Purchaser shall, prior to such

disposition, give Seller a reasonable opportunity at Seller's expense, to segregate and remove such books and records as Seller may select.

Section 5.7    [RESERVED].

Section 5.8    Certain Affiliate Arrangements.    Effective as of the Closing, all contracts (whether written or verbal) between the Company, on the one hand, and the Seller or any Affiliate of Seller, on the other hand, shall be terminated as between them and shall be without any further force and effect, and there shall be no further obligations of any of the relevant parties thereunder.    Without limiting the foregoing, all inter-company accounts, whether payables or receivables (excluding the European Receivables, which are being transferred from the Company to Seller in connection with the transactions contemplated hereby), or other amounts or obligations between the Seller or any Affiliate of Seller, on the one hand, and the Company, on the other hand, shall, effective as of the Closing, be extinguished and terminated with no amounts being paid or assets being transferred in connection therewith.

Section 5.9    Releases.

(a)    Purchaser, the Company and Owner hereby release and discharge, effective as of the Closing, (i) Seller and each of its Affiliates (the "PBE Releasees"), (ii) each of the PBE Releasees' officers, directors and employees in their capacities as such, and (iii) the PBE Releasees' heirs, executors, administrators and successors, from all actions, causes of action, suits, controversies, damages, Claims and demands whatsoever, in law or equity (known or unknown), which Purchaser, the Company, Owner or any of their respective Affiliates ever had, now have or hereafter can, shall or may have upon or by the Closing Date against the PBE Releasees or any of them.

(b)    Seller hereby releases and discharges, effective as of the Closing, (i) the Company and Owner (the "Company Releasees"), (ii) each of the Company Releasees' officers, directors and employees in their capacities as such, and (iii) the Company Releasees' heirs, executors, administrators and successors, from all actions, causes of action, suits, controversies, damages, Claims and demands whatsoever, in law or equity (known or unknown), which Seller ever had, now has or hereafter can, shall or may have upon or by the Closing Date against the Company Releasees or any of them.

Section 5.10    Satisfaction of Liabilities Post-Closing.    The parties hereto acknowledge and agree that, following the Closing, (i) neither Seller nor any of its Affiliates (excluding, for these purposes, the Company) shall have any liability or obligation relating to the Company and (ii) Purchaser shall satisfy (and Owner shall cause Purchaser to satisfy) all liabilities and obligations of the Company, including all liabilities and obligations relating to product warranties and the return or replacement of products, whether incurred prior to or after the Closing.

Section 5.11    Conditions to Closing.

(a)    Conditions to Obligation of Seller.    The obligations of Seller to consummate the transactions contemplated hereby are subject to the satisfaction or (to the extent permitted by

applicable law) waiver by Seller, on or prior to the Closing Date, of each of the following conditions:

(i) *Accuracy of Representations and Warranties*. Each of the representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects, in each case at and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such representations and warranties speak expressly as of an earlier date, in which case they shall be true and correct, or true and correct in all material respects, as the case may be, as of such earlier date).

(ii) *Performance of Covenants*. Purchaser shall have performed or complied in all material respects with all covenants, agreements and obligations required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

(iii) *Certificate of Compliance*. Purchaser shall have delivered to Seller a certificate dated as of the Closing Date, signed by an authorized officer of Purchaser certifying as to the satisfaction of the conditions set forth in <u>Sections 5.11(a)(i)</u> and <u>5.11(a)(ii)</u>.

(iv) *Consents and Approvals*. All consents and approvals of any Person, including the approval of the Bankruptcy Court, required to consummate the transactions contemplated hereby shall have been obtained, taken or made, as applicable, and shall remain in full force and effect.

(v) *Agreement with Global*. Purchaser shall have entered into a Distribution Agreement with Global, in form and substance satisfactory to Seller.

(b) <u>Conditions to Obligation of Purchaser</u>. The obligations of Purchaser to consummate the transactions contemplated hereby are subject to the satisfaction or (to the extent permitted by applicable law) waiver by Purchaser, on or prior to the Closing Date, of each of the following conditions:

(i) *Accuracy of Representations and Warranties*. Each of the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects, in each case at and as of the Closing Date as if made on and as of the Closing Date (except to the extent that any such representations and warranties speak expressly as of an earlier date, in which case they shall be true and correct, or true and correct in all material respects, as the case may be, as of such earlier date).

(ii) *Performance of Covenants*. Seller shall have performed or complied in all material respects with all covenants, agreements and obligations required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date.

(iii) *Certificate of Compliance*. Seller shall have delivered to Purchaser a certificate dated the Closing Date, signed by an authorized officer of Purchaser certifying as to the satisfaction of the conditions set forth in <u>Sections 5.11(b)(i)</u> and <u>5.11(b)(ii)</u>.

(iv) *Debt Financing*. Purchaser shall have available to it the debt financing required to consummate the transactions contemplated by this Agreement.

Section 5.12    <u>No Dividends; Distributions of Cash</u>.    Prior to the Closing, Seller shall not (and Seller shall not permit the Company to) (i) declare or pay any dividend on the capital stock of the Company or make, or agree to make, any other payment or distribution from the Company to Seller or any of its Affiliates, or (ii) except for payments in the ordinary course of business, otherwise distribute any cash of the Company to any Person.    Owner acknowledges and agrees that neither he nor any of his Affiliates shall take any action that would cause Seller to not be in compliance with this <u>Section 5.12</u>.

Section 5.13    <u>Termination</u>.

(a)    <u>Circumstances for Termination</u>.    Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(i)    by the mutual written consent of Purchaser and Seller;

(ii)    by either Purchaser or Seller if the Bankruptcy Court does not approve the transactions contemplated hereby (or if the Bankruptcy Court approves a transaction with another buyer relating to the sale of the Company); or

(iii)    by either Purchaser or Seller if the Closing has not occurred by September 30, 2009.

(b)    <u>Notice of Termination</u>.    Any party desiring to terminate this Agreement pursuant to <u>Section 5.13</u> shall give written notice of such termination to the other parties to this Agreement in accordance with <u>Section 7.1</u>, specifying the provision(s) pursuant to which such termination is effective.

(c)    <u>Effect of Termination</u>.    If this Agreement is terminated pursuant to this <u>Section 5.13</u>, this Agreement shall forthwith become wholly void and of no further force and effect and all rights and obligations of the parties hereunder shall be terminated without further liability of any party to any other party; <u>provided</u>, <u>however</u>, that (a) <u>Sections 5.1</u>, and <u>5.13(c)</u>, and <u>Article 7</u>, and the rights and obligations of the parties thereunder, shall survive any such termination; and (b) nothing herein shall relieve any party from liability for any intentional misrepresentation under, or any breach of, this Agreement prior to the date of termination.

ARTICLE 6
SURVIVAL

Section 6.1    <u>Survival</u>.    Each of the representations and warranties, covenants and agreements of Seller and Purchaser made in this Agreement shall not survive the Closing Date; <u>provided</u>, <u>however</u>, that any covenant or agreement in this Agreement which, by its terms, is to survive the Closing Date, shall survive the Closing Date for the duration of such covenant or agreement.

Section 6.2    <u>Specific Performance</u>.    Seller, on the one hand, and Purchaser and Owner, on the other hand, each acknowledges that in the case of any breach of their covenants or obligations, the other would suffer immediate and irreparable harm, which money damages

Doc# 3034735\9

would be inadequate to remedy, and accordingly, in case of any such breach, each non-breaching party shall be entitled to obtain specific performance and other equitable remedies in addition to other remedies provided in this <u>Article 6</u>.

ARTICLE 7
<u>GENERAL PROVISIONS</u>

Section 7.1 <u>Notices</u>.   All notices or other communications required or permitted hereunder (a) shall be in writing signed by or on behalf of the party making the same; (b) shall be deemed given or delivered (i) if delivered personally, when received, (ii) if transmitted by facsimile, when sent (subject to receipt of written confirmation of transmission), (iii) if sent from within the United States by registered or certified mail, postage prepaid, return receipt requested, on the third business day after mailing, or (iv) if sent by messenger or reputable overnight courier service, when received; and (c) shall be addressed to each party at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this <u>Section 7.1</u>):

     (i)    If to Seller, to:

> PBE Corporation
> c/o Lindquist & Vennum PLLP
> 4200 IDS Center
> 80 South Eighth Street
> Minneapolis, MN   55402
> Attn:   George H. Singer, Esq.
> Facsimile:   (612) 371-3207

     (ii)    If to Purchaser or Owner, to:

> Frontiers Corporation
> 5-53-13 Shimonagaya, Konan-ku
> Yokohama-shi
> Kanagawa, 233-0016
> Japan
> Attn:   Yuta Ito
> Facsimile:   81-3-3433-1097

Section 7.2 <u>Counterparts</u>.   This Agreement and the ancillary agreements relating hereto may be executed and delivered (including by facsimile or other electronic transmission) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 7.3 <u>Amendments and Waivers</u>.   Any provision of this Agreement may be amended or waived if such amendment or waiver is in writing and signed, in the case of an amendment, by an authorized representative of each party, or in the case of a waiver, by the party against whom the waiver is to be effective.   No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or

partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 7.4    Severability.    Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but if any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

Section 7.5    Assignment; Successors and Assigns.    Neither this Agreement nor any of the rights, interests or obligations of any party hereunder may be assigned, delegated or otherwise transferred by such party, in whole or in part (whether by operation of law or otherwise), without the prior written consent of each other party, and any attempt to make any such assignment, delegation or other transfer without such consent shall be null and void. Subject to the preceding sentences, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns, including any trustee appointed in the Bankruptcy Case or subsequent Chapter 7 case.

Section 7.6    No Third Party Beneficiaries.    Except for Section 5.9, nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Purchaser and their respective successors and permitted assigns (including any trustee appointed in the Bankruptcy Case or subsequent Chapter 7 case).    Nothing in this Agreement is intended to or shall relieve or discharge the obligation or liability of any third Persons to Seller, Purchaser, or the Company.    Except as set forth in Section 5.9, this Agreement is not intended and shall not give any third Persons and right of subrogation or action over or against Seller or against Purchaser.

Section 7.7    Governing Law; Venue; Waiver of Jury Trial.    This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable United States federal law.    For so long as Seller, or its estate, successors and/or assigns is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.    After Seller, or its estate, successors and/or assigns is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having jurisdiction over Hennepin County, Minnesota.    To the fullest extent permitted by applicable law, the parties hereby irrevocably and expressly waive all right to trial by jury in any action, proceeding or counterclaim (whether based in contract, tort or otherwise) arising out of or relating to this Agreement, the ancillary agreements relating hereto, or the actions of Seller, Purchaser or their respective representatives in the negotiation, preparation, performance or enforcement of this Agreement.

Section 7.8    Joint Drafting; Interpretation.    The parties have participated in the negotiating and drafting of this Agreement.    If an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.    In this Agreement, except to the extent otherwise provided herein or the context otherwise requires, (i) words used in the singular include the plural and vice versa; (ii) any pronouns used in this Agreement shall include the corresponding masculine, feminine or neuter forms; (iii) the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation"; (iv) the words "herein," "hereunder," "hereof," "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Section or other provision hereof; (v) reference to any Article, Section, or Exhibit or Schedule shall mean such Article or Section of, or such Exhibit or Schedule to, this Agreement, as the case may be, and references in any Section or definition to any clause means such clause of such Section or definition; and (vi) reference to any applicable law shall mean such applicable law (including all rules and regulations promulgated thereunder) as amended, modified, codified or reenacted, in whole or in part, and in effect at the time of determining compliance or applicability.

Section 7.9    Entire Agreement.    This Agreement and the ancillary agreements related hereto constitute the entire agreement and understanding, and supersede any and all prior and/or contemporaneous agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

Section 7.10    Public Announcements.    Seller, on the one hand, and Purchaser and Owner, on the other hand, shall not make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written agreement from Seller or Purchaser, as applicable, unless a press release or public announcement is required by law, the rules of any stock exchange or order of the Bankruptcy Court.    If any such announcement or other disclosure is required by law, the rules of any stock exchange or order of the Bankruptcy Court, the form and content of any such announcement or other disclosure shall be subject to the prior written consent of Seller or Purchaser, as applicable, which consent shall not be unreasonably withheld.

[Signature Page Follows]

Doc# 3034735\9

IN WITNESS WHEREOF, each party has caused this Stock Purchase Agreement to be duly executed and delivered as of the date first written above.

SELLER:                          PBE CORPORATION

                                 By: _____
                                     Name:   Mary L. Jeffries
                                     Title:   President and Chief Executive Officer

PURCHASER:                       FRONTIERS CORPORATION

                                 By: _____
                                     Name:   Yuta Ito
                                     Title:   Representative Director

OWNER:                           _____
                                 Yuta Ito

Acknowledged and agreed for purposes
of Section 5.9:

NIPPON POLAROID KABUSHIKI
KAISHA

By: _____
    Name:   Yuta Ito
    Title:   President & Representative Director

Doc # 20247351 9

# Exhibit B

**Assets**

| | | |
|---|---|---:|
| 11100000 | Cash | 3,625,449 |
| **CashEquiv** | **Cash and Cash Equivalents** | **3,625,449** |
| | | |
| 11311000 | Receivables Trade | 941,098 |
| 11313000 | Receivables Third Party Other | 113,886 |
| 11314000 | Receivables Reval | (6,739) |
| 11320000 | Receivables Reserve For Doubtful Account | (113,886) |
| 11360500 | Interest Rcv | 606 |
| **NetRec3rdPrty** | **Net Third Party Receivables** | **934,965** |
| 11351055 | I/C Rec from JAPAN | 0 |
| 11351415 | I/C Rec from PCEE NPKK | 337,866 |
| 11351422 | I/C Rec From Pol Trad BV CE Asia | (21,589) |
| 11351475 | I/C REC FROM PDP ASIA | 0 |
| 11351455 | I/C Rec From NPKK Pol PCB | 0 |
| 11353000 | I/C Loan Rec from Affiliates | 2,546,078 |
| 11354055 | I/C AR Reval & Misc Jnl JAPAN | 0 |
| 11354415 | I/C AR Reval & Misc Jnl NPK PDP Princ | (6,814) |
| 11354422 | I/C AR Reval & Misc Jnl Pol Trad CV Asia | (51) |
| 11371022 | I/C Rec from Polaroid Japan | (794,239) |
| 11371430 | I/C Rec from PCB, LLC | 493 |
| 11374020 | I/C AR Reval and Misc Journal Pol USA CV | (37,600) |
| 11374430 | I/C A/R Reval and Misc JE PCB | 31 |
| **RecIC** | **InterCompany Recievables** | **(280,939)** |
| **TtlAR** | **Total Accounts Recievable** | |
| | | |
| 11510101 | PREPAID RENT | 21,796 |
| 11510202 | PREPAID INSURANCE | 43,744 |
| 11510810 | PREPAID EXPENSE | 551,492 |
| 11510905 | PREPAID TAXS VAT/TVA REC-INPUT | 159,597 |
| **PrepdExp** | **Prepaid Expense and Other Current Assets** | |
| | | 776,628 |
| **TtlPrepds** | **Total Prepaid and Other Current Assets** | **776,628** |
| **CurAssets** | **Total Current Assets** | **5,056,103** |
| | | |
| 12110301 | FIXED ASSETS MACH&EQUIP IN HND | 309,080 |
| **GrossFXA** | **Gross Fixed Assets** | **309,080** |
| 12120300 | Depreciation Mach & Equipment | (289,860) |
| **AccumDepr** | **Accumulate Depreciation** | **(289,860)** |
| **TtlFXA** | **Total Fixed Assets** | **19,220** |
| 12390000 | Longterm Invest Other | 523,253 |
| 12600000 | Other Deferred Charges | 272,530 |
| **NonCurAssets** | **Non Current Assets** | **815,002** |
| | | |
| **Total Assets** | | **8,176,220** |

**Liabilities & Equity**

| | | |
|---|---|---:|
| | | 0 |
| 21310000 | Payables Trade Accounts | 47,307 |
| 21340000 | Payables Reserve for Marketing Programs | 5,538 |
| | | |
| 21351055 | PAYABLE TO JAPAN | 0 |
| 21351415 | Pay I/C PCEE NPK | (55,010) |
| 21351422 | Pay I/C to Pol Trad BV CE Asia | 567,748 |
| 21351475 | Pay I/C to Pol NPKK PDP | 0 |
| 21351455 | Pay I/C to NPKK Pol PCB | 0 |
| **PayIC** | **Pay I/C Affiliates** | **(1,792,377)** |
| 21352000 | Pay I/C Affiliates Accrued Interest | 33,440 |
| 21353000 | Pay I/C Loans to Affiliates | 676,546 |
| | | 0 |
| 21354415 | I/C AP Reval and Misc Journal PCEE NPK | (5,703) |
| **PayICReval** | **I/C AP Reval Adj. Affiliates** | **(5,703)** |
| 21360000 | Accrued Expenses and Other Current Liabi | 567,930 |
| **AccrPay** | **Payables and Accrual** | **567,930** |
| 21371022 | Payables to Polaroid Japan | (1,373,793) |
| 21371430 | Payable to PCB, LLC | (314,855) |
| 21374000 | Payables Loans Reval to Polcorp | 8,029 |
| 21374430 | Pay Reval to PCB, LLC | 763 |
| **ICPay** | **Intercompany Payables** | **(1,679,855)** |
| 21380000 | Accrued Taxes and Oth Govt Accts | 11,602 |
| 21410000 | Compensation Payroll and Related Expense | 133,537 |
| **AccrComp** | **Accrued Compensation and Benefits** | **133,537** |
| 21610000 | Income Taxes Accrued | 21,655 |
| **AccrTax** | **Accrued Income Taxes** | **21,655** |
| **CurLiab** | **Current Liabilities** | **(1,980,380)** |
| | | |
| 22600001 | LONG TERM PENSION LIABILITY | 820,076 |
| **NonCurLiab** | **Non Current Liabilities** | **820,076** |
| **Total Liabilities** | | **(1,160,304)** |
| | | |
| 23110000 | Capital Stock | 640,000 |
| 23140000 | Cumulative Translation Adjustment | (586,611) |
| 23140006 | Defined Pension Plan Adj | 197,864 |
| 23150200 | Retained Earnings Begin of Year | 6,704,522 |
| **CurYrEarn** | **Current Year Earnings** | 75,632 |
| **Net Equity** | | |
| | | 7,031,407 |
| | | |
| **Total Liabilities and Equity** | | |
| | | **8,176,218** |

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| In re: | **Jointly Administered under Case No. 08-46617** |
| Polaroid Corporation, et al., | Court Files No.'s: |
| Debtors. | 08-46617 (GFK) |
| (includes: | |
| Polaroid Holding Company; | 08-46621 (GFK) |
| Polaroid Consumer Electronics, LLC; | 08-46620 (GFK) |
| Polaroid Capital, LLC; | 08-46623 (GFK) |
| Polaroid Latin America I Corporation; | 08-46624 (GFK) |
| Polaroid Asia Pacific LLC; | 08-46625 (GFK) |
| Polaroid International Holding LLC; | 08-46626 (GFK) |
| Polaroid New Bedford Real Estate, LLC; | 08-46627 (GFK) |
| Polaroid Norwood Real Estate, LLC; | 08-46628 (GFK) |
| Polaroid Waltham Real Estate, LLC) | 08-46629 (GFK) |
|  | Chapter 11 Cases Judge Gregory F. Kishel |

---

## MEMORANDUM IN SUPPORT OF MOTION FOR EXPEDITED HEARING AND MOTION FOR AUTHORIZATION TO SELL DEBTOR'S SHARES OF STOCK IN NIPPON POLAROID KABUSHIKI KAISHA (NPKK) FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND OUTSIDE THE ORDINARY COURSE OF BUSINESS PURSUANT TO 11 U.S.C. § 363

---

PBE Corporation (the "**Debtor**"), respectfully submits this Memorandum in support of its Motion for Authorization to Sell Debtor's Shares of Stock in Nippon Polaroid Kabushiki Kaisha (NPKK) Free and Clear of Liens, Claims, Interests and Encumbrances and Outside the Ordinary Course of Business Under 11 U.S.C. § 363.  Capitalized terms not otherwise defined herein shall have the meanings given to such terms in the motion filed in connection herewith (the "**Motion**") or in the Bankruptcy Code unless the context requires otherwise.

# FACTS

The factual basis for this Memorandum is set forth in the verified Motion and is incorporated as though fully set forth herein.

# DISCUSSION

## Use or Sale of Property Outside the Ordinary Course

In pertinent part, § 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions. *See, e.g., In re Schipper,* 933 F.2d 513, 515 (7th Cir. 1991); *In re Channel One Communications*, 117 B.R. 493 (Bankr. E.D. Mo. 1990) (applying the sound business purpose test of *In re Lionel Corp*., 722 F.2d 1063 (2d Cir. 1983).

In evaluating whether a sound business purpose justifies the use, sale or lease of property under § 363(b), courts consider a variety of factors, which essentially represent a "business judgment test." *See* Collier on Bankruptcy § 363.02 (15th rev. ed. 2008). In *In re Lionel Corp.,* the Court of Appeals for the Second Circuit listed several factors which a bankruptcy court may consider in its § 363(b) analysis. Specifically confronted with the sale of assets under § 363(b), the Second Circuit stated:

> In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions, and most importantly perhaps, whether the asset is increasing or decreasing in value.

722 F.2d at 1071. In delineating these factors, the Second Circuit cautioned that "this list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge." *Id.*

Here, the Debtor believes a sound business justification exists to sell the NPKK Stock to Frontiers, subject to higher and otherwise better offers. The Debtor has received no other offers for the NPKK business, and based on consultation with its financial advisors and a review of NPKK's financials, the Debtor has determined that the $1 million offered by Frontiers will maximize value to the estate for the NPKK Stock. If NPKK is liquidated under Japanese law, instead of sold as a going concern to Frontiers, then NPKK would be required to be placed under the supervision of a Japanese court-appointed trustee and recovery of funds, if any, to the estate likely would be delayed for several years. Therefore, in the exercise of its sound business judgment, the Debtor has determined that the sale of NPKK to Frontiers for $1 million is in the best interest of the bankruptcy estate and its creditors.

## Sale of Property Free and Clear of Liens

The Debtor also seeks authority to sell the NPKK Stock free and clear of all liens and encumbrances under 11 U.S.C. § 363(f). Section 363 of the Bankruptcy Code provides that:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--
>
> > **(1)** applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> > **(2)** such entity consents;
> > **(3)** such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> > **(4)** such interest is in bona fide dispute; or
> > **(5)** such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Any one of the five conditions provides authority to sell free and clear of liens. *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). To the extent a secured creditor or

lienholder that receives notice of the sale and does not file an objection to the motion, that creditor should be deemed to have consented to the sale. *See, e.g., Veltman v. Whetzal*, 93 F.3d 517, 521 n.5 (8th Cir. 1996) (in a Chapter 7 case, stating that "some courts have found implied consent, however, when a party with an interest in the bankruptcy estate fails to object after receiving notice of the sale under subsection 363(f)(2)") (citing *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988); *In re Shary*, 152 B.R. 724, 725-26 (Bankr. N.D. Ohio 1993).

Here, the parties with potential secured interests in the NPKK Stock are the Asserted Secured Creditors. The Debtor is providing proper notice of this Motion to these creditors, thereby giving them the opportunity to object to this transaction. Provided that no such creditors claiming an interest in the NPKK Stock object to this transaction, 11 U.S.C. § 363(f)(2) will be satisfied.

Under 11 U.S.C. § 363(f)(4), a sale free and clear of all interests, liens, claims and encumbrances is permissible if the interest of any entity is in bona fide dispute. The Bankruptcy Code does not define the phrase "bona fide dispute." The courts have, however, found that the inquiry for § 363(f)(4) is "whether there is an objective basis for either a factual or legal dispute as to the validity of debt" or the lien. *In re Gaylord Grain, L.L.C.*, 306 B.R. 624, 627 (8th Cir. B.A.P. 2004). "Clearly this standard does not require the court to resolve the underlying dispute, just to determine its existence." *Id.* at 627. Indeed, courts have dispensed with evidentiary hearings into such matters in § 363 sales, particularly in instances where such hearings would operate only to delay a sale of property and the price and process relative to the sale is designed to ensure that the value of the property is maximized. *See, e.g., In re Collins*, 180 B.R. 447, 452 n.7 (Bankr. E.D. Va. 1995). As such, the propriety of the lien does not need to be the subject of

an immediate or concurrent adversary proceeding in order to determine whether a bona fide dispute exists. *In re Gaylord Grain, L.L.C.*, 306 B.R. at 628; *In re Collins*, 180 B.R. at 452 n.8; *In re Oneida Lake Dev., Inc.*, 114 B.R. 352, 357-58 (Bankr. N.D.N.Y. 1990); *In re Bedford Square Assocs.*, L.P., 247 B.R. 140, 145 (Bankr. E.D. Pa. 2000). A court does not "need to determine the probable outcome of the dispute, but merely whether one exists." *In re Octagon Roofing, L.P.*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1995).

The purpose of § 363(f)(4) is to allow the sale of property of the estate free and a clear of disputed interests so the liquidation of the assets is not unnecessarily delayed while the disputes are being litigated. *Moldo v. Clark (In re Clark)*, 266 B.R. 163, 171 (9th Cir. B.A.P. 2001). In *In re Gaylord Grain*, for example, the secured creditor filed a UCC-1 financing statement covering a vehicle instead of following the procedures set forth in state law for perfecting a lien against motor vehicles. *In re Gaylord Grain, L.L.C.*, 306 B.R. at 628. The Eighth Circuit Bankruptcy Appellate Panel concluded that a bona fide dispute as to the avoidance and validity of the lien interest existed for purposes of § 363(f)(4) and, accordingly, approved the proposed sale in a transaction free and clear. *Id.* at 630.

Legitimate disputes exist with respect to the liens and claims potentially asserted by the Asserted Secured Creditors. The Debtor believes that there are legitimate grounds upon which to challenge the liens in question and have them voided, recharacterized and/or subordinated as inherent aspects of Mr. Petters' fraudulent Ponzi scheme activities. These disputes are bona fide and concern the validity, extent, priority and voidability of liens and the allowance of these related claims. The Debtor's schedules indicate that the liens of such entities are disputed. Pursuant to the foregoing, the NPKK Stock may be transferred as well pursuant to § 363(f)(4).

### Expedited Relief is Proper and Necessary

Fed. R. Bankr. P. 2002(a)(2) provides that written notice of a motion regarding the

"proposed use, sale, or lease of property of the estate other than in the ordinary course of business" is to be served not less than twenty days before the hearing on such motion, "unless the court for cause shown shortens the time . . . ." Fed. R. Bankr. P. 9006(c), however, provides that the Court, on request of a party and for cause shown, may order a notice period reduced. Local Rule 9006-1(d) provides that if expedited relief is necessary, the party seeking such relief must request an expedited hearing and take all reasonable steps to provide the most expeditious service and notice possible.

The Debtor believes that the notice previously provided to creditors through the Sale Motion, Bidding Procedures Motion and Auction process, as well as through service of this Motion, provides sufficient opportunity for creditors to file responses to this motion if any party so desires. The United States Trustee, as well as all parties who have requested electronic notice, will be served by the filing of this Motion via CM/ECF. All such other parties will be served via express mail or fax, which the Debtors believe will allow all parties sufficient opportunity to review and respond to this Motion. Based on the foregoing, the Debtor respectfully asserts cause exists to hear the Motion on an expedited basis.

## CONCLUSION

Debtor respectfully requests the court enter an order authorizing the sale of the NPKK Stock to Frontiers, or any other party providing a higher and otherwise better offer, and that such sale be free and clear of all liens, claims and encumbrances and granting such other relief as may be just and equitable.

DATED: August 12, 2009

**LINDQUIST & VENNUM P.L.L.P.**


By: _____/e/ George H. Singer_____
James A. Lodoen (#173605)
George H. Singer (#262043)

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)
www.lindquist.com

**ATTORNEYS FOR DEBTOR**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

|  | Jointly Administered under<br>Case No. 08-46617 |
|---|---|
| Polaroid Corporation, et al., | Court Files No.'s: |
| Debtors. | 08-46617 (GFK) |
| (includes: | |
| Polaroid Holding Company; | 08-46621 (GFK) |
| Polaroid Consumer Electronics, LLC; | 08-46620 (GFK) |
| Polaroid Capital, LLC; | 08-46623 (GFK) |
| Polaroid Latin America I Corporation; | 08-46624 (GFK) |
| Polaroid Asia Pacific LLC; | 08-46625 (GFK) |
| Polaroid International Holding LLC; | 08-46626 (GFK) |
| Polaroid New Bedford Real Estate, LLC; | 08-46627 (GFK) |
| Polaroid Norwood Real Estate, LLC; | 08-46628 (GFK) |
| Polaroid Waltham Real Estate, LLC) | 08-46629 (GFK) |
| | Chapter 11 Cases<br>Judge Gregory F. Kishel |

---

## ORDER AUTHORIZING SALE OF DEBTOR'S SHARES OF STOCK IN NIPPON POLAROID KABUSHIKI KAISHA (NPKK) FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND OUTSIDE THE ORDINARY COURSE OF BUSINESS PURSUANT TO 11 U.S.C. § 363

---

This matter came on before the Court on August 27, 2009 on the Motion of PBE Corporation (the "**Debtor**") for authorization to sell Debtor's shares of stock in Nippon Polaroid Kabushiki Kaisha (NPKK) free and clear of liens, claims, interests and encumbrances and outside the ordinary course of business pursuant to 11 U.S.C. § 363. Capitalized terms not otherwise defined herein shall have the meanings given to such terms in the motion filed in connection herewith (the "**Motion**") or in the Bankruptcy Code unless the context requires otherwise. Appearances were as noted on the record.

Based on the arguments of counsel, moving documents and the record made at the hearing, and the Court's findings of fact and conclusions of law, if any, having been recorded in open court following the close of evidence,

IT IS HEREBY ORDERED:

1.      The Motion for expedited relief is granted.

2.      The Motion to sell the NPKK Stock free and clear of liens, claims, interests and encumbrances and outside the ordinary course of business pursuant to 11 U.S.C.§ 363(b) is granted.

3.      The Debtor is authorized to sell the NPKK Stock it owns and controls as more fully described in the Motion.

4.      The Debtor (i) has full corporate or other power to execute, deliver and perform its obligations under the Purchase Agreement and all other documents and agreements contemplated thereby or entered into in connection therewith, and the sale of the NPKK Stock has, in each case, been duly and validly authorized by all necessary corporate or similar action; (ii) has all of the corporate or other power and authority necessary to consummate the transactions contemplated by the Purchase Agreement and such other documents and agreements contemplated thereby or entered into in connection therewith; (iii) has taken all action necessary to authorize and approve the Purchase Agreement and such other documents and agreements contemplated thereby or entered into in connection therewith; and (iv) is fully authorized and empowered to perform its obligations under the Purchase Agreement and such other documents and agreements contemplated thereby or entered in connection therewith.   No third-party consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtor to consummate such transactions.

5.     The Debtor and the Buyer are each authorized and empowered to transfer the NPKK Stock in accordance with the terms of the Purchase Agreement as more fully described in the Motion and, in connection therewith, are each entitled to rely upon the provisions of this Order in all respects and consummate the transactions and agreements set forth in, and contemplated by, the Motion, notwithstanding any conversion of these cases to cases under Chapter 7 of the Bankruptcy Code.

6.     The Purchase Agreement and the transactions set forth therein and contemplated thereby (i) are fair and reasonable, (ii) are the highest and best offer for the NPPK Stock being purchased, (iii) will provide a greater recovery to the Debtor's estate than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

7.     Pursuant to 11 U.S.C. § 363(f), the NPKK Stock described in the attached Motion shall be sold to the Buyer free and clear of any and all liens, claims, interests and encumbrances of any kind or nature and all such liens, claims, encumbrances and interests, if any, shall attach to the net proceeds of the transaction with the same validity, priority, dignity and effect and to the same extent that existed immediately prior to the consummation of the sale and in all cases subject to any and all rights, claims and defenses that the Debtors or their bankruptcy estates may have with respect thereto.

8.     The Debtor is authorized and empowered to execute and deliver any agreements or documents, and is authorized and empowered to perform under, consummate and implement the Purchase Agreement and all other documents and agreements contemplated thereby or entered in connection therewith, together with all additional instruments and documents that the

Debtor deems necessary or appropriate to implement the Purchase Agreement and to effectuate the sale of the NPKK Stock, and to take such other actions as may be reasonably necessary or desirable for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer the NPKK Stock, or as may be necessary or appropriate for the performance of the obligations and transactions contemplated by the Purchase Agreement.

9.      The sale and Purchase Agreement was negotiated, proposed and entered into by the Debtors and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtor nor the Buyer has engaged in any conduct that would cause or permit either the Purchase Agreement or any other related agreement to be avoided under Section 363(n) of the Bankruptcy Code.

10.     The sale of NPKK to the Buyer will be a legal, valid and effective transfer of all issued and outstanding shares of NPKK Stock pursuant to the Purchase Agreement and will vest the Buyer with all right, title and interest of the Debtor in the NPKK Stock free and clear of any and all liens, claims, interests and encumbrances against and in property of the Debtors of whatever kind or character.

11.     The Buyer is, and shall be, deemed to be a good faith purchaser under Section 363(m) of the Bankruptcy Code and, as such, is and shall be entitled to all of the protections afforded thereby.  In the absence of a stay pending appeal, the Buyer will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing on the sale at any time after entry of this Order, notwithstanding the provisions of Bankruptcy Rule 6004(h).

11.     This Order and the Purchase Agreement shall be binding in all respects upon all creditors of and holders of claims and equity interests in the Debtor (whether known or unknown) and shall inure to the benefit of the Debtor and all applicable successors and assigns of

the Buyer, the Debtor and any subsequent trustees appointed upon a conversion of the Cases to Chapter 7 of the Bankruptcy Code and shall not be subject to rejection.

12.     Notwithstanding Fed. R. Bankr. P. 6004(h), this Order shall take effect immediately upon entry.

Dated: _____


_____
The Honorable Gregory F. Kishel
United States Bankruptcy Judge