# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | **Jointly Administered under Case No. 08-46617** |
| Polaroid Corporation, et al., | Court File Nos.: |
| Debtors. | 08-46617 (GFK) |
| (includes: | |
| Polaroid Holding Company; | 08-46621 (GFK) |
| Polaroid Consumer Electronics, LLC; | 08-46620 (GFK) |
| Polaroid Capital, LLC; | 08-46623 (GFK) |
| Polaroid Latin America I Corporation; | 08-46624 (GFK) |
| Polaroid Asia Pacific LLC; | 08-46625 (GFK) |
| Polaroid International Holding LLC; | 08-46626 (GFK) |
| Polaroid New Bedford Real Estate, LLC; | 08-46627 (GFK) |
| Polaroid Norwood Real Estate, LLC; | 08-46628 (GFK) |
| Polaroid Waltham Real Estate, LLC) | 08-46629 (GFK) |
| | Chapter 7 Cases |
| | Judge Gregory F. Kishel |

## NOTICE OF HEARING AND MOTION TO SELL THE BANKRUPTCY ESTATE'S MEMBERSHIP UNITS IN PLR IP HOLDINGS, LLC FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS PURSUANT TO 11 U.S.C. §§ 105 AND 363

TO:     The entities specified in Local Rule 9013-3

1.     John R. Stoebner, as the Chapter 7 trustee ("Trustee") for the bankruptcy estates of the above-captioned debtors (collectively, the "Debtors"), including PBE Corporation, f/k/a Polaroid Corporation ("PBE"), through his legal counsel, Lindquist & Vennum LLP, respectfully moves the Court for the relief requested herein and gives notice of hearing.

2.      The Court will hold a hearing on this verified motion (the "<u>Motion</u>")
before the Honorable Gregory F. Kishel, Chief United States Bankruptcy Judge, at 2:00
p.m. on Wednesday, December 17, 2014, in Courtroom 2A, at the United States
Courthouse, 316 North Robert Street, St. Paul, Minnesota.

3.      Pursuant to Local Rule 9006-1(c), any response to the motion must be filed
with the Court and served by mail or delivery not later than Friday, December 12, 2014,
which is five (5) days before the time set for the hearing (including Saturdays, Sundays,
and holidays). **UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY
FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.**

4.      This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 157
and 1334, Rule 5005 of the Federal Rules of Bankruptcy Procedure (the "<u>Federal Rules</u>"),
and Local Rule 1070-1. This is a core proceeding pursuant to 11 U.S.C. §§ 157(b)(2)(A),
(N) and (O). The Debtors filed voluntary petitions commencing their Chapter 11 cases
(the "<u>Cases</u>") on December 18, 2008 (the "<u>Petition Date</u>"). The Debtors voluntarily
converted the Cases to cases under Chapter 7 of the Bankruptcy Code on August 31,
2009 (the "<u>Conversion Date</u>"). John R. Stoebner was subsequently appointed as the
Chapter 7 Trustee.

5.      This Motion arises under 11 U.S.C. §§ 105 and 363 and Federal Rule 6004.
This Motion is filed under Federal Rule 9014 and Local Rule 9013. The Trustee seeks an
order authorizing him to sell property of the PBE bankruptcy estate outside the
ordinary course of business which consists of the bankruptcy estate's membership units

2

(the "<u>PBE Units</u>") in PLR IP Holdings, LLC d/b/a Polaroid ("<u>PLR IP</u>" or the "<u>Company</u>"), and that such sale be free and clear of any and all liens, claims, encumbrances and interests.

## I.    BANKRUPTCY SALE OF DEBTORS' ASSETS

6.    Since commencement of the above-captioned Cases, the Debtors and the Trustee previously sought and obtained multiple authorizations from this Court to sell all or a portion of the Debtors' assets free and clear of all liens, claims and interests. *See, e.g.*, January 28, 2009 Motion ("<u>Sale Motion</u>") and February 18, 2009 Order ("<u>Bidding Procedures Order</u>") authorizing the auction of substantially all assets of the Debtors, Dkt. Nos. 71 & 118. Pursuant to the Bidding Procedures Order, the Debtors conducted an auction for the sale of their assets after which PLR Acquisition, LLC ("<u>PLR</u>"), a joint venture between Hilco Consumer Capital Corp. ("<u>Hilco</u>"), Gordon Brothers Brands, LLC ("<u>Gordon Brothers</u>") and certain other investors, was designated as the successful bidder. On April 17, 2009, the Court entered an order granting the Sale Motion and approved the sale of certain assets, including substantially all of the patents, trademarks and other intellectual property of Polaroid Corporation, to PLR and its affiliate, PLR IP, pursuant to the terms of an Asset Purchase Agreement. *See* Dkt. No. 332.    The bankruptcy sale transaction closed on May 7, 2009 (the "<u>2009 Sale</u>").

7.    As part of the 2009 Sale, PLR IP acquired substantially all of the intellectual property assets of the PBE bankruptcy estate for $49.5 million.    The bankruptcy estates received additional consideration for the value of other assets and

3

the estimated value of excluded assets.  Part of the consideration PLR provided for the

2009 Sale was that the PBE bankruptcy estate receive 25% of the membership units in

PLR IP, which were ascribed an aggregate indicated value of $16,250,000 for purposes

of the auction. This indication of value was the result of an assessment by the Debtors'

investment banker of information known at the time as well as certain assumptions

made based upon anticipated future events, which assigned a value of $650,000 to each

point of equity that was included in competing bids at the auction. Because both

bidders offered the same percentage of equity as a component of their bids, the

indicated value for their equity had no impact on the outcome of the auction as each

bidder offered the estate 25% interest in the acquiring entity.

8.      The PBE Units acquired as part of the 2009 Sale represent a minority

interest in PLR IP, a privately-held, limited liability company. The PBE Units are subject

in all respects to that certain Limited Liability Company Agreement dated May 7, 2009

(the "LLC Agreement"), which contains transfer restrictions and other limitations

impacting the marketability of the interests, including a right of first refusal and drag-

along rights. *See* Dkt. No. 272.  In addition, the LLC Agreement contains provisions that

address the distribution of net equity value in connection with a sale transaction or

other liquidation event that includes a waterfall under which capital members of the

Company are entitled to receive a return of their capital contributions before the bankruptcy estate receives any distribution other than tax distributions.[1]

9.      Since the 2009 Sale, PLR IP has been engaged in the business of exploiting and developing the Polaroid brand name and related intellectual property rights. Pursuant to the terms of the LLC Agreement, the business, property and affairs of PLR IP have been managed, and all powers of the Company, have been exercised by or under the direction of Hilco/Gordon Brothers PLR IP Holdings, LLC (the "Manager") (i.e. an affiliate of other owners of the Company).  Under the LLC Agreement, virtually "all decisions concerning the management, operation and policy" of the Company's business are vested in the Manager who has "full, complete and exclusive authority, power and discretion to manage and control the business, property and affairs" of the Company. As such, the Trustee has had no authority to participate in the management and governance of PLR IP.   The Trustee was, however, entitled under the LLC Agreement to appoint one member to a five-member advisory board which met on a quarterly basis to discuss the Company's strategic objectives and performance.

10.      Since the 2009 Sale, the Trustee and his advisors have monitored the operations, the performance and the established objectives of PLR IP by, among other things, regularly participating in meetings of the advisory board, obtaining and reviewing financial information, reviewing management presentations and business plan projections, and otherwise observing as a member of PLR IP.  The Trustee has

---

[1] Since 2009, the Trustee has received tax distributions on account of the PBE Units in an aggregate approximate amount of $595,568.

participated in discussions with management of the Company and the Manager since

the 2009 Sale regarding various strategic and operational matters, including matters

impacting the value of the PBE bankruptcy estate's equity interest.

## II.    NEGOTIATIONS WITH RESPECT TO SALE OF PLR IP HOLDINGS, LLC

11.    Negotiations between the Manager and representatives of the Marquette

Companies, LLC that transpired over the course of a number of months ultimately

culminated in the receipt of an offer made on behalf of PFCF, LLC, Picture Eagle, LLC

and a to-be-formed Delaware limited liability company (the "Principal Buyer") that will

initially be majority-owned by PFCF, LLC and Picture Eagle, LLC (each a "Buyer," and

collectively, the "Buyers") to acquire all of the outstanding membership units of PLR IP

(the "Proposed Transaction").

12.    The Proposed Transaction contemplates not only an acquisition of the PBE

Units and membership units held by other owners of the Company, but also the

contribution of interests (or the value of such interests) held by Gordon Brothers and

Hilco affiliates and certain of their employees to the Principal Buyer. The Proposed

Transaction currently contemplates the continued participation of certain current

members in the new enterprise through the contribution or rollover of their

membership interests or the value thereof; however, approximately 64% of the

members (by interest) excluding the Trustee, and approximately 69% of the members

(by interest) including the Trustee, will sell their membership units to the Buyers in

connection with the Proposed Transaction.  The limited liability company agreement for

DOCS-#4406469-V7

the Principal Buyer, which has been the subject of intensive negotiations dating back to April, 2014, spells out the governance terms, permissible activities, capital accounts and obligations to invest new capital on the new equity owners of the Buyer. These terms are all based on a heavily negotiated purchase price of $70 million ($18 million of which will be based on the assumption of liabilities, including secured debt). After there was an agreement of the terms of the limited liability agreement, the parties turned their attention to the negotiation of a Member Unit Purchase Agreement. That agreement sets forth the other key economic terms, including the payment obligations to the Trustee, indemnification and holdback provisions applicable to certain of the parties selling their interests. The negotiations relating to the transaction agreements have intensified over the last six weeks, culminating in the agreements filed with this Motion.

13.    The aggregate purchase price, which was heavily negotiated and increased as a result of negotiations between the Manager and the Buyers, is based on an enterprise value for PLR IP of $70 million. The Proposed Transaction, including the enterprise value and contemplated economics, is supported by the Manager and all of the members of PLR IP (i.e. the economic stakeholders of PLR IP).

14.    The Trustee and his professionals engaged in a process to evaluate the Proposed Transaction that included conducting due diligence and a review of documents and information that was provided to representatives of the Buyers as part of their due diligence process. The Trustee met with members of the Company's management team and evaluated the Proposed Transaction in light of projected

7

assessments of value and assumptions made in 2009 as part of the auction process.  The Trustee also engaged PricewaterhouseCoopers LLP ("PwC") to perform various financial valuation services in order to assist the Trustee in evaluating the proposals that were made by the Buyers.  The Trustee considered the economics of the Proposed Transaction and the ultimate benefit of the transaction to the PBE bankruptcy estate. The Trustee also reviewed the transaction in light of the information, prospects, and other business factors relating to PLR IP that he obtained as part of his role on the advisory board that impact the Company's value. The Trustee also considered the transaction and the proposed consideration in light of the nature of the asset and available alternatives for maximizing value.

15.    Over the course of several months, the Trustee and his professionals independently negotiated with representatives of the Buyers regarding the Proposed Transaction and achieved, as result of that negotiation process, additional consideration and transaction terms that contemplate the prospect of an increased return (as discussed below).

**III.    THE PURCHASE AGREEMENT**

16.    The negotiations among PLR IP, the Manager, the Trustee and the Buyers culminated in the negotiation and preparation of a Membership Unit Purchase Agreement and related transaction documents. The current draft or form of the Membership Unit Purchase Agreement, without schedules and disclosure statements, which is expected to be finalized before the hearing on this Motion is attached hereto as

Exhibit 1 (the "Purchase Agreement").[2]  The Purchase Agreement and related transaction documents are the result of extensive, arm's-length negotiations and are summarized below (with all capitalized terms not defined herein having those meanings set forth in the Purchase Agreement unless the context requires otherwise):[3]

| | |
|---|---|
| **Purchase Price:** | The aggregate Purchase Price for the sale, assignment, transfer, assignment and conveyance of the Sale Units shall be $70,000,000 (i) minus $18,000,000, which is the indebtedness deduction agreed to by the parties; and (ii) minus the Rollover Amount. |
| **Acquired Assets:** | All of members' right, title and interest in the Membership Units of PLR IP free and clear of all Encumbrances. |
| **Representations:** | The parties have each made representations and warranties that are customary in connection with transactions of this size and nature.  The representations and warranties of the Trustee are limited. |
| **Indemnification:** | Each member is indemnifying the Buyer Indemnified Parties against losses incurred arising out of or by reason of any inaccuracy in or breach of representations or warranties. However, the indemnity obligations of the bankruptcy estate are limited. |

---

[2] The specific schedules and disclosure statements to the Purchase Agreement contain information with respect to license agreements, trademarks and intellectual property, material contracts and other confidential and proprietary information of the Company and, as such, are not attached to the Motion. The information contained in the schedules and disclosure statements was not material to the Trustee's determinations concerning the sale of the PBE Units and does not implicate any interest of the Debtors' bankruptcy estates and the relief requested in this Motion.

[3] This summary is necessarily abbreviated and qualified in its entirety by reference to the provisions of the Purchase Agreement.  Parties should refer directly to the Purchase Agreement and related transaction documents for complete details with respect to the Proposed Transaction.  To the extent that there are any inconsistencies between the summary contained herein and the Purchase Agreement, the final form of Purchase Agreement and related transaction documents shall control.

9

| | |
|---|---|
| **Covenants:** | Sellers have made certain agreements and covenants with Buyer relating to the operation of the Business. The covenants of the Trustee are limited. |
| **Releases:** | The Trustee, on behalf of the Debtors' bankruptcy estates, PLR, PLR IP and their respective affiliates, are expected to execute mutual releases relating to events, circumstances and other matters arising prior to the Closing. |
| **Closing Conditions:** | Closing is subject to certain conditions, including (i) the continued accuracy of representations and warranties, (ii) the performance by Sellers in all material respects of their obligations under the Purchase Agreement, and (iii) the entry of an Order by the Bankruptcy Court authorizing the sale the PBE Units free and clear of all Encumbrances. |
| **Termination:** | The Purchase Agreement lists customary termination provisions, including the right of parties to terminate in the event that the Closing shall not have occurred by December 31, 2014. |

17.    The $70 million Purchase Price includes the assumption of existing PLR IP debt in the approximate amount of $18 million, resulting in approximately $52 million of distributable net equity value to its members. After satisfaction of certain distribution obligations to capital members of PLR IP in accordance with the terms of the LLC Agreement and the payment of certain other obligations, the sale proceeds to the PBE bankruptcy estate are expected to be approximately $7,049,073 estate.   *See* **Exhibit 2** (describing waterfall under the LLC Agreement). Some of the members of PLR IP will contribute all or a portion of their units of the Company ("Rollover Units") for an investment in the Principal Buyer.

18.    As part of the Trustee's negotiations, the Trustee and the Buyers have agreed, however, that in lieu of receiving a cash payment at Closing, the PBE bankruptcy estate will receive its share of closing cash proceeds in the form of a secured promissory note (the "Note") from the Principal Buyer who will acquire ninety-nine percent (99%) of the PLR IP units that will bear interest at a fixed rate of ten percent (10%) per annum and mature on May __, 2017 (i.e. approximately 30 months from the Closing). *See* Purchase Agreement, at Exhibit B (form of Note).  The Note provides that the Trustee may put the Note to the Principal Buyer by providing notice and setting a date between 60 and 75 days after the effective date of the notice by which date the Principal Buyer is required to pay the PBE bankruptcy estate the entire unpaid principal amount plus accrued but unpaid interest without premium or penalty.  The Note also provides that the Principal Buyer may redeem the Note, upon which notice it will be obligated to pay the Trustee the sum of (i) the unpaid Principal Amount and accrued but unpaid interest, (ii) an additional amount equal to the aggregate amount of all interest payments that would have become due at the non-default interest rate from the Redemption Date to the Maturity Date had the notice not been given, and (iii) all amounts due and payable under a certain LMF Agreement (as defined below).

19.    The Trustee and the Principal Buyer will also enter into a Loan Management Fee Agreement ("LMF Agreement"), which has a term equal to that of the Note.  *See* Purchase Agreement, at Exhibit D.  Under the LMF Agreement, the Principal Buyer will pay an origination fee in the amount of $400,000 to the PBE bankruptcy

11

DOCS-#4406469-V7

estate upon execution of the Note and the LMF Agreement, as well as monthly loan

management fees of $25,000 earned on the last day of each calendar month for each

calendar month during the loan term, payable at the end of each calendar quarter

during the Loan Term.   If the Note is redeemed by the Principal Buyer, the loan

management fees payable under the LMF Agreement through the stated loan term of

the Note become due and payable to the PBE bankruptcy estate.

20.     All of the payment and performance obligations to the PBE bankruptcy

estate under the Note and the Loan Management Fee Agreement, will be secured by a

pledge of all membership interests acquired by the Buyers in connection with the

Proposed Transaction pursuant to a Membership Interests Pledge Agreement (the

"Pledge Agreement").   *See* Purchase Agreement, at Exhibit C.  Upon the occurrence of

an Event of Default, the Trustee will be able to exercise certain rights and remedies as

set forth in the Pledge Agreement.

## IV.   LIENS AND AVOIDANCE ACTIONS

21.     All of the PBE bankruptcy estate's right, title and interest in and to the

PBE Units are proposed to be sold in a sale free and clear of any and all liens, claims,

encumbrances and interests to the full extent permissible under 11 U.S.C. § 363(f).  The

following entities assert or may claim a lien or interest in assets of the Debtors, either on

their own account or as collateral agent for the account of certain investors:  (i) Asset

Based Resource Group, LLC as successor servicer to Acorn Capital Group, LLC, (ii)

Ritchie Capital Management, LLC (collectively with its affiliates "Ritchie"), and (iii)

PAC Funding, LLC, (iv) Petters Company, Inc., (v) Petters Company, LLC, (vi) Petters

Capital, LLC, and (vii) TLP Services LLC (an affiliate of Ritchie).  Ronald R. Peterson,

the Chapter 7 Trustee for RWB Services, LLC, also asserts an interest in certain assets of

the bankruptcy estates as a purported successor to the claims of Petters Capital, LLC.

Collectively, these are the "Asserted Secured Parties" and the "Asserted Secured

Claims."

22.     With the exception of the secured claims of PAC Funding, LLC and Acorn

Capital Group, LLC which have been avoided by settlement agreement and preserved

for the benefit of the bankruptcy estates of PBE and Polaroid Consumer Electronics,

LLC, the Trustee disputes the validity, extent, nature and propriety of the liens and

obligations imposed on the Debtors and their assets under the agreements with each of

the Asserted Secured Parties. The Trustee has commenced adversary proceedings

contesting each of the Asserted Secured Claims as follows:

(a)     Adv. Proceeding No. 10-04577 against Petters Capital, LLC;

(b)     Adv. Proceeding No. 10-04576 against Petters Company, Inc.;

(c)     Adv. Proceeding No. 10-04565 against RWB Services, LLC, et al.; and

(d)     Adv. Proceeding No. 09-4032 against Ritchie.[4]

---

[4] Any asserted lien by or on behalf of Ritchie has been avoided pursuant to this Court's
order entered on April 30, 2012 and the subsequent entry of judgment in Adversary
Proceeding No. 09-4032. This Court's order and judgment was affirmed by the United
States District Court and is currently on appeal to the United States Court of Appeals
for the Eighth Circuit.

DOCS-#4406469-V7

The Complaints in these adversary proceedings set forth in detail the facts forming the basis for the bona fide disputes with respect to the Asserted Secured Claims.

23.     The Trustee has clearly and consistently reserved all rights regarding the fact that all of the security interests or liens of Asserted Secured Parties are subject to bona fide dispute, including avoidance and/or subordination. In other words, the Trustee has never conceded that any party actually has an interest in the assets of the Debtors' bankruptcy estates, including the PBE Units.

V.     THE SALE IS IN THE BEST INTERESTS OF THE BANKRUPTCY ESTATE

24.     As part of the liquidation of assets of the bankruptcy estates, and in an effort to maximize the value of such assets, the Trustee believes the sale of the PBE Units on the terms set forth and contemplated in the Purchase Agreement and described herein is in the best interests of the PBE bankruptcy estate and thus brings this Motion.

25.     The Trustee has evaluated the Proposed Transaction in light of projected assessments of value. As a brand management company, PLR IP's value is primarily based upon an income streams from royalties from licenses net of expenses. The Trustee has engaged PwC to review and analyze PLR IP's business plan, financial projections and perform cash flow analyses to provide an opinion as to the enterprise value of the Company.  *See* Declaration of Allen Arnett attached as **Exhibit 3** hereto. Based on that analysis and the Trustee's independent evaluation, the Trustee believes the Purchase Price offered by the Buyers is reasonable for a fair market sale for the Company.  The

14

Trustee is aware that at the time of the auction for most, but not all, of the assets of the debtor in 2009, the bankruptcy court was presented with an indicated value of the estate's 25% membership units in PLR IP of approximately $16.25 million. Notwithstanding this indicated value, the current value of the estate's 25% membership units PLR IP, nearly six years later, is based on the Company's current financial condition, current business plan, and current estimates of future cash flows and other factors, all of which are different from that which existed in 2009.

26.     As a result of the sale of the PBE Units, and through negotiation of the Note, the Membership Pledge Agreement and the LMF Agreement with the Buyers, the Trustee anticipates the total value (not reduced to present value) to the bankruptcy estates, which includes 30 months of interest on the Note, the Loan Origination Fee and Loan Management Fees, will be approximately $9,961,341, an enhancement of approximately $2,912,268 from its share of closing cash proceeds. In addition, the Trustee has previously received tax distributions on account of the PBE Units in an aggregate approximate amount of $595,568.

## VI.    NOTICE OF SALE AND SALE HEARING

27.     Rule 2002(a) and (c), Rule 6004 and Rule 6006, of the Federal Rules require the notification of creditors and other parties in interest of the Proposed Transaction and the deadline for filing objections.  On November 25, 2014, the Trustee filed a Notice of Sale which has been, or will be, served by the Bankruptcy Noticing Center upon all creditors of record in the case providing notice of the sale described in this Motion, the

hearing date and response deadline. *See* Dkt. No. 2250. The Trustee will also serve this Motion upon Parties in the Service List as provided in Local Rule 9013.  The Trustee believes service and notice are proper under the circumstances.

28.     Bankruptcy Rules 6004(g) and 6006(g) provide that orders authorizing the sale of property or the assignment of executory contracts are stayed until the expiration of 14 days after the entry of an order approving the sale.  Time is of the essence in approving the sale and subsequent closing of the transactions.  A waiver is necessary to accommodate a prompt closing schedule.  Accordingly, this Court should waive the 14-day period staying any order to sell property of the estate imposed by Bankruptcy Rules 6004(g) and 6006(d).

29.     Pursuant to Local Rule 9013-2(c), the counsel for the Trustee hereby gives notice that it may, if necessary, call one or more of the following individuals to testify about the factual matters raised in and relevant to this Motion:   John R. Stoebner, Chapter 7 Trustee, Lapp, Libra, Thomson, Stoebner & Pusch, 120 South 6th Street, Suite 2500, Minneapolis, MN 55402; Allen Arnett, Principal, PricewaterhouseCoopers LLP, 1 North Wacker Drive, Chicago, IL 60606; Rafael Klotz, Senior Managing Director, Gordon Brothers Group, Prudential Tower, 800 Boylston Street, 27th Floor, Boston, MA 02199; Scott Hardy, President & Chief Executive Officer, PLR IP Holdings, LLC, 4350 Baker Road, Minnetonka, MN 55343; Jann Ozello Wilcox, representative of PFCF, LLC, c/o Marquette Companies, LLC 60 South Sixth Street, Suite 3900, Minneapolis, MN 55402.  Other representatives of PLR IP and the Buyers may also be called.

WHEREFORE, the Trustee respectfully requests that the Court grant the Motion and enter an Order (i) authorizing the Trustee to sell the PBE Units to the Buyers, free and clear of all liens, claims, encumbrances and interests with such liens, claims, encumbrances and interests attaching to the proceeds of the sale ultimately attributable to the property against or in which such liens, claim, interests and encumbrances are asserted, all with the same validity, dignity, priority, effect and to the same extent as existed prior to the sale and in all cases subject to any and all rights, claims and defenses that the Trustee and the bankruptcy estates may have with respect thereto; (ii) waiving the requirements of Bankruptcy Rules 6004(g) and 6006(d); and (iii) granting such further, different or additional relief as is just and proper.

DATED: November 26, 2014            **LINDQUIST & VENNUM LLP**


By: _____/e/ George H. Singer_____
George H. Singer (#262043)
Jeffrey D. Smith (#387035)

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)
www.lindquist.com

ATTORNEYS FOR JOHN R. STOEBNER
CHAPTER 7 TRUSTEE

DOCS-#4406469-V7

# Exhibit 1

Draft 11/26/14

# MEMBERSHIP UNIT PURCHASE AGREEMENT

**by and among**

**[HOLDINGS NEWCO], LLC,**

**PFCF, LLC,**

**PICTURE EAGLE, LLC,**

**PLR IP HOLDINGS, LLC,**

**THE MEMBERS OF PLR IP HOLDINGS, LLC,**

**THE TRUSTEE,**

**And**

**THE SELLERS' REPRESENTATIVE**

**dated as of**

**_____, 2014**

6695142v8

# TABLE OF CONTENTS

**PAGE**

ARTICLE I       PURCHASE AND SALE ............................................................. 2
    Section 1.01   Purchase and Sale ............................................................ 2
    Section 1.02   Purchase Price; Payment................................................. 2
    Section 1.03   Bankruptcy Actions ........................................................ 3
    Section 1.04   Closing. .......................................................................... 4

ARTICLE II      REPRESENTATIONS AND WARRANTIES OF THE COMPANY
REGARDING THE COMPANY ENTITIES ................................. 4
    Section 2.01   Organization, Authority and Qualification of the Company Entities ........ 4
    Section 2.02   Capitalization .................................................................. 5
    Section 2.03   No Subsidiaries ............................................................... 5
    Section 2.04   No Conflicts; Consents ................................................... 5
    Section 2.05   Financial Statements ....................................................... 6
    Section 2.06   No Undisclosed Liabilities.............................................. 6
    Section 2.07   Absence of Certain Changes, Events and Conditions............... 6
    Section 2.08   Material Contracts........................................................... 8
    Section 2.09   Title to Assets; Real Property ........................................ 9
    Section 2.10   Intellectual Property........................................................ 10
    Section 2.11   Insurance ......................................................................... 11
    Section 2.12   Legal Proceedings; Governmental Orders ..................... 11
    Section 2.13   Compliance With Laws; Permits ................................... 12
    Section 2.14   Environmental Matters.................................................... 12
    Section 2.15   Employee Benefit Matters .............................................. 13
    Section 2.16   Employment Matters........................................................ 14
    Section 2.17   Taxes................................................................................ 15
    Section 2.18   Brokers............................................................................ 16
    Section 2.19   Accounts Receivable....................................................... 16
    Section 2.20   Licensees......................................................................... 16
    Section 2.21   Condition and Sufficiency of Assets.............................. 16
    Section 2.22   Trade Regulation............................................................ 17
    Section 2.23   Related Party Transactions ........................................... 17

ARTICLE III     REPRESENTATIONS AND WARRANTIES OF THE MEMBERS .......... 17
    Section 3.01   Organization and Authority of the Members ................ 17
    Section 3.02   Ownership of Units ......................................................... 17
    Section 3.03   No Conflicts; Consents ................................................... 18
    Section 3.04   Brokers............................................................................ 18
    Section 3.05   Legal Proceedings .......................................................... 18

ARTICLE IV      REPRESENTATIONS AND WARRANTIES OF BUYERS ...................... 18
    Section 4.01   Organization and Authority of Buyers.......................... 18
    Section 4.02   No Conflicts; Consents ................................................... 19
    Section 4.03   Investment Purpose ........................................................ 19

i

# TABLE OF CONTENTS
(continued)

**PAGE**

Section 4.04    Brokers ..................................................................................... 19
Section 4.05    Legal Proceedings ................................................................... 19

ARTICLE V        COVENANTS .......................................................................... 19

Section 5.01    Conduct of Business Prior to the Closing ............................... 20
Section 5.02    Access to Information .............................................................. 20
Section 5.03    Notification of Certain Matters ............................................... 20
Section 5.04    Supplement to Disclosure Schedules ...................................... 21
Section 5.05    Confidentiality ........................................................................ 21
Section 5.06    Governmental Approvals and Other Third-party Consents .... 22
Section 5.07    Books and Records .................................................................. 22
Section 5.08    Closing Conditions .................................................................. 23
Section 5.09    Public Announcements ............................................................ 23
Section 5.10    Preservation of Existence and Sufficient Assets .................... 23
Section 5.11    Further Assurances .................................................................. 23
Section 5.12    Non-solicitation ....................................................................... 24
Section 5.13    Tax matters .............................................................................. 25
Section 5.14    Exclusivity ............................................................................... 26
Section 5.15    Consent to Transfer of Units; Termination of Rights under LLC
                Agreement ................................................................................ 26

ARTICLE VI       CONDITIONS TO CLOSING ................................................. 26

Section 6.01    Conditions to Obligations of All Parties ................................. 26
Section 6.02    Conditions to Obligations of Buyers ...................................... 27
Section 6.03    Conditions to Obligations of Members ................................... 29

ARTICLE VII      INDEMNIFICATION .............................................................. 31

Section 7.01    Survival .................................................................................... 31
Section 7.02    Indemnification by Members .................................................. 31
Section 7.03    Indemnification by Buyers ...................................................... 32
Section 7.04    Certain Limitations ................................................................. 32
Section 7.05    Indemnification Procedures .................................................... 33
Section 7.06    Tax Treatment of Indemnification Payments .......................... 36
Section 7.07    Setoff ....................................................................................... 36
Section 7.08    Exclusive Remedies ................................................................ 36

ARTICLE VIII     TERMINATION ...................................................................... 36

Section 8.01    Termination .............................................................................. 36
Section 8.02    Effect of Termination .............................................................. 37

ARTICLE IX       MISCELLANEOUS ................................................................ 38

Section 9.01    Sellers' Representative ............................................................. 38
Section 9.02    Expenses .................................................................................. 39
Section 9.03    Notices ..................................................................................... 39

ii

## TABLE OF CONTENTS
(continued)

**PAGE**

Section 9.04    Interpretation ........................................................................ 41
Section 9.05    Headings .............................................................................. 41
Section 9.06    Severability ......................................................................... 41
Section 9.07    Entire Agreement ................................................................. 42
Section 9.08    Successors and Assigns ........................................................ 42
Section 9.09    No Third-Party Beneficiaries ................................................ 42
Section 9.10    Amendment and Modification; Waiver ................................. 42
Section 9.11    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial ........ 42
Section 9.12    Specific Performance ........................................................... 43
Section 9.13    Counterparts ........................................................................ 43
ARTICLE X        DEFINITIONS .................................................................. 43
EXHIBITS
EXHIBIT A – Units, Net Equity Value, Holdback, Closing Cash Proceeds. ...........................A
EXHIBIT B – Form of PBE Note ................................................................B
EXHIBIT C – Form of Member Interests Pledge Agreement ...................................................C
EXHIBIT D – Form of Loan Management Fee Agreement .....................................................D

iii

## MEMBERSHIP UNIT PURCHASE AGREEMENT

This Membership Unit Purchase Agreement (this "**Agreement**"), dated as of November ___, 2014, is entered into by and among PLR IP Holdings, LLC, a Delaware limited liability company (the "**Company**"), the Sellers (as defined herein), the Rollover Holders (as defined herein), [HOLDINGS NEWCO], LLC, a Delaware limited liability company ("**Holdings**"), PFCF, LLC, a Delaware limited liability company ("**PFCF**"), Picture Eagle, LLC, a Delaware limited liability company ("**Picture Eagle**" and collectively with Holdings and PFCF, each, a "**Buyer**" and collectively, "**Buyers**"), the Sellers' Representative and the Trustee, acting on behalf of PBE.

## RECITALS

A.  Buyers desire to purchase all of the outstanding Units of the Company.

B.  The Sellers and the Rollover Holders constitute all of the Members of the Company.

C.  Each Seller desires to sell to Buyers the number of Sale Units held by such Buyer, which sale will be consummated pursuant to this Agreement.

D.  Each Seller will receive a cash payment at Closing for such Seller's Sale Units except that PBE will receive a promissory note issued by Holdings.

E.  Simultaneous with the closing of the transactions contemplated by this Agreement, each Rollover Holder will contribute its Rollover Equity to Holdings in exchange for membership units of Holdings (such contribution and issuance of equity, the "**Rollover Transaction**").

F.  Holdings and the Rollover Holders will consummate the Rollover Transaction pursuant to the terms and conditions of a Rollover Agreement (the "**Rollover Agreement**").

G.  The Rollover Holders are also a party to this Agreement for purposes of making certain representations and warranties, entering into certain covenants and providing indemnification pursuant to **Article VII**.

H.  The Company is a party to this Agreement solely for purposes of making the representations and warranties in **Article II** and for entering into certain covenants.

I.  Following the closing of the transactions contemplated by this Agreement and the Rollover Agreement, the Buyers will collectively own 100% of the Units, of which 99% will be held by Holdings, .5% will be held by PFCF and .5% will be held by Picture Eagle.

J.  Any defined terms used herein but not otherwise defined shall have the meanings given to them in **Article X**.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## PURCHASE AND SALE

**Section 1.01   Purchase and Sale**.  Subject to the terms and conditions set forth herein, at the Closing, Sellers shall sell, assign and transfer to Buyers, and Buyers shall purchase from Sellers, the Sale Units, free and clear of all Encumbrances, for the consideration specified in **Section 1.02**.

**Section 1.02   Purchase Price; Payment**.

(a)      *Purchase Price*.  The aggregate purchase price ("**Purchase Price**") for the Sale Units shall be $70,000,000: (i) minus $18,000,000, which is the indebtedness deduction agreed to by the parties hereto; and (ii) minus the Rollover Amount.

(b)      *Units, Net Equity Value, Holdback, Closing Cash Proceeds.*  Attached hereto as **Exhibit A** is a schedule reflecting for each Member: (i) the number of Units held by such Member; (ii) the net equity value of such Member; (iii) the Sale Units and Rollover Equity held by such Member; (iv) the Holdback Amount of such Member attributable to such Member's Sale Units; (v) the Indemnified Loss Percentage of each Member; and (vi) the Closing Cash Proceeds payable to such Member for Sale Units, as applicable.  The net equity value for each Member as reflected on **Exhibit A** is the Equity Value *minus* Company Transactions Costs, which net number is then allocated to each of the Members in accordance with the distribution sections of the LLC Agreement.  The net equity value of each Member set forth on **Exhibit A** has been calculated in accordance with the "waterfall provisions" of the LLC Agreement.  On the Closing Date, **Exhibit A** will be updated to reflect the actual Company Transaction Costs (not to exceed $600,000) and, if such costs are less than $600,000, all amounts reflected in clauses (ii), (iv) and (vi) will be recalculated and increased accordingly.

(c)      As used herein, the following definitions shall apply:

 "**Closing Cash Proceeds**" means for each Member that holds Sale Units, an amount equal to such Member's net equity value as set forth on **Exhibit A** with respect to such Sale Units *less* the Holdback Amount attributable to such Sale Units, if any.

"**Company Transaction Costs**" means the costs and expenses of the Company incurred on behalf of the Company in connection with the transactions contemplated by this Agreement, which the parties agree includes, without limitation, any representation and warranty insurance obtained for the benefit of the Buyers in connection with this Agreement and the Sellers' Representative Fee, which shall not exceed $600,000 in the aggregate.

"**Equity Value**" means $52,000,000 (i.e., $70,000,000 *minus* $18,000,000).

"**Holdback Amount**" means for each Member the amount set forth next to such Member's name on **Exhibit A** under the column "Holdback," if any.

"**Indemnified Loss Percentage**" means for each Member the percentage set forth next to such Member's name on **Exhibit A** under the heading "Indemnified Loss Percentage."

(d)    *Payment of Purchase Price*. At the Closing, the Buyers shall pay to each Seller (other than PBE) such Seller's Closing Cash Proceeds by wire transfer of immediately available funds.  The portion of the Closing Cash Proceeds payable to PBE will be paid by delivery of a promissory note issued by Holdings (the "**PBE Note**"), in the form attached hereto as **Exhibit B**.  Holdings will acquire 99% of the Sale Units, PFCF will acquire 0.5% of the Sale Units and the Picture Eagle will acquire 0.5% of the Sale Units.

(e)    *Holdback*.  The Holdback Amounts shall be retained by Buyers and be available for the payment or reimbursement of any Losses incurred by the Buyer Indemnified Parties in accordance with **Article VII**, and thereafter, any remaining portion of the Holdback Amounts shall be distributed to the Sellers in accordance with **Section 7.04 (e).**

**Section 1.03   Bankruptcy Actions**.  In addition to the conditions set forth in **Article VI** hereof, the obligations of Buyers to effect the transactions contemplated by this Agreement, shall be subject to the satisfaction of each of the following conditions, each of which may be waived, in writing, only by Buyers:

(a)    Bankruptcy Approval Motion.  By no later than the close of the third Business Day following the execution hereof, the Trustee shall file in the Polaroid Case a motion (the "**Motion**") seeking approval of the Bankruptcy Court of the transactions contemplated herein, in an order reasonably acceptable to Buyers, which provides, inter alia, that (i) the sale of the Sale Units owned by PBE by the Trustee to Buyers will be free and clear of all Encumbrances, (ii) Buyers are a good faith purchasers entitled to the protections of section 363(m) of the Bankruptcy Code, and (iii) the provisions of Rule 6004(h), to the extent applicable, are waived and that there will be no stay of the Approval Order under said Rule 6004(h) (the "**Approval Order**"). The Trustee may file a copy of this Agreement with the Motion, but shall not file the schedules and disclosure statements to be provided hereunder and shall not disclose the contents of such documents to any party without the written consent of the Buyers and the Managers, it being acknowledged and agreed that such documents contain confidential commercial and proprietary information, the unauthorized disclosure of which would cause substantial and irreparable harm to Buyers. The parties further acknowledge that such documents do not implicate any interest of the bankruptcy estate, do not impose any obligation on the Trustee and have not been relied upon by the Trustee in connection with his decision to enter into and perform his obligations under this Agreement.

(b)    Proceedings on Motion.  The Trustee shall provide appropriate notice of the hearing(s) on the Motion, as is required by U.S. Code Title 11, the rules promulgated

3

thereunder and other applicable Law, to the parties entitled to notice thereof. In the event that an objection is filed to the Motion, the Trustee shall reasonably consult with the Buyers with regard to the preparation and filing of any additional documents or pleadings that may be appropriate or necessary to resolve such objection.

(c)     Approval Order.   Thereafter, the Trustee, proceeding in good faith, shall take such actions as he deems appropriate to endeavor to cause the Approval Order to be issued and entered and to become a Final Order.  Unless subject to a stay order entered by a court of competent jurisdiction, Buyers may, at their option, proceed to a Closing prior to the date that the Approval Order becomes a Final Order.

(d)     Appeals of Orders.   If, following the Closing, the Approval Order or any other Governmental Order relating to this Agreement issued by the Bankruptcy Court in the Polaroid Case shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), the Trustee shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, at PBE's sole cost, and Buyers agree to cooperate in such efforts, and each party hereto shall endeavor in good faith to obtain an expedited resolution of such appeal.

**Section 1.04   Closing**.[1]   Subject to the terms and conditions of this Agreement, the purchase and sale of the Sale Units contemplated hereby shall take place at a closing (the "**Closing**") no later than two (2) Business Days after the last of the conditions to Closing set forth in **Section 1.03** and **Article VI** have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), remotely, or on such other date as the Sellers' Representative, the Trustee, the Rollover Holders and Buyers may mutually agree upon in writing (the day on which the Closing takes place being the "**Closing Date**").  The Closing shall be effective as of 12:01 a.m. central standard time on the Closing Date.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY REGARDING THE COMPANY ENTITIES

Except as set forth in the Disclosure Schedules (which Disclosure Schedules set forth the exceptions to the representations and warranties contained in this **Article II** under captions referencing the Sections and subsections, if any, of this Agreement to which such exceptions apply and separately identify each disclosure relating to the Subsidiaries), the Company represents and warrants to Buyers that the statements contained in this **Article II** are true and correct as of the date hereof.

**Section 2.01   Organization, Authority and Qualification of the Company Entities**. Each Company Entity is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all necessary company power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it is currently conducted. Each Company Entity is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties

---

[1] The Buyers are assuming a delayed closing.

owned or leased by it or the operation of its business as currently conducted makes such licensing or qualification necessary, except where the failure to be so licensed, qualified or in good standing would not have a Material Adverse Effect. Section 2.01 of the Disclosure Schedule contains a complete and accurate list of the jurisdictions in which each Company Entity is qualified to do business as a foreign corporation.

**Section 2.02   Capitalization**.

(a)      The Company has _____ issued and outstanding Units.  The Sale Units are comprised of _____ Units and represent ____% of the issued and outstanding equity of the Company. All of the Sale Units have been duly authorized, are validly issued, fully paid and non-assessable. On the date hereof and on the Closing Date, each Seller identified on **Exhibit A** as holding Sale Units is, and will be, the record and beneficial owner of the Sale Units set forth next to each Seller's name.[2]

(b)      Other than as set forth in the charter, LLC Agreement or other organizational documents of the Company Entities, there are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to ownership interests of any Company Entity or obligating any Seller or any Company Entity to issue or sell any ownership interests of, or any other interest in, any Company Entity. Except for the value appreciation rights set forth in the Hardy Employment Agreement, no Company Entity has outstanding or authorized any unit appreciation, phantom unit, profit participation or similar rights. Other than as set forth in the charter, LLC Agreement or other organizational documents of the Company Entities, there are no voting trusts, member control agreement, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Sale Units or the ownership interests of any of the Subsidiaries.

**Section 2.03   No Subsidiaries**.  Other than (a) the Subsidiaries, and (b) as set forth in Section 2.03 of the Disclosure Schedules, the Company does not own, or have any ownership interest in, any other Person.

**Section 2.04   No Conflicts; Consents**.  Except as set forth in Section 2.04 of the Disclosure Schedules, the execution, delivery and performance by Sellers of this Agreement, and the consummation of the transactions contemplated hereby, do not and will not (a) constitute or result in a violation or breach of any provision of the certificate of incorporation/certificate of formation, bylaws or limited liability company agreement of any Company Entity, (b) constitute or result in a violation or breach of any provision of any Law or Governmental Order binding upon or applicable to any Company Entity, (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under, give rise to any right of termination, cancellation or acceleration of any obligation of any Company Entity or to a loss of any material benefit to which any Company Entity is entitled under any provision of any Material Contract or any material Permit of such Company Entity or (d) result in the creation or imposition of any Encumbrance on any assets, properties or rights of any Company Entity, except, in the case of clauses (b), (c) or (d), for such violations, breaches, defaults,

---

[2] Note: Any transfers between signing and closing will need to be addressed.

conflicts, rights, losses or impositions that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth in Section 2.04 of the Disclosure Schedules, other than the Approval Order, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required to be obtained from any Person or given by any Seller or any Company Entity in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

Section 2.05   **Financial Statements**.  Copies of the Audited Financial Statements and Interim Financial Statements have been made available to Buyers. The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved, subject, in the case of the Interim Financial Statements, to the absence of notes and year-end adjustments required by GAAP. The Financial Statements fairly present in all material respects the financial condition of the Company Entities (on a consolidated basis) as of the respective dates they were prepared, and the results of the operations and cash flows of the Company Entities for the periods indicated, and were derived from the books and records of the Company Entities.  The books and records of the Company Entities are accurate and complete in all material respects and are maintained in all material respects in accordance with good business practices and all applicable Laws.

Section 2.06   **No Undisclosed Liabilities**.  None of the Company Entities has any liability, and there is no basis for any Action (whether civil, criminal, administrative or investigative) before any Governmental Authority against any Company Entity giving rise to any liability, in each case that would be required to be reflected or reserved against on the balance sheets of the Company Entities prepared in accordance with GAAP (as in effect on the date hereof) or the notes thereto, except for (a) liabilities set forth on the Interim Balance Sheet (including the notes thereto), and (b) liabilities that have arisen after the Interim Balance Sheet Date in the ordinary course of business.  None of the Company Entities has paid any Member Transaction Expenses.

Section 2.07   **Absence of Certain Changes, Events and Conditions**.  Except as expressly contemplated by this Agreement or as set forth on Section 2.07 of the Disclosure Schedules, since the Interim Balance Sheet Date, the Company Entities have operated in the ordinary course of business consistent with past practices and there has not been, with respect to the Company Entities, any:

      (a)     Material Adverse Effect, or, to the Company Entities' Knowledge, any material adverse effect on any Seller's ability to consummate the transactions contemplated hereby;

      (b)     any notice (written or oral) from any licensee, customer, vendor, representative, consultant, Governmental Authority or any other Person, or any group thereof, which would reasonably be expected to give rise to or result in a Material Adverse Effect;

      (c)     material amendment of the charter, LLC Agreement or other organizational documents of the Company Entities;

6

(d)      split, combination or reclassification of any Units or other ownership interests;

(e)      issuance, sale or other disposition of any of its ownership interests, or grant of any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any of its ownership interests;

(f)      declaration or payment of any dividends or distributions on or in respect of any of its ownership interests or redemption, purchase or acquisition of its ownership interests;

(g)      material change in any method of accounting or accounting practice of the Company Entities, except as required by GAAP or applicable Law, or as disclosed in the notes to the Financial Statements;

(h)      creation or assumption by any Company Entity of any Encumbrance, other than Permitted Encumbrances, on any material asset of any Company Entity other than in the ordinary course of business consistent with past practices;

(i)      making of any loan, advance or capital contributions to or investment in any Person;

(j)      forgiveness of Indebtedness or other liability owed by any Seller to any Company Entity;

(k)      failure to satisfy accounts payable or accrued expenses of any Company Entity when due;

(l)      personal property damage, destruction or casualty loss or personal injury loss (whether or not covered by insurance), individually or in the aggregate in excess of $100,000;

(m)      capital expenditures, individually or in the aggregate, in excess of $100,000;

(n)      execution of a Contract with a labor union;

(o)      incurrence, assumption or guarantee of any Indebtedness for borrowed money in an aggregate amount exceeding $100,000;

(p)      sale, transfer, lease or other disposition of any of its material assets;

(q)      increase in the compensation, bonus or other benefits of its Employees, managers, directors, consultants or officers of any Company Entity, other than as provided for in any written agreements provided to Buyers in the ordinary course of business;

7

(r)    adoption, amendment or modification of any Benefit Plan, the effect of which in the aggregate would increase the obligations of any Company Entity by more than five percent (5%) of its existing annual obligations to such plans;

(s)    termination or material amendment of any Material Contract;

(t)    failure to keep in full force and effect insurance in amount and scope of coverage consistent, in all material respects, with past practice;

(u)    adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law; or

(v)    any commitment or agreement to do any of the foregoing.

**Section 2.08    Material Contracts**.

(a)    Section 2.08(a) of the Disclosure Schedules contains a true, correct and complete list of each of the following Contracts to which any Company Entity is a party, or which contain obligations of any Company Entity which will survive the Closing (together with all Leases listed in Section 2.09(b) of the Disclosure Schedules, collectively, the "**Material Contracts**"):

(i)    partnership, joint venture or limited liability company Contracts (other than the LLC Agreement);

(ii)    Contracts that limit the freedom of any Company Entity to compete in any line of business or with any Person or in any geographic area;

(iii)    Contracts relating to (A) the issuance of any securities by any Company Entity, (B) any outstanding securities of any Company Entity, or (C) the sale or purchase of any other issuer's securities by any Company Entity;

(iv)    profit sharing, equity option, equity purchase, equity appreciation, deferred compensation, severance or other Contracts or plans for directors, officers, employees or consultants;

(v)    consulting and management services Contracts;

(vi)    Contracts with respect to the employment of any directors, managers, executive officers or key employees requiring payments in excess of $50,000 per annum;

(vii)    Contracts requiring aggregate payments to or from any Company Entity in excess of $50,000 annually;

8

(viii)   Contracts that relate to the sale of any Company Entity's assets, other than in the ordinary course of business, for consideration, in any individual instance, in excess of $50,000;

(ix)   Contracts that relate to the acquisition of any material amount of equity or assets of any other Person (whether by merger, sale of equity, sale of assets or otherwise);

(x)   except for Contracts relating to trade payables, Contracts relating to Indebtedness for borrowed money (including guarantees) of any Company Entity;

(xi)   Contracts under which any Company Entity has advanced or loaned any amount to its directors, managers, officers, employees or other Persons, other than immaterial advances to customers, licensees and employees in the ordinary course of business;

(xii)   Contracts between or among any Company Entity on the one hand and any Seller or any Affiliate of a Seller (other than the Company Entities) on the other hand; and

(xiii)   collective bargaining agreements or Contracts with any labor organization, union or association to which any Company Entity is a party.

(b)   Except as set forth on Section 2.08(b) of the Disclosure Schedules, no Company Entity is in material breach of, or material default under, any Material Contract. True, correct and complete copies of all written Material Contracts, and a written description of all oral Material Contracts, referred to in Section 2.08(b) of the Disclosure Schedules have been made available to Buyers.  Except as set forth on Section 2.08(b) of the Disclosure Schedules, each Material Contract required to be disclosed pursuant to **Section 2.08(a)** is a valid and binding agreement of the Company Entity which is a party thereto, enforceable in accordance with its terms against such Company Entity, and, to the Knowledge of the Company Entities, the other contracting party, except in each case to the extent that enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, or similar Laws affecting the enforcement of the rights of creditors generally and (ii) the availability of equitable remedies (including specific performance and injunctive relief ).

**Section 2.09   Title to Assets; Real Property**.

(a)   The Company Entities have good, valid and marketable title to, or a valid leasehold interest in, all Real Property and material tangible personal property and other material assets, tangible or intangible, (i) reflected in the Financial Statements or acquired after the Interim Balance Sheet Date, other than properties and assets sold or otherwise disposed of in the ordinary course of business since the Interim Balance Sheet Date, or (ii) used by the Company Entities in the ordinary course of business (all such Real Property, personal property and other assets, "**Company Properties**").   All such Company Properties (including leasehold interests) are free and clear of Encumbrances

9

except for Permitted Encumbrances, provided, however, that none of the Permitted Encumbrances described in (iii) or (iv) of the definition thereof individually or in the aggregate materially impair the current use and operation of the property to which they relate in the business of the Company Entities as presently conducted. All such material assets other than Real Property are located on Real Property leased by the Company Entities. None of the material assets of PLR Acquisition, LLC are necessary for, or used in, the business of the Company Entities.

(b)    Section 2.09(b) of the Disclosure Schedules contains a true, correct and complete list of all Real Property and a description of the Company Entities' interest therein. No Company Entity owns any real property. All leased buildings and all leased fixtures are held under leases or subleases that are valid instruments enforceable against the Company Entity that is the party thereto in accordance with their respective terms. True, correct and complete copies of all Leases have been made available or provided to Buyers in the Data Room. No Company Entity has leased or subleased any of its rights with respect to any of its leased Real Properties to any other Person.

**Section 2.10    Intellectual Property**.

(a)    Section 2.10(a) of the Disclosure Schedules contains a true, correct and complete list of each item of registered Intellectual Property owned by any Company Entity as well as applications for registration thereof, including an indication of the jurisdiction in which such Intellectual Property has been registered or in which applications for such Intellectual Property are pending. Except as set forth in Section 2.10(a) of the Disclosure Schedules, the Company Entities own exclusively, or otherwise have sufficient rights to use, all Intellectual Property used to conduct the business of the Company Entities as presently conducted (the "**Company Intellectual Property**"). Without limiting the foregoing, all items of Intellectual Property used by each Company Entity in the operation of its business have been validly assigned to such Company Entity, and, except as set forth on Section 2.10(a) of the Disclosure Schedules, all such assignments have been recorded with the U.S. Patent and Trademark Office or applicable foreign equivalent. Except as set forth in Section 2.10(a) of the Disclosure Schedules, each Company Entity has the exclusive right to use or license other Persons to use all of the material Company Intellectual Property it purports to own in the jurisdictions where such Company Entity has registered or otherwise established rights in such Company Intellectual Property. The material Company Intellectual Property includes, without limitation, the trademarks "Polaroid" and "Polaroid & Pixel Logo." None of the material Company Intellectual Property has been adjudicated or otherwise declared invalid or unenforceable, in whole or in part, and all material Company Intellectual Property is valid and enforceable in the jurisdictions where the applicable Company Entity has registered or otherwise established rights in such Company Intellectual Property. Except as set forth in Section 2.10(a) of the Disclosure Schedules, each Company Entity is the legal and beneficial owner of the Company Intellectual Property it purports to own with title thereto free and clear of any Encumbrance other than Permitted Encumbrances and licenses granted to other Persons in the ordinary course of business.

10

(b)     The Company Entities have made available to Buyers a true and complete copy of all registrations, applications, licenses and contracts that evidence their ownership of or rights to use the Company Intellectual Property that is registered or applied for by or licensed to a Company Entity.  Except as set forth in Section 2.10(b) of the Disclosure Schedules, there are no restrictions on the ability of the Company Entities to use and exploit all rights in the Company Intellectual Property.  Each of the material registered trademarks and registered trade names included in the Company Intellectual Property is in use in the jurisdictions where it is registered if and to the extent actual use is required to obtain and maintain such registrations.

(c)     Section 2.10(c) of the Disclosure Schedules contains a complete and accurate list of all material licenses and other material rights granted by (i) any Company Entity to any Person with respect to any Company Intellectual Property, and (ii) any Person to any Company Entity with respect to any material Intellectual Property (other than through shrink wrap or click through software licenses). Except as set forth in Section 2.10(c) of the Disclosure Schedules, no Company Entity has (other than through shrink wrap or click through software licenses) licensed any material Intellectual Property from any Person.

(d)     There are no Actions pending or, to the Company Entities' Knowledge, threatened, against any Company Entity or Seller asserting that any of the Intellectual Property owned or used by any Company Entity infringes upon the Intellectual Property of any Person.  The conduct of the Company Entities' business as presently conducted does not infringe or otherwise violate any rights of any Person in respect of any Intellectual Property.  To the Company Entities' Knowledge, none of the Intellectual Property owned by the Company Entities is being infringed or otherwise used or is available for use by any other Person, in each case, in a manner that would result in a Material Adverse Effect.

**Section 2.11   Insurance**. Section 2.11 of the Disclosure Schedules sets forth a list of all insurance policies and fidelity bonds covering the assets, business, equipment, properties, operations, employees, officers, managers and directors of the Company Entities, or with respect to which a Company Entity is otherwise a named insured or beneficiary.  All premiums payable under all such policies and bonds have been paid or accrued, when due or within applicable grace periods.  Each Company Entity is in compliance in all material respects with the terms and conditions of all such policies and bonds (including with respect to the payment of premiums or the giving of notices thereunder).  Each Company Entity has complied with all requirements to purchase insurance under any Contract or Law, including requirements to provide or retain evidence of such insurance, except where the failure to so comply would not reasonably be expected to have a Material Adverse Effect.

**Section 2.12   Legal Proceedings; Governmental Orders**.

(a)     Except as set forth in Section 2.12(a) of the Disclosure Schedules, (i) there is no Action pending against or, to the Knowledge of the Company Entities, threatened against or affecting, any Company Entity or its properties, and (ii) there is no Action pending against or, to the Knowledge of the Company Entities, threatened against any

11

Company Entity which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereby. Section 2.12(a) of the Disclosure Schedules contains a true, correct and complete list of all Actions by or against any Company Entity, and of all Governmental Orders entered in proceedings to which any Company Entity has been a party, in each case since January 1, 2013.

(b)     Except as set forth in Section 2.12(b) of the Disclosure Schedules, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting any Company Entity.

**Section 2.13     Compliance With Laws; Permits**.

(a)     Except as set forth in Section 2.13(a) of the Disclosure Schedules, each Company Entity is, and at all times since January 1, 2013 has been, in compliance with all Laws and Governmental Orders applicable to it or its business, properties or assets, including any Laws related to licensors or franchisors, except where the failure to so comply would not reasonably be expected to have a Material Adverse Effect.

(b)     Since January 1, 2013, no Company Entity or, to the Company Entities' Knowledge, any Seller has received any written or, to the Knowledge of the Company Entities, oral notification or communication from any Governmental Authority asserting that any Company Entity is in violation of or is not in compliance with any Law, except where any such violation of or failure to comply with such Law would not reasonably be expected to have a Material Adverse Effect.

(c)     Section 2.13(c) of the Disclosure Schedules contains a true, correct and complete list of all material Permits issued to each Company Entity that are currently used by such Company Entity in connection with its business. Each Company Entity holds and is in compliance with all Permits required for it to conduct its business and all such Permits are in full force and effect, except, in each case, where the failure to so hold or comply, or the failure to be in full force and effect, would not reasonably be expected to have a Material Adverse Effect. Any applications for the renewal or transfer of any such Permit that are due prior to the Closing Date have been or will be timely filed prior to the Closing Date. No Action to modify, suspend, revoke, withdraw, terminate or otherwise limit any such Permit is pending or, to Knowledge of the Company Entities, threatened, except where any such Action would not reasonably be expected to have a Material Adverse Effect. No Action by a Governmental Authority has been taken or, to the Knowledge of the Company Entities, threatened in connection with the expiration of any such Permit, other than expiration in accordance with the terms of any Permit that may be renewed in the ordinary course of business without lapsing.

**Section 2.14     Environmental Matters**.

(a)     Except as set forth in Section 2.14(a) of the Disclosure Schedules, each Company Entity and its properties are, and have at all times been, in compliance in all material respects with all Environmental Laws. No Company Entity or, to the Knowledge of the Company, Seller has, within the last three (3) years, received from any

Person any (i) Environmental Notice or Environmental Claim relating to a Company Entity, or (ii) written request for information pursuant to Environmental Law relating to a Company Entity or written allegation that any Company Entity is not in compliance or is in violation of an Environmental Law. There is no Environmental Claim pending, or to the Company Entities' Knowledge, threatened against any Company Entity.

(b)     Each Company Entity has obtained and is, and has at all times been, in compliance in all material respects with all terms and conditions of Environmental Permits (each of which is disclosed in Section 2.14(b) of the Disclosure Schedules) that are necessary for the ownership, lease, operation or use of the business or assets of such Company Entity. All Environmental Permits and other Permits required by each Company Entity under applicable Environmental Laws are in full force and effect, and such Company Entity is in compliance in all material respects with the terms and conditions thereof.

(c)     There has been no Release of Hazardous Materials with respect to the business or assets of any Company Entity or any Real Property currently owned, operated or leased by any Company Entity in violation of applicable Environmental Law or that would reasonably be expect to give rise to Losses under any Environmental Law, and no Company Entity has received an Environmental Notice that any Real Property currently owned, operated or leased in connection with the business or assets of any Company Entity (including soils, groundwater, surface water, buildings and other structure located on any such real property) has been contaminated with any Hazardous Material, except in each case where such Release or contamination would not reasonably be expected to have a Material Adverse Effect.

(d)     The Company Entities have provided to Buyers or previously made available in the Data Room any and all Phase I reports, copies of reports from environmental audits and copies of any soil and ground water studies that were prepared by third parties and are in the possession of any of the Company Entities relating to environmental conditions at any Real Property that was owned, operated or leased by any Company Entity during the three (3) year period ending on the date hereof.

**Section 2.15   Employee Benefit Matters**

(a)     Section 2.15(a) of the Disclosure Schedules contains a list of each Benefit Plan.

(b)     Except as set forth in Section 2.15(b) of the Disclosure Schedules, each Benefit Plan complies in all material respects with all applicable Laws (including ERISA and the Code and the regulations promulgated thereunder). Each Qualified Benefit Plan has received a favorable determination letter from the Internal Revenue Service, or with respect to a pre-approved plan, can rely on an opinion or advisory letter from the Internal Revenue Service to the pre-approved plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code, and nothing has occurred that could reasonably be expected to cause the revocation of such

13

determination letter from the Internal Revenue Service or the unavailability of reliance on such opinion letter from the Internal Revenue Service, as applicable. Except as set forth in Section 2.15(b) of the Disclosure Schedules, all contributions and premiums required by and due under the terms of each Benefit Plan or applicable Law have been timely paid in accordance with the terms of such Benefit Plan, the terms of all applicable Laws and GAAP. With respect to any Benefit Plan, no event has occurred or is reasonably expected to occur that has resulted in or would subject any Company Entity to a Tax under Section 4971 of the Code or the assets of any Company Entity to a lien under Section 430(k) of the Code.

(c)     Except as set forth in Section 2.15(c) of the Disclosure Schedules, no Benefit Plan: (i) is subject to the minimum funding standards of Section 302 of ERISA or Section 412 of the Code; or (ii) is a "multi-employer plan" (as defined in Section 3(37) of ERISA). No Company Entity or to the Company Entities' Knowledge, any Seller: (x) has withdrawn from any pension plan under circumstances resulting (or expected to result) in a liability to the Pension Benefit Guaranty Corporation; or (y) has engaged in any transaction which would give rise to a liability of any Company Entity or any Buyer under Section 4069 or Section 4212(c) of ERISA.

(d)     Except as set forth in Section 2.15(d) of the Disclosure Schedules and other than as required under Section 4980B of the Code or other applicable Law, no Benefit Plan provides benefits or coverage in the nature of health, life or disability insurance following retirement or other termination of employment (other than death benefits when termination occurs upon death).

(e)     Except as set forth in Section 2.15(e) of the Disclosure Schedules and other than routine benefit claims: (i) there is no pending or, to the Company Entities' Knowledge, threatened Action relating to a Benefit Plan; and (ii) no Benefit Plan has within the three (3) years prior to the date hereof been the subject of a formal examination or audit by a Governmental Authority.

(f)     Except as set forth in Section 2.15(f) of the Disclosure Schedules, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will: (i) result in the payment to any Employee, manager or consultant of any money or other property under any Benefit Plan; (ii) accelerate the vesting of or provide any additional rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any Employee, manager or consultant under any Benefit Plan, except as a result of any partial plan termination resulting from this Agreement; or (iii) limit or restrict the ability of any Buyer or its Affiliates to merge, amend or terminate any Benefit Plan.  Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby will result in "excess parachute payments" within the meaning of Section 280G(b) of the Code.

**Section 2.16   Employment Matters**.

(a)     No Company Entity is a party to, or bound by, any collective bargaining or other agreement with a labor organization representing any of its Employees.

(b)     Section 2.16(b) of the Disclosure Schedules contains a list of the names and positions of all current employees of each Company Entity (including those on furlough, leave, disability (short or long-term) or layoff of any kind, which status is noted therein), and the Company Entities have made available to Buyers, in the Data Room or otherwise, a list of the annual salary rates, hourly wage rates, severance benefits, accrued vacation and sick leave and other paid time off, as of the date hereof, of all such employees.  Except as set forth in Section 2.16(b) of the Disclosure Schedules, none of the employees of the Company has informed the Company that he or she intends to terminate employment with any Company Entity.  Except as set forth on Section 2.16(b) of the Disclosure Schedules, all employees are employed on an "at will" basis.  Each such individual has been appropriately classified as an employee or independent contractor.

(c)     Section 2.16(c) of the Disclosure Schedules sets forth all Actions against any Company Entity of which any Company Entity or, to the Company Entities' Knowledge, any Seller, has been notified in writing regarding its employees or employment practices, or operations as they pertain to conditions of employment.

(d)     Each Company Entity is in compliance in all material respects with all applicable Laws pertaining to employment and employment practices.

**Section 2.17   Taxes**.  Except as set forth in Section 2.17 of the Disclosure Schedules:

(a)     Each Company Entity has timely filed all Tax Returns required to be filed by it.  All such Tax Returns were true, complete and correct in all material respects.  All Taxes owed by the Company Entities (whether or not shown on any of the aforementioned Tax Returns) have been paid.  No Company Entity is currently the beneficiary of any extension of time within which to file any Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business.  Since January 1, 2011, no claim has been made by an authority in a jurisdiction where any Company Entity does not file Tax Returns that the Company or any Subsidiary is or may be subject to taxation by that jurisdiction.  There are no liens on any of the assets of any Company Entity that arose in connection with any failure (or alleged failure) to pay any Tax.

(b)     No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of any Company Entity.

(c)     To the Company Entities' Knowledge, the Company does not expect any Tax authority to assess any material additional Taxes for any period for which Tax Returns have been filed.  There are no ongoing Actions by any Taxing authority against any Company Entity.

(d)     No Company Entity is a party to any Tax-allocation or Tax-sharing agreement.

(e)     Each Company Entity has withheld and paid all material Taxes required to have been withheld and paid in connection with any amounts paid or owing to any

15

employee, independent contractor, creditor or other third party, and all Forms W-2 and 1099 required with respect thereto have been property completed and timely filed.

(f)     The Company is and since its formation has been a partnership for federal income taxes purposes and each of the Subsidiaries is and since its formation has been a disregarded entity for federal income tax purposes.  No election has been made to treat any Company Entity as an association taxable as a corporation for Tax purposes.

(g)     No Company Entity is or has been a party to any "reportable transaction," as defined in Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b).

**Section 2.18   Brokers**.  No broker, finder or investment banker has been employed or engaged by or on behalf of any Company Entity, and no Person with which any Company Entity has had any dealings or communications of any kind is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of any Company Entity.

**Section 2.19   Accounts Receivable**.  The accounts receivable reflected on the Interim Balance Sheet and the accounts receivable arising after the Interim Balance Sheet Date:  (a) have arisen from bona fide transactions entered into by a Company Entity involving the sale or licensing of goods or the rendering of services in the ordinary course of business consistent with past practice; (b) constitute valid claims of the Company Entities, subject to an adequate reserve for bad debts (established in accordance with GAAP) as shown on the Interim Balance Sheet. Since the Interim Balance Sheet Date, there have been no changes in the Company Entities' accounts receivable other than transactions effected in the ordinary course of the business.  The reserve for bad debts shown on the Interim Balance Sheet is adequate in all material respects and has been determined in accordance with GAAP, subject to normal year-end adjustments (which would not be material in the aggregate) and the absence of disclosures normally made in footnotes.  The Company Entities' accounts receivable are collectible within 90 days after the Closing Date.

**Section 2.20   Licensees**.  Section 2.20 of the Disclosure Schedules sets forth with respect to each Company Entity (i) the top ten licensees for each of the fiscal years ended December 31, 2013 and December 31, 2012 and for the ten (10) month period ending on October 31, 2014 (collectively, the "**Material Licensees**"), and (ii) the amount of consideration paid by each Material Licensee to each Company Entity during each such period. Except as set forth in Section 2.20 of the Disclosure Schedules, since December 31, 2013: (a) to the Company Entities' Knowledge, no Material Licensee has notified any Company Entity that it will not continue to do business with the Company Entities or that it will materially reduce the amount of business that it does with the Company Entities; and (b) no Company Entity has Knowledge of, and to the Company Entities' Knowledge, no Seller has knowledge of, any such termination of business or material reduction of business by any Material Licensee, whether or not it received any notification as such.

**Section 2.21   Condition and Sufficiency of Assets**.  The Company Entities' material assets are in good operating condition and repair, subject only to ordinary wear and tear.  The

16

Company Entities' assets are sufficient for the continued conduct of the business of the Company Entities after the Closing consistent in all material respects with the conduct of such business immediately prior to the Closing.  There are no assets or properties used in the operation of the Company Entities' business as currently being conducted that are (i) owned by any Person other than the Company Entities and (ii) not leased or licensed to the Company Entities under valid, current leases or license arrangements.

**Section 2.22   Trade Regulation**.  No claims have been communicated to or, to the Knowledge of the Company Entities, threatened against any Company Entity with respect to discriminatory pricing, price fixing, unfair competition, false advertising, misleading or incomplete franchise disclosure documents, or any other violation of any legal requirements relating to anti-competitive practices or unfair trade practices of any kind, except where such claims would not reasonably be expected to have a Material Adverse Effect.

**Section 2.23   Related Party Transactions**.  Except as set forth in Section 2.22 of the Disclosure Schedules, to the Company Entities' Knowledge, none of the Sellers nor any equityholders, directors, officers or employees of such Sellers has any ownership interest in any of the material assets of any Company Entity or has or owns, of record or as a beneficial owner, an equity interest or any other financial or profit interest in any Person that has had, since January 1, 2014, business dealings with any Company Entity that are material to the Company Entities or a financial interest in any transaction that is material to the Company Entities.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE MEMBERS

Except as set forth in the Disclosure Schedules, each Member, severally and not jointly, represents and warrants to Buyers that the statements contained in this **Article III** with respect to such Member are true and correct as of the date hereof.

**Section 3.01   Organization and Authority of the Members**.  If such Member is an entity, the Member is duly organized, validly existing and in good standing under the Laws of its jurisdiction of incorporation or organization, as applicable. Such Member has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby, subject, in the case of PBE, to entry of the Approval Order. The execution and delivery by such Member of this Agreement, the performance by such Member of its obligations hereunder and the consummation by such Member of the transactions contemplated hereby have been duly authorized by all requisite corporate or other action on the part of such Member, subject in the case of PBE, to entry of the Approval Order. This Agreement has been duly executed and delivered by such Member, and (assuming due authorization, execution and delivery by the other parties hereto) this Agreement constitutes a legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms, subject, in the case of PBE, to entry of the Approval Order.

**Section 3.02   Ownership of Units**.  If such Member is a Seller, such Member (a) is the record and beneficial owner of the Sale Units indicated on **Exhibit A** hereto next to its name, (b)

6695142v8

has good and marketable title to such Member's Sale Units, except in the case of PBE, subject to entry of the Approval Order, and (c) will convey to Buyers at the Closing title to such Sale Units, free and clear of all Encumbrances, other than (i) Encumbrances created by or under this Agreement, and (ii) restrictions under federal or state securities Laws.[3]

Section 3.03  **No Conflicts; Consents**.  The execution, delivery and performance by such Member of this Agreement, and the consummation by such Member of the transactions contemplated hereby, do not and will not (a) constitute or result in a violation or breach of any provision of the certificate of incorporation/certificate of formation, bylaws or limited liability company agreement of such Member, (b) constitute or result in a violation or breach of any provision of any Law or Governmental Order binding upon or applicable to such Member, (c) other than the Approval Order with respect to PBE and except as set forth in Section 3.03 of the Disclosure Schedules with respect to such Member, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, or constitute a default under any provision of any Contract to which such Member is a party, or (d) result in the creation or imposition of any Encumbrance on any assets, properties or rights of such Member, except, in the case of clauses (b), (c) or (d), for such violations, breaches, defaults, conflicts or impositions that would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of such Member to consummate the transactions contemplated hereby.  No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required to be obtained from any Person or given by any Member in connection with the execution and delivery of this Agreement by such Member and the consummation by such Member of the transactions contemplated hereby, except as set forth in Section 3.03 of the Disclosure Schedules with respect to such Member, and except in the case of PBE, the entry of the Approval Order.

Section 3.04  **Brokers**.  No broker, finder or investment banker has been employed or engaged by or on behalf of such Member, and no Person with which such Member has had any dealings or communications of any kind is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of such Member.

Section 3.05  **Legal Proceedings**.  There are no Actions pending or, to such Member's Knowledge, threatened against or by such Member that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYERS

Except as set forth in the Disclosure Schedules, each Buyer represents and warrants to the Members that the statements contained in this **Article IV** are true and correct as of the date hereof.

Section 4.01  **Organization and Authority of Buyers**.  Such Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of

---

[3] Note:  The consents set forth in Section 5.15 will permit the Sellers to deliver the Sale Units free of any Encumbrances.

6695142v8

Delaware.   Such Buyer has all necessary corporate power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by such Buyer of this Agreement, the performance by such Buyer of its obligations hereunder and the consummation by such Buyer of the transactions contemplated hereby have been duly authorized by all requisite limited liability company action on the part of such Buyer. This Agreement has been duly executed and delivered by such Buyer, and (assuming due authorization, execution and delivery by the other parties hereto) this Agreement constitutes a legal, valid and binding obligation of such Buyer, enforceable against such Buyer in accordance with its terms.

Section 4.02   **No Conflicts; Consents**.   The execution, delivery and performance by such Buyer of this Agreement, and the consummation of the transactions contemplated hereby by such Buyer, do not and will not: (a) constitute or result in a violation or breach of any provision of the certificate of formation or limited liability company agreement of such Buyer; (b) constitute or result in a violation or breach of any provision of any Law or Governmental Order binding upon or applicable to such Buyer; or (c) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default under or result in the acceleration of any Contract to which such Buyer is a party, except in the cases of clauses (b) and (c), where the violation, breach, conflict, default, acceleration or failure to give notice would not have a material adverse effect on such Buyer's ability to consummate the transactions contemplated hereby.   No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required to be obtained from any Person or given by such Buyer in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

Section 4.03   **Investment Purpose**.   Such Buyer is acquiring the Sale Units solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Such Buyer acknowledges that none of the Sale Units are registered under the Securities Act of 1933, as amended, or any state securities Laws, and that none of the Sale Units may be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended or pursuant to an applicable exemption therefrom and subject to state securities Laws, as applicable. Such Buyer is able to bear the economic risk of holding the Sale Units for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of its investment.

Section 4.04   **Brokers**.   No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of such Buyer except that the Buyers have engaged Imperial Capital, which fees shall be paid solely by Holdings.

Section 4.05   **Legal Proceedings**.   There are no Actions pending or, to such Buyer's Knowledge, threatened against or by such Buyer or any Affiliate of such Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**ARTICLE V
COVENANTS**

19

**Section 5.01   Conduct of Business Prior to the Closing**.  From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Buyers, the Members (other than PBE) shall, and shall cause the Company Entities to, and the Company shall: (a) conduct the business of each Company Entity in the ordinary course of business consistent with past practice; and (b) maintain and preserve intact the current organization, business and franchise of each Company Entity and to preserve the rights, franchises, goodwill and relationships of its Employees, licensees, licensors, lenders, suppliers, regulators and others having business relationships with each Company Entity. From the date hereof until the Closing Date, except as consented to in writing by Buyers, the Members (other than PBE) shall not cause or permit any Company Entity to, and the Company shall not: (i) make any capital expenditures in excess of $50,000, individually or in the aggregate, or enter into any Contracts committing capital or cash flow in excess of $50,000, individually or in the aggregate, of any Company Entity, in each case other than in the ordinary course of such Company Entity's business consistent with past practices, (ii) enter into, commit to enter into, or terminate any Contract that would be deemed a Material Contract other than in the ordinary course of such Company Entity's business consistent with past practices, (iii) declare or pay any dividends or distributions on or in respect of any of its ownership interests or redeem, purchase or acquire its ownership interests, or (iv) take any action that would cause any of the changes, events or conditions described in **Section 2.07** to occur.

**Section 5.02   Access to Information**.   From the date hereof until the earlier of the Closing or the termination of this Agreement, the Members (other than PBE) shall, and shall cause each Company Entity and the Company Entity's Representatives to, and the Company shall: (a) afford Buyers and their Representatives reasonable access to and the right to inspect all of the Real Property, offices, properties, assets, premises, books and records, Tax Returns, Contracts, commitments, personnel and other documents and data related to the Company Entities; (b) furnish Buyers and their Representatives with such financial, operating and other data and information related to the Company Entities as Buyers or any of their Representatives may reasonably request; and (c) instruct the Representatives of the Members (other than PBE) and the Company Entities to cooperate with Buyers in their investigation of the Company Entities; provided, however, that any such investigation shall be conducted during normal business hours upon reasonable advance notice to the Company and the Sellers' Representative, under the supervision of the Company Entities' personnel and in such a manner as not to unreasonably interfere with the normal operations of the Company Entities.  For the avoidance of doubt, all information disclosed pursuant to this **Section 5.02** shall be subject to the confidentiality obligations set forth in **Section 5.05**.  All requests by Buyers for access pursuant to this **Section 5.02** shall be submitted or directed exclusively to the Sellers' Representative or such other individuals as they may designate to Buyers in writing from time to time.  Buyers shall not, and shall cause their Representatives not to, contact any employee, customer, licensee or other known business relation of any Company Entity without the prior written consent of the Sellers' Representative.

**Section 5.03   Notification of Certain Matters**.

(a)   The Sellers' Representative, each Rollover Holder and the Company, as applicable, shall give prompt written notice to Buyers of (i) the occurrence, or failure to occur, of any event of which any such Person or any Company Entities has Knowledge

20

that has caused any representation or warranty regarding the Company Entities or the Members contained in this Agreement to be inaccurate, and (ii) the failure of the Members to comply with or satisfy in any material respect any covenant to be complied with by it hereunder.

(b)     Buyers shall give prompt notice to the Sellers' Representative and each Rollover Holder of (i) the occurrence, or failure to occur, of any event of which it has Knowledge that has caused any representation or warranty of Buyers contained in this Agreement to be inaccurate, and (ii) the failure of Buyers to comply with or satisfy in any material respect any covenant to be complied with by it hereunder.

(c)     Except to the extent permitted by **Section 5.04**, no such notification shall affect the representations or warranties of the parties or the conditions to their respective obligations hereunder, nor the parties' respective rights hereunder, including those set forth in **Article II**, **Article III** or **Article IV**.

**Section 5.04   Supplement to Disclosure Schedules**.  From time to time after the date hereof but prior to the Closing, the Company shall have the right (but not the obligation) to supplement or amend the Disclosure Schedules hereto solely with respect to any fact, matter, event, occurrence or circumstance originally arising after the date hereof (each a "**Schedule Supplement**").  If the Disclosure Schedules are supplemented or amended by a Schedule Supplement, then the Buyers shall be entitled to terminate this Agreement pursuant to **Section 8.01(b)(i)**; provided, that if Buyers do not elect to terminate this Agreement within seven (7) Business Days following the Buyers' receipt of the Schedule Supplement as a result of the items set forth in the Schedule Supplement, such items shall be deemed to modify the disclosure schedules for purposes of determining if the closing condition in **Section 6.02(a)** has been satisfied and the Buyers shall not be entitled to indemnification pursuant to **Article VII** hereof with respect to the items set forth in the Schedule Supplement.

**Section 5.05   Confidentiality**.  The Company, each Member and each Buyer shall keep confidential all information and materials disclosed to them in connection with the transactions contemplated hereby; provided, however, that the Company, each Buyer and each Member may disclose such information and materials to its officers, managers, directors, governors, financing sources, Affiliates, Representatives, accountants and legal counsel who need to have such information or materials to consummate the transactions contemplated by this Agreement and each Buyer may disclose such information and materials as permitted under **Section 5.09**; provided further, that nothing contained in this **Section 5.05** shall preclude any Buyer from using in any way information or materials relating directly or indirectly to the Company Entities' business.  Each Member shall keep confidential and not disclose to any Person all confidential information relating to the business of the Company Entities.  Notwithstanding anything to the contrary contained herein, no party hereto shall be required to maintain as confidential any information or material which is:

(a)     now, or hereafter becomes, through no act or failure to act on the part of such party which would constitute a breach of this **Section 5.05**, generally known or available to the public;

21

(b)      known to such party at the time of the initial disclosure of such information, as substantiated by documentary evidence produced by the non-disclosing party;

(c)      hereafter furnished to such party by a third party, who, to the best knowledge of such party, is not under obligations of confidentiality to any other party, without restriction on disclosure;

(d)      disclosed with the prior written approval of the other parties;

(e)      developed independently by the non-disclosing party, as substantiated by documentary evidence produced by the non-disclosing party;

(f)      required to be disclosed by Law, Governmental Order, or similar compulsion; provided, however, that such disclosure shall be limited to the minimum disclosure so required or compelled; and provided further, that the party required to disclose such confidential information and material shall give the other parties prompt written notice of such disclosure and cooperate with such other parties in seeking suitable protection;

(g)      disclosed pursuant to or in connection with any Action relating to this Agreement or the Transaction Documents or involving the parties hereto but only if and to the extent that such disclosure is reasonably necessary in light of the subject matter of the Action and confidential treatment of such information is first sought by the disclosing party; or

(h)      required to be disclosed in order to obtain the Approval Order in a manner consistent with **Section 1.03(a)**.

**Section 5.06   Governmental Approvals and Other Third-party Consents**.   Each party hereto shall, as promptly as possible, make commercially reasonable efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement. The Company, the Members (other than PBE) and the Buyers shall use commercially reasonable efforts to give all notices to, and obtain all consents from, all third parties that are described in **Section 2.04** and **Section 4.02** of the Disclosure Schedules; provided, however, that none of the Company Entities, the Buyers nor the Members shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested.

**Section 5.07   Books and Records**.

(a)      In order to facilitate the resolution of any claims made against or incurred by the Members prior to the Closing, or for any other reasonable purpose, for a period of three (3) years after the Closing, Buyers shall:

(i)      Retain, in a manner and to the extent reasonably consistent with the prior practices of each Company Entity, the books and records (including

personnel files) of each Company Entity relating to periods prior to the Closing; and

(ii)     upon reasonable advance written notice by the Sellers' Representative or the Rollover Holders, as applicable, to Buyers, afford the Representatives of such Parties reasonable access (including the right to make, at such Party's expense, photocopies) to such books and records during normal business hours, under the supervision of Buyers and the Company Entities' personnel and in such a manner as not to substantially interfere with the normal operations of the Company Entities.

(b)     Buyers shall not be obligated to provide the Sellers' Representative or the Rollover Holders with access to any books or records (including personnel files) pursuant to this **Section 5.07** where such access would violate any Law.

**Section 5.08   Closing Conditions**.  From the date hereof until the Closing, each party hereto shall, and the Members (other than PBE) shall cause the Company Entities to, use commercially reasonable efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in **Article VI** hereof.  The Company, the Buyers, the Sellers' Representative and the Members shall reasonably cooperate to do all such acts and take all such measures as may be reasonably appropriate to enable them to perform as early as reasonably practicable the obligations herein provided to be performed by them.

**Section 5.09   Public Announcements**.  Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), and except for the filing of the Motion, no party to this Agreement shall issue any press release or make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other parties (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement; provided, however, that Buyers or any of their Affiliates may make public disclosure of the transactions contemplated hereby following the Closing, and shall also be entitled to disclose the material terms hereof in connection with the ordinary course reporting or disclosure activities of Buyers or any of their Affiliates to any investors, potential investors, lenders or other financing sources.

**Section 5.10   Preservation of Existence and Sufficient Assets**.  Each Member (other than PBE) shall:  (a) preserve its existence and sufficient assets to perform its obligations under this Agreement, including its indemnification obligations under **Article VII**; and (b) not enter into or undertake any Contracts that will limit its ability to perform its obligations under this Agreement.

**Section 5.11   Further Assurances**.  Following the Closing, each of the parties hereto shall, and shall cause their respective Representatives and Affiliates to, from time to time, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions as may be reasonably required, or otherwise reasonably requested by the other party, to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

23

**Section 5.12   Non-solicitation**.   Each Member (other than PBE) agrees that, in consideration of Buyers' execution and delivery of, and payments under, this Agreement:

(a)   Such Member shall not take any action, or omit to take any action, in each case, that could reasonably be expected to discourage any Employee from working for any Buyer or any Company Entity after the Closing.  During the Restricted Period, such Member shall not, and shall cause its Affiliates not to, directly or indirectly, hire, solicit, induce or attempt to induce any employee of any Buyer or any Company Entity who is or was employed by any Buyer or any Company Entity during the Restricted Period, or encourage any such employee to leave such employment or hire any such employee who has left such employment.

(b)   Such Member acknowledges that, under the terms of this **Section 5.12**, Buyers and the Company Entities are entitled to non-solicitation immediately following the Closing through the Restricted Period.  Such Member agrees if any of this obligation to any Buyer or any Company Entity is breached during the Restricted Period, then the time period of the Restricted Period will be extended for the length of time that such Member fails to fulfill its obligations.

(c)   Such Member covenants and agrees that, if it shall violate or breach the foregoing restrictive covenants, Buyers shall be entitled to an accounting and repayment of all profits, compensation, royalties, commissions, remuneration, or other benefits which such Member directly or indirectly shall have realized or may realize relating to, growing out of, or in connection with any such violation or breach, and/or compensation for any Losses suffered by Buyers, the Company Entities or any of their respective Affiliates as a result of such violation or breach.  Such remedy shall be in addition to and not in limitation of any injunctive relief or other rights or remedies to which any Buyer or any Company Entity is or may be entitled at Law or in equity or otherwise under this Agreement.

(d)   Such Member acknowledges that a breach or threatened breach of this **Section 5.12** would give rise to irreparable harm to Buyers, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such Member of any such obligations, Buyers shall, in addition to any and all other rights and remedies that may be available to it at Law or in equity in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a Governmental Authority (without any requirement to post bond or prove the inadequacy of money damages).

(e)   Such Member acknowledges that the restrictions contained in this **Section 5.12** are reasonable and necessary to protect the legitimate interests of Buyers and constitute a material inducement to Buyers to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this **Section 5.12** should ever be adjudicated to exceed the time or other limitations permitted by applicable Law in any jurisdiction, then any Governmental Authority is expressly empowered to reform such covenant, and such covenant shall be

24

deemed reformed, in such jurisdiction to the maximum time or other limitations permitted by applicable Law. The covenants contained in this **Section 5.12** and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

### Section 5.13   Tax matters.

(a)     The Members (other than PBE) shall be responsible for and pay all Taxes with respect to the Company Entities for all taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date ("**Pre-Closing Tax Period**") and the Company (after consultation with Gordon Brothers Brands, LLC), shall prepare and file or cause to be filed all Tax Returns and forms for any taxable period that ends on or before the end of the Pre-Closing Tax Period; provided that except as provided by Law all such Tax Returns shall be prepared on a basis consistent with past practices and the Company shall deliver each such Tax Return to Gordon Brothers Brands, LLC and the Sellers' Representative at least fifteen (15) days prior to the date on which such Tax Return is required to be filed with the appropriate Governmental Authority; and provided, further, that Buyers will cooperate with any reasonable requests from Gordon Brothers Brands, LLC with respect to such Tax Returns and forms.

(b)     Each Member (other than PBE) will be responsible for all transfer, sales, use, value added and other similar Taxes, if any, arising out of the transfer of the Sale Units by such Member to Buyers pursuant to this Agreement.

(c)     In the case of any taxable period that includes (but does not end on) the Closing Date (a "**Straddle Period**"), (i) the amount of any Taxes based on or measured by income or receipts of the Company Entities for the Pre-Closing Tax Period will be determined based on an interim closing of the books as of the effective time of the Closing, and (ii) with respect to Taxes not based on or measured by income or receipts, the amount of Taxes of the Company Entities for a Straddle Period that relates to the Pre-Closing Tax Period will be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending at the effective time of the Closing and the denominator of which is the number of days in such Straddle Period.[4]

(d)     The Members will be entitled to any refund or credit with respect to any Tax for which the Members are liable under this Agreement (plus any interest received, by payment or credit, with respect thereto but less any additional Taxes payable with respect thereto).  Buyers will file (or cause to be filed), at the Members' sole cost and expense, claims for any refund or credit reasonably requested by the Sellers' Representative and Gordon Brothers Brands, LLC relating to any Pre-Closing Tax Period

---

[4] Note: This Section under review by tax attorneys.

provided that such refund would not result in an increase or other adverse affect on the Taxes of a Company Entity or Buyer.

**Section 5.14   Exclusivity**.  Prior to the termination of this Agreement, no Member will, directly or indirectly, offer, initiate, solicit, make inquiries regarding or otherwise engage in discussions or negotiations concerning any other transaction which contemplates the sale of the assets of any Company Entity (other than licenses entered into by any Company Entity in the ordinary course of business) or the sale of Units of the Company or the membership interests of any Subsidiary, or any transaction having a reasonably similar effect, such as a merger or consolidation. Each Member will promptly notify the Buyers to the extent they receive offer, inquiry or similar proposal that would be prohibited by this **Section 5.14**.

**Section 5.15   Consent to Transfer of Units; Termination of Rights under LLC Agreement**.  Each Member (a) hereby consents to the purchase, sale and transfer of the (i) Sale Units to Buyers pursuant to the terms of this Agreement, which in the case of PBE, is subject to the entry of the Approval Order, and (ii) Rollover Equity to Holdings, (b) hereby waives any and all rights that such Member may have under the LLC Agreement, including under Article VIII of the LLC Agreement with respect to the transactions contemplated by this Agreement, and (c) acknowledges and agrees that any rights that such Member has under the LLC Agreement shall terminate upon the Closing without any further action by the Member.

## ARTICLE VI
## CONDITIONS TO CLOSING

**Section 6.01   Conditions to Obligations of All Parties**.  The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of the following conditions:

(a)      No Action shall be instituted, pending or threatened, and no Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order or Law which is in effect, that (i) has the effect of making the transactions contemplated by this Agreement and the other documents, instruments and agreements to be executed and/or delivered by the parties pursuant to this Agreement illegal, or otherwise enjoining, restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder or thereunder to be rescinded following completion thereof, (ii) requires the divestiture of any assets or restricts the operations of any Buyer or any Company Entity, or (iii) imposes or seeks to impose material damages on any Buyer or any Company Entity.

(b)      The Approval Order (i) shall have been obtained and (ii) shall have become a Final Order and be in full force and effect and not stayed as of the Closing Date and (iii) shall be in a form reasonably satisfactory to Buyers; provided, that Buyers shall have the right to waive the condition in clause (ii) on behalf of all parties.[5]

---

[5] Trustee confirming ability for Buyers to waive

**Section 6.02  Conditions to Obligations of Buyers**.  The obligations of Buyers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, or Buyers' waiver, at or prior to the Closing, of each of the following conditions:

(a)     The representations and warranties of the Company contained in **Article II** and of the Members contained in **Article III** shall (i) in the case of representations and warranties that are subject to materiality qualifications, have been true and correct in all respects when made and as of the Closing Date with the same force and effect as though made at and as of such date and (ii) in the case of representations and warranties that are not subject to materiality qualifications, have been true and correct in all material respects when made and as of the Closing Date with the same force and effect as though made at and as of such date (it being understood for purposes of this **Section 6.02(a)** that any Schedule Supplement delivered to Buyers prior to the Closing Date shall be taken into consideration for purposes of determining the accuracy of such representations and warranties for purposes of this **Section 6.02(a)**, if Buyers have not exercised their termination right in accordance with **Section 5.04**), except, in each case, that those representations and warranties that address matters only as of a specified date or with respect to a specified period need only be true and correct as of such date or with respect to such period.

(b)     Each Member, the Trustee and the Sellers' Representative shall have duly performed and complied in all material respects with all obligations, agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)     Since the date of this Agreement, there shall not have occurred a Material Adverse Effect on any Company Entity.

(d)     Buyer shall have received a certificate from the Company, signed by a duly authorized officer of the Company, and in form and substance reasonably satisfactory to Buyers, that each of the conditions set forth in **Section 6.02(a)** and **6.02(c)** have been satisfied.

(e)     Buyers shall have received a certificate from each Member (other than PBE), dated the Closing Date, signed by such Member, if such Member is an individual, or signed by a duly authorized officer of such Member, if such Member is not an individual, and in form and substance reasonably satisfactory to Buyers, that the conditions set forth in **Section 6.02(b)** have been satisfied.

(f)     Buyers shall have received a certificate of the Secretary (or equivalent officer) of each Member (other than PBE) that is not an individual, in form and substance reasonably satisfactory to Buyers, certifying that attached thereto are true, correct and complete copies, which are in full force and effect and unmodified as of the date of this Agreement, of all resolutions adopted by the board of managers or directors of such Member authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated

27

hereby and thereby, and that all such resolutions are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(g)     Buyers shall have received a certificate of the Secretary (or equivalent officer) of each Company Entity, in form and substance reasonably satisfactory to Buyers, certifying that attached thereto are true, correct and complete copies, which are in full force and effect and unmodified as of the date of this Agreement, of such Company Entity's (i) certificate of formation, and (ii) limited liability company agreement.

(h)     Holdings shall have received a duly executed signature page to the Holdings LLC Agreement from each Rollover Holder.

(i)     Holdings shall have received a duly executed signature page to the Rollover Agreement from each Rollover Holder.

(j)     The Sellers or the Sellers' Representative shall have delivered to Buyers:

(i)     the Sale Units, free and clear of all Encumbrances, by delivery of an instrument of transfer duly executed in blank;

(ii)     a non-foreign affidavit of each Seller dated as of the Closing Date, in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

(iii)     a certificate of good standing for each Company Entity dated within five (5) days prior to the Closing Date issued by the Secretary of State of the State of Delaware;

(iv)     the Funds Flow Memorandum, duly executed by each Seller;

(v)     the corporate record book, member ledger and all other corporate records of each Company Entity;

(vi)     evidence of the termination of all Encumbrances (other than Permitted Encumbrances) on Company Property or, if applicable, the Sale Units;

(vii)     evidence of the removal of each Company Entity's bank account signatories (other than Scott Hardy and Kent Akervik) and the replacement of such signatories effective as of the Closing with individuals to be designated by Buyers no less than three (3) days prior to the Closing Date;

(viii)     evidence that PLR Brand Services, LLC has made all payments to Scott Hardy as required pursuant to the Hardy Employment Agreement as a result of the transactions contemplated by this Agreement or the Rollover Agreement;

(ix)     written resignations, effective as of the Closing Date, of each manager of each Company Entity, which resignations shall include a release of

28

claims against the Company Entities (other than claims for earned but unpaid compensation and indemnification claims); and

      (x)    a consent of the managers of the Company to the purchase, sale and transfer of the (A) Sale Units to Buyers pursuant to the terms of this Agreement, and (B) Rollover Equity to Holdings as required under Section 8.1 of the LLC Agreement.

      (k)    Holdings shall have received a duly executed signature page to the Employment Agreement from Scott Hardy.

      (l)    *[Buyers shall have received copies of the fully-executed amendments to the Company's credit facility to the extent necessary to reflect the transactions contemplated by this Agreement, the Rollover Agreement, the PBE Note and the Holdings LLC Agreement.]

      (m)    The Buyers shall have received a mutual release (in a form reasonably satisfactory to the Buyers and the Trustee) between PBE and the Trustee, on the one hand, and the Company Entities, on the other hand, releasing and holding harmless such parties and their employees from events, circumstances or other matters arising prior to the Closing Date (the "**Mutual Release**"), duly executed by PBE and the Trustee.

      (n)    Each Buyer that is a party to the Option Agreement shall have received an executed signature page to the Option Agreement from the Rollover Holders that are a party thereto.

      (o)    The Buyers shall have received all consents, authorizations, orders and approvals from the Governmental Authorities and other Persons required to be set forth in **Section 2.04 and Section 3.03** of the Disclosure Schedules in order for the representations and warranties in **Section 2.04 and Section 3.03** to be true and correct, in form and substance reasonably satisfactory to Buyers, and no such consent, authorization, order and approval shall have been revoked.

**\*[Additional closing documents to be confirmed.]**

      **Section 6.03  Conditions to Obligations of Members**.  The obligations of each Member to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or waiver by the party to whom a delivery is expressly required in such closing condition (i.e., the Sellers, the Trustee, the Sellers' Representative, or Rollover Holder, as applicable), at or prior to the Closing, of each of the following conditions:

      (a)    The representations and warranties of Buyers contained in **Article IV** shall (i) in the case of representations and warranties that are subject to materiality qualifications, have been true and correct in all respects when made and as of the Closing Date with the same force and effect as though made at and as of such date and (ii) in the case of representations and warranties that are not subject to materiality qualifications, have been true and correct in all material respects when made and as of the Closing Date with the same force and effect as though made at and as of such date

29

(b)     Buyers shall have duly performed and complied in all material respects with all obligations, agreements, covenants and conditions required by this Agreement to be performed or complied with by it prior to or on the Closing Date.

(c)     The Sellers' Representative (on behalf of the Sellers other than PBE), the Trustee and the Rollover Holders shall have received a certificate, dated the Closing Date, signed by a duly authorized officer of each Buyer, and in substantially the same form as the certificate called for under Section 6.02(d), that each of the conditions set forth in Section 6.03(a) and (b) have been satisfied.

(d)     The Sellers' Representative and the Rollover Holders shall have received a certificate of the Secretary (or equivalent officer) of each Buyer, in substantially the same form as the certificate called for under **Section 6.02(e)**, certifying that attached thereto are true, correct and complete copies, which are in full force and effect and unmodified as of the date of this Agreement, of all resolutions adopted by the board of managers of such Buyer authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(e)     Buyers shall have delivered to the Sellers (other than PBE) the Closing Cash Payment by wire transfer of immediately available funds as set forth in **Section 1.02(c)(ii)**.

(f)     With respect to PBE only, Holdings shall have delivered to the Trustee, a duly executed signature page to the PBE Note, the Member Interests Pledge Agreement, in the form attached hereto as **Exhibit C** and the Loan Management Fee Agreement, in the form attached hereto as **Exhibit D**.

(g)     With respect to PBE only, the Trustee shall have received the Mutual Release, duly executed by the Company Entities.

(h)     Buyers shall have delivered to the Sellers' Representative the Funds Flow Memorandum, duly executed by Buyers.

(i)     The Sellers' Representative shall have received the Sellers' Representative Fee from the Company.

(j)     With respect to a Member that is a Rollover Holder, Holdings shall have delivered to such Rollover Holder a duly executed signature page to the Rollover Agreement.

(k)     With respect to a Member that is a Rollover Holder, Holdings shall have delivered to such Rollover Holder a duly executed signature page to the Holdings LLC Agreement.

30

(l)      With respect to a Member that is a Rollover Holder and a party to the Option Agreement, such Rollover Holder shall have received an executed signature page to the Option Agreement from the Buyers that are a party thereto.

## ARTICLE VII
## INDEMNIFICATION[6]

**Section 7.01  Survival**.    Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is fourteen (14) months from the Closing Date (such fourteen-month period, the "**Survival Period**"); provided, however, that the representations and warranties and the rights to indemnity for any breach thereof with respect to the Indefinite Representations shall survive indefinitely. The covenants and other agreements contained in this Agreement shall survive the Closing Date according to their respective terms, and if no stated term, indefinitely. Notwithstanding the foregoing, any claims asserted with reasonable specificity (to the extent known at such time) and in writing by notice from the Indemnified Party to the Indemnifying Party prior to the expiration date of the applicable survival period, and any claims of fraud or intentional misrepresentation, shall not thereafter be barred by the expiration of such survival period and such claims shall survive until finally resolved.

**Section 7.02   Indemnification by Members**.  Subject to the other terms and conditions of this **Article VII**, (i) each Member shall indemnify the Buyer Indemnified Parties against, and shall hold the Buyer Indemnified Parties harmless from and against, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnified Parties based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any of the representations or warranties of such Member contained in **Article III**, any breach or non-fulfillment of any covenant, agreement or obligation to be performed by such Member pursuant to Sections **5.05, 5.06, 5.08. 5.09. 5.10, 5.11, 5.12, 5.14 and 5.15** of this Agreement or any fraud or intentional misrepresentation on the part of such Member, (ii) the Members (other than PBE), severally and not jointly (based on each such Member's Indemnified Loss Percentage), shall indemnify the Buyer Indemnified Parties against, and shall hold the Buyer Indemnified Parties harmless from and against, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnified Parties based upon, arising out of, with respect to or by reason of (1) Taxes of any Company Entity with respect to any period ending on or before the Closing Date and with respect to that portion of the Straddle Period that ends on or prior to the Closing Date as further described in **Section 5.13,** and (2) the Hong Kong Tax Liability; and (iii) the Members (other than PBE), severally and not jointly (based on each such Member's Indemnified Loss Percentage), shall indemnify the Buyer Indemnified Parties against, and shall hold the Buyer Indemnified Parties harmless from and against, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnified Parties based upon, arising out of, with respect to or by reason of:

---

[6] The parties are obtaining a quote for representation and warranty insurance.  This section will be revised accordingly if such insurance is obtained.

6695142v8

(a)      any inaccuracy in or breach of any of the representations or warranties of the Company contained in **Article II**;

(b)      any breach or non-fulfillment of any covenant, agreement or obligation to be performed by a Company Entity (or which the Members are obligated to cause the Company Entities to perform) pursuant to this Agreement;

(c)      any fraud or intentional misrepresentation on the part of any Company Entity;

(d)      the allocation or payment of the Closing Cash Payment among or to the Sellers in compliance with Exhibit A and the Funds Flow Memorandum;

(e)      the allocation or issuance of the Rollover Equity among or to the Members in compliance with Exhibit A;

(f)      any Member Transaction Expenses;

(g)      any actions, claims, disputes or controversies of any kind between or among the Members or between and among the Members and the Sellers' Representative; and/ or

(h)      the reorganization of any Member (other than PBE) or the distribution, directly or indirectly, of any membership interests of the Company by any Member (other than PBE) to its members, shareholders or owners.

**Section 7.03    Indemnification by Buyers**.  Subject to the other terms and conditions of this **Article VII**, Buyers shall indemnify the Member Indemnified Parties against, and shall hold the Member Indemnified Parties harmless from and against, any and all Losses incurred or sustained by, or imposed upon, the Member Indemnified Parties based upon, arising out of, with respect to or by reason of:

(a)      any inaccuracy in or breach of any of the representations or warranties of Buyers contained in this Agreement;

(b)      any breach or non-fulfillment of any covenant, agreement or obligation to such Member to be performed by Buyers pursuant to this Agreement; or

(c)      Taxes of any Company Entity with respect to any period beginning after the Closing Date and with respect to that portion of the Straddle Period that is after the Closing Date as further described in **Section 5.13**.

**Section 7.04    Certain Limitations**.  The indemnification provided for in **Section 7.02** shall be subject to the following limitations:

(a)      The Indemnifying Party shall not be liable to the Indemnified Party for indemnification under **Section 7.02(iii)(a)** until the aggregate amount of all Losses in respect of indemnification under **Section 7.02(iii)(a)** exceeds the Deductible, in which

32

event the Indemnifying Party shall only be required to pay or be liable for such Losses that are in excess of the Deductible; provided, however, that the Deductible does not apply to Indefinite Representations.

(b)     Except with respect to the obligations regarding covenants and agreements in **Section 7.02(i), Section 7.02(ii)** and the Indefinite Representations, the Members (other than PBE) will not have any liability under **Section 7.02** with respect to any Losses to the extent that the aggregate of all such Losses exceeds, on a cumulative basis, an amount equal to $1,200,000 (the "**Cap**")[7]. PBE will not have liability under Section 7.02 in excess of the amount of its Closing Cash Proceeds.

(c)     Except with respect to the obligations regarding covenants and agreements in **Section 7.02(i), Section 7.02(ii)** and the Indefinite Representations, no Member (other than PBE) will have any liability under **Section 7.02** with respect to Losses that exceed an amount equal such Member's Indemnified Loss Percentage of the Cap. PBE will not have liability under Section 7.02(i) in excess of the amount of its Closing Cash Proceeds.

(d)     No Member will have any liability under **Section 7.02** with respect to Losses relating to or resulting from a breach by another Member of such other Member's representations and warranties in **Article III** or in any other Transaction Document or a breach by another Member of the covenants of such Member set forth in **Section 7.02(i)** or **7.02(ii)** of this Agreement or any other Transaction Document.

(e)     The Buyers shall distribute any remaining Holdback Amount to the Sellers (other than PBE) promptly (which shall be no longer than five business days) following the date on which both of the following have occurred: (1) the Survival Period has expired; and (2) all claims for indemnification made by the Buyer Indemnified Parties prior to the expiration of the Survival Period with respect to any Seller (other than PBE) have been paid or dismissed by the Buyer Indemnified Parties. All such remaining amounts shall be distributed to the Sellers (other than PBE) based on such Seller's Indemnified Loss Percentage after taking into account any indemnifications Losses paid from the Holdback Amount with respect to such Seller's indemnification obligations in Section 7.02(i) or (ii).  Any such remaining Holdback Amounts shall be distributed to the Sellers (other than PBE) in cash by wire transfer of immediately available funds. The parties agree that each Seller's Holdback Amount may only be used or applied to satisfy Losses of the Buyer Indemnified Parties owed by such Seller.

**Section 7.05   Indemnification Procedures**.

(a)     If any Indemnified Party receives notice of the assertion or commencement of any Action made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a Representative of the foregoing other than with respect to the Hong Kong Tax Liability (a "**Third Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is

---

[7] Note: The amount of the Cap assumes that rep and warranty insurance is obtained in the currently contemplated coverage amount and policy cost.  Provisions relating to the insurance will be added if such policy is obtained.  If the policy is not obtained, the Cap and related indemnification provisions will be revisited.

or may be obligated to provide indemnification under this Agreement, the Indemnified Party shall give the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Third Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have the right to participate in, or by giving written notice to the Indemnified Party within fifteen (15) days of receipt of written notice of the Third Party Claim, to assume the defense of any Third Party Claim at the Indemnifying Party's sole expense and by the Indemnifying Party's own counsel, and the Indemnified Party shall cooperate in good faith in such defense at the expense of the Indemnifying Party. In the event that the Indemnifying Party assumes the defense of any Third Party Claim, subject to **Section 7.05(b)**, it shall have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party shall have the right, at its own cost and expense, to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. If the Indemnifying Party elects not to compromise or defend such Third Party Claim or fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, the Indemnified Party may, subject to **Section 7.05(b)**, pay, compromise, defend such Third Party Claim and seek indemnification for any and all Losses based upon, arising from or relating to such Third Party Claim. The Indemnifying Parties and the Indemnified Parties shall cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) and subject to the provisions of **Section 5.05** of this Agreement, records relating to such Third Party Claim, and making available, without expense (other than reimbursement of actual out-of-pocket expenses), to the defending party, the Representatives of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

(b)     Notwithstanding any other provision of this Agreement and except as provided in this **Section 7.05(b)**, the Indemnifying Party shall not enter into settlement, compromise, consent or cessation, of any Third Party Claim without the prior written consent of the Indemnified Party (which consent shall not be unreasonably withheld or delayed); provided, however, that notwithstanding the foregoing, the Indemnified Party may withhold its consent in its sole discretion if such settlement, compromise, consent or cessation, (i) provides for injunctive relief, specific performance or any other non-monetary remedy or award against any Indemnified Party, (ii) would lead to liability or create any financial or other obligation on the part of any Indemnified Party for which the Indemnified Party is not entitled to indemnification hereunder, (iii) would impose a covenant not to compete on any Indemnified Party, or (iv) does not contain an unqualified release of the Indemnified Parties.  If a firm offer is made to settle a Third Party Claim and (A) the Indemnified Party would have no cause to withhold consent to the firm offer for any of the reasons set forth in (i) – (iv) above, (B) the Indemnifying

34

Party agrees in writing that the entire amount of such proposed firm offer constitutes Losses that are indemnifiable under this Agreement (without regard to the limitations set forth in this **Article VII**), and (C) the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party shall give written notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within thirty (30) days after its receipt of such notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum liability of the Indemnifying Party as to such Third Party Claim shall not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim within such thirty (30) day period, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim.

(c)     Any claim by an Indemnified Party on account of the Hong Kong Tax Liability or a Loss which does not result from a Third Party Claim (a "**Direct Claim**") shall be asserted by the Indemnified Party giving the Indemnifying Party prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such notice by the Indemnified Party shall describe the Direct Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party shall have thirty (30) days after its receipt of such notice to respond in writing to such Direct Claim, except that with respect to the Hong Kong Tax Liability, such period shall be seven (7) days. During such thirty (30) or seven (7) day period, as applicable, the Indemnified Party shall allow the Indemnifying Party and its professional advisors reasonable access (during normal business hours upon reasonable advance written notice) to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim and the Indemnified Party shall assist the Indemnifying Party's investigation by giving such information and reasonable assistance (including reasonable access to the Indemnified Party's premises and personnel and the right to examine and copy, at the Indemnifying Party's cost, any accounts, documents or records related to the Direct Claim, all during normal business hours upon reasonable advance written notice) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty (30) or seven (7) day period, as applicable, the Indemnifying Party shall be deemed to have accepted such claim, in which case the Indemnified Party shall be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement. If a timely objection is made in writing in accordance with this **Section 7.05(c)**, the Indemnified Party shall have an additional thirty (30) or seven (7) days, as applicable, to respond in a written statement to the objection. If, after such thirty (30) or seven (7) day period, as applicable, there remains a dispute as to any Direct Claims, the parties shall attempt in good faith for an additional thirty (30) or seven (7) days, as applicable, to agree upon the rights of the respective parties with respect to each such Direct Claim before pursuing any other remedies. If the parties should so agree, a memorandum setting forth such agreement shall be prepared and signed by both parties.

35

(d)     Any notices to be given to Members as either an Indemnified Party or an Indemnifying Party shall be given to the Sellers' Representative, the Trustee on behalf of PBE or the Rollover Holders, as applicable.  Any notices to be given by Members as either an Indemnified Party or an Indemnifying Party shall be given by the Sellers' Representative, the Trustee on behalf of PBE or the Rollover Holders, as applicable. Notwithstanding anything herein to the contrary, if the Indemnifying Party or the Indemnified Party includes the Sellers (other than PBE) and the Rollover Holders, any action, decision or consent of such Indemnifying Party required under this **Section 7.05** shall be deemed given upon the written consent of the holders of a majority of the aggregate net equity value of the Sellers (other than PBE) and the Rollover Holders as set forth on **Exhibit A**.

    **Section 7.06   Tax Treatment of Indemnification Payments**.   All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

    **Section 7.07   Setoff**.  Neither Buyers nor any Member shall have any right to set off any Losses (including indemnification obligations under this **Article VII**) against any payments to be made by them pursuant to this Agreement, the Transaction Documents or otherwise.

    **Section 7.08   Exclusive Remedies**.  Subject to **Section 9.12**, the parties acknowledge and agree that from and after the Closing their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud or intentional misrepresentation of the Indemnifying Party in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, including without limitation, any representation, warranty or covenant of the Company shall be pursuant to the indemnification provisions set forth in this **Article VII**. Nothing in this **Section 7.08** shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to **Section 9.12** or to seek any remedy on account of any fraud or intentional misrepresentation by any party hereto.

## ARTICLE VIII
## TERMINATION

    **Section 8.01   Termination**.  This Agreement may be terminated at any time prior to the Closing:

        (a)     by the mutual written consent of Buyers, the Sellers' Representative and the Trustee;

        (b)     by Buyers by written notice to the Sellers' Representative and the Trustee if:

            (i)     There has been a breach or inaccuracy in any representation or warranty or a material failure to perform any covenant or agreement made by Members pursuant to this Agreement, in each case that would give rise to the failure of any of the conditions specified in **Article VI** and such breach,

36

inaccuracy or failure cannot be cured by the Members by the Drop Dead Date or the Buyers receive a Schedule Supplement in accordance with **Section 5.04**;

        (ii)     the Approval Order shall not have been issued and become a Final Order, or shall not remain a Final Order, by the Drop Dead Date;

        (iii)    any of the conditions set forth in **Section 6.01** or **Section 6.02** shall not have been fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of Buyers to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

    (c)     by the Sellers' Representative and the Trustee by written notice to Buyers if:

        (i)     There has been a breach or inaccuracy in any representation or warranty, or a material failure to perform any covenant or agreement made by Buyers pursuant to this Agreement, in each case that would give rise to the failure of any of the conditions specified in **Article VI** and such breach, inaccuracy or failure cannot be cured by Buyers by the Drop Dead Date; or

        (ii)    any of the conditions set forth in **Section 6.01** or **Section 6.03** shall not have been fulfilled by the Drop Dead Date, unless such failure shall be due to the failure of the Members to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

    (d)    by Buyers or the Sellers' Representative and the Trustee in the event that:

        (i)     there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited;

        (ii)    any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement; or

        (iii)    as of the Drop Dead Date, the Approval Order is subject to appeal or has been reversed or modified in any material respect.

    **Section 8.02   Effect of Termination**.  In the event of the termination of this Agreement in accordance with this **Article VIII**, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

    (a)    as set forth in this **Article VIII**, **Sections 5.01** or **5.05** and **Article IX** hereof; and

    (b)    that nothing herein shall relieve any party hereto from liability for any intentional breach of any provision hereof.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.01   Sellers' Representative**.

(a)     The Sellers' Representative is hereby constituted and appointed as agent and attorney in fact for and on behalf of the Departing Sellers.  Without limiting the generality of the foregoing, the Sellers' Representative has full power and authority, on behalf of each Departing Seller and its successors and assigns, to (i) interpret the terms and provisions of this Agreement and the documents to be executed and delivered by the Departing Sellers in connection herewith, (ii) execute and deliver and receive deliveries of all agreements, certificates, statements, notices, approvals, extensions, waivers, undertakings, amendments, and other documents required or permitted to be given in connection with the consummation of the transactions contemplated by this Agreement, (iii) receive service of process in connection with any claims under this Agreement, (iv) agree to, negotiate, enter into settlements and compromises of, assume the defense of claims, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims, and to take all actions necessary or appropriate in the judgment of the Sellers' Representative for the accomplishment of the foregoing, (v) give and receive notices and communications, and (vi) take all actions necessary or appropriate in the judgment of the Sellers' Representative on behalf of the Departing Sellers in connection with this Agreement.

(b)     Such agency may be changed, at any time and from time to time, by the holders of a majority of Units outstanding at such time and held by the Departing Sellers (and following the Closing, the holders of a majority of Units outstanding immediately prior to the Closing and held by the Departing Sellers) upon not less than five (5) days' prior written notice to Buyers.  The Sellers' Representative, or any successor hereafter appointed, may resign at any time by written notice to Buyers and the other Departing Sellers.  A successor Sellers' Representative will be named by the holders of a majority of outstanding Units outstanding and held by the Departing Sellers at any time following such resignation.  All power, authority, rights and privileges conferred in this Agreement to the Sellers' Representative will apply to any successor Sellers' Representative.

(c)     In performing any of its duties under this Agreement or upon the claimed failure to perform its duties under this Agreement, the Sellers' Representative will not be liable to the Departing Sellers for any Losses that the Departing Sellers may incur as a result of any act, or failure to act, by the Sellers' Representative under this Agreement, and the Sellers' Representative will be indemnified and held harmless by the Departing Sellers for all Losses; provided, however, that the Sellers' Representative will not be entitled to indemnification for Losses to the extent that a court of competent jurisdiction has finally determined that the actions or omissions of the Sellers' Representative either (i) were taken or omitted not in good faith or (ii) constituted willful default under this Agreement. Accordingly, the Sellers' Representative will not incur any such liability to the Departing Sellers with respect to (x) any action taken or omitted to be taken in good faith upon advice of counsel given with respect to any questions relating to the duties and responsibilities of the Sellers' Representative under this Agreement or any agreements or

38

documents executed and delivered by any Company Entity or any Seller that is a Departing Seller in connection herewith or (y) any action taken or omitted to be taken in reliance upon any document, including any written notice or instructions provided for in this Agreement or any agreements or documents executed and delivered by any Company Entity or any Seller that is a Departing Seller in connection herewith, which the Sellers' Representative does in good faith believe to be genuine (not only as to its due execution and to the validity and effectiveness of such document's provisions, but also as to the truth and accuracy of any information contained in such document), to have been signed or presented by the purported proper Person or Persons and to conform with the provisions of this Agreement or any agreements or documents executed and delivered by any Company Entity or any Member in connection herewith. The limitation of liability provisions of this **Section 9.01(c)** will survive the termination of this Agreement and the resignation of the Sellers' Representative.

(d)     **Effect of Decision of Sellers' Representative**. A decision, act, consent or instruction of the Sellers' Representative will constitute a decision, act, consent or instruction of all of the Departing Sellers and will be final, binding and conclusive upon each such Departing Seller. Buyers may rely upon any such decision, act, consent or instruction of the Sellers' Representative as being the decision, act, consent or instruction of every such Departing Seller. Buyers are hereby relieved from any liability to any Person for any acts done by it in accordance with such decision, act, consent or instruction of the Sellers' Representative. Buyers shall have no liability of any kind to the Sellers' Representative or any of the Departing Sellers arising out of or in connection with such appointment or the performance, acts or omissions of the Sellers' Representative of any kind.

(e)     **Sellers' Representative Fee**. In consideration for his services under this **Article IX**, the Company shall pay the Sellers' Representative Fee to the Sellers' Representative.

**Section 9.02   Expenses**. Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 9.03   Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered to the recipient by hand (with written confirmation of receipt); (b) when delivered to the recipient if sent by a nationally recognized overnight courier (with written confirmation of delivery); (c) on the date sent to the recipient by facsimile or e-mail of a PDF document (with written or electronic confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed to the recipient, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be

specified in a notice given in accordance with this **Section 9.03**):  **\*\*[Notice information to be updated]**

If to the Departing Sellers
or the Sellers' Representative:                    Kenny Finkelstein
                                                   Attention:
                                                   Email:
                                                   Fax:

with a  copy to:                                   Goulston & Storrs PC
                                                   400 Atlantic Avenue
                                                   Boston, MA 02110
                                                   Attention: [_____]
                                                   Fax: [_____]
                                                   Email: [_____]

If to Buyers:                                      [Holdings Newco], LLC
                                                   PFCF, LLC
                                                   c/o Marquette Companies, LLC
                                                   60 South Sixth Street
                                                   Suite 3900
                                                   Minneapolis, Minnesota 55402
                                                   Attention: Jann Ozzello Wilcox
                                                   Fax: (612) 661-3863
                                                   Email: Jann.OzzelloWilcox@marquette.com

with a copy to:                                    Picture Eagle, LLC
                                                   c/o Sansome Partners, LLC
                                                   One Maritime Plaza
                                                   San Francisco CA 94111
                                                   Attention: Alexander L. Dean, Jr.
                                                   Fax: (415) 288-0549
                                                   Email: sandy@sansome.com

with a further copy to:                            Briggs and Morgan
                                                   2200 IDS Center
                                                   Minneapolis, MN 55402
                                                   Attention: Charles Johnson
                                                   Fax: 612-977-8650
                                                   Email: cjohnson@briggs.com

with a further copy to:                            Lowenstein Sandler LLP
                                                   1251 Avenue of the Americas
                                                   New York, New York 10020
                                                   Attention: Michael A. Brosse
                                                   Fax: 973-422-6841
                                                   Email: mbrosse@lowenstein.com

| | |
|---|---|
| If to PBE or the Trustee: | Lapp, Libra, Thomson, Stoebner & Pusch,<br>One Financial Plaza, Suite 2500<br>120 South Sixth Street<br>Minneapolis, MN 55402<br>Attention: John R. Stoebner<br>Fax:<br>Email: jstoebner@lapplibra.com |
| If to the Rollover Holders: | Attention:<br>Email:<br>Fax: |
| with a  copy to: | Goulston & Storrs PC<br>400 Atlantic Avenue<br>Boston, MA 02110<br>Attention: [_____]<br>Fax: [_____]<br>Email: [_____] |

**Section 9.04   Interpretation**.  For purposes of this Agreement: (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections and Disclosure Schedules mean the Articles and Sections of, and Disclosure Schedules attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof; and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.  The definitions contained in this Agreement are applicable to the singular as well as to the plural forms of such terms and to the masculine as well as the feminine and neuter genders of such term. The words "dollar" or "dollar," when used in this Agreement, shall mean U.S. dollar(s).

**Section 9.05   Headings**.  The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.06   Severability**.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this

41

Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.07   Entire Agreement**.   This Agreement and the other Transaction Documents delivered by the parties in connection herewith constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous representations, warranties, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and the other Transaction Documents (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 9.08   Successors and Assigns**.   This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign its rights or obligations hereunder without the prior written consent of the other parties, which consent shall not be unreasonably withheld or delayed.[8] No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section 9.09   No Third-Party Beneficiaries**.   Except as provided in **Article VII**, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.10   Amendment and Modification; Waiver**.   This Agreement may only be amended, modified or supplemented by an agreement in writing signed by Buyers, the Rollover Holders, the Trustee and the Sellers' Representative.  No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving or, in the case of a waiver by any of the Departing Sellers, the Sellers' Representative.  No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.11   Governing Law; Submission to Jurisdiction; Waiver of Jury Trial**.

(a)     This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

---

[8] Note: Need to confirm timing of GBB and Hilco transfers and whether or not such recipients will be signing on the same day as Buyers.  .

42

(b)    ANY ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF MINNESOTA IN EACH CASE LOCATED IN THE CITY OF MINNEAPOLIS AND COUNTY OF HENNEPIN COUNTY, AND EACH PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH ACTION, SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY ACTION BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY ACTION IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **SECTION 9.11(c)**.

**Section 9.12   Specific Performance**.  The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 9.13   Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement

**ARTICLE X
DEFINITIONS**

43

The following terms have the meanings specified or referred to in this **Article X**:

"**Action**" means any investigation, lawsuit, arbitration, mediation or administrative proceeding by or before any Governmental Authority.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Approval Order**" has the meaning set forth in **Section 1.03(a)**.

"**Audited Financial Statements**" means the Company Entities' audited financial statements consisting of the balance sheet of the Company Entities as at the Balance Sheet Date and the related statements of income and retained earnings, owners' equity and cash flow for the year then ended.

"**Balance Sheet Date**" means December 31, 2013.

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the District of Minnesota.

"**Benefit Plan**" means each benefit, retirement, employment, compensation, incentive, option, restricted unit, appreciation right, phantom equity, change in control, severance, vacation, paid time off and fringe-benefit agreement, plan, policy and program, whether or not reduced to writing, in effect and covering one or more Employees, former employees of any Company Entity, current or former managers of any Company Entity or the beneficiaries or dependents of any such Persons, and is maintained, sponsored, contributed to, or required to be contributed to by any Company Entity, or under which any Company Entity has any liability for premiums or benefits (as listed on Section 2.15(a) of the Disclosure Schedules).

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in Minneapolis, Minnesota are authorized or required by Law to be closed for business.

"**Buyer**" and "**Buyers**" has the meaning set forth in the preamble.

"**Buyer Indemnified Parties**" means Buyers, the Company Entities and each of their Affiliates, and their respective officers, directors, managers, governors, employees, shareholders, members and agents, and each of their respective heirs, personal representatives, successors and assigns.

"**Cap**" has the meaning set forth in Section 7.04(b) hereof.

6695142v8

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**Closing**" has the meaning set forth in **Section 1.04**.

"**Closing Cash Proceeds**" has the meaning set forth in **Section 1.02(c)**.

"**Closing Date**" has the meaning set forth in **Section 1.04**.

"**Closing Date Indebtedness**" means all interest bearing Indebtedness of the Company Entities as of the Closing Date.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the recitals.

"**Company Entities**" means the Company and the Subsidiaries.

"**Company Properties**" has the meaning set forth in **Section 2.09(a)**.

"**Company Transaction Expenses**" has the meaning set forth in **Section 1.02(c)**.

"**Contracts**" means all written (unless otherwise specified) contracts, leases, licenses, consensual obligations, commitments, arrangements, understandings or undertakings, and other agreements (including any amendments and other modifications thereto) of any type, nature or description, to which any Company Entity is or was a party.

"**Data Room**" means the electronic documentation site established by Net Documents on behalf of the Members.

"**Deductible**" means $250,000.

"**Departing Sellers**" means the Sellers other than PBE.

"**Direct Claim**" has the meaning set forth in **Section 7.05(c)**.

"**Disclosure Schedules**" means the Disclosure Schedules delivered by the Members concurrently with the execution and delivery of this Agreement, as they may be updated, from time to time, in accordance with the terms of this Agreement.

"**Drop Dead Date**" means **December 31, 2014**.

"**Employees**" mean those Persons employed by any Company Entity immediately prior to the Closing.

**["Employment Agreement" means that certain employment agreement, which shall include covenants not to compete and not to solicit employees or licensees of any Company Entity during the term of employment and for a period following termination of**

45

employment, in form and substance reasonably satisfactory to Buyers, by and between the Company and Scott Hardy, dated effective as of the Closing Date.]

"**Encumbrance**" means any lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, encroachment, encumbrance, lease, option, right of first refusal, servitude or other right, restriction or limitation (other than restrictions or limitations of Laws of general applicability).

"**Environmental Claim**" means any Governmental Order, Action, allegation, cause of action, written notice or other legal proceeding by any Person related in any way to: (a) the presence, Release of, or exposure to, any Hazardous Materials at any location, whether or not owned, occupied or operated by any Company Entity; or (b) any non-compliance with, or violation of, any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority relating to the environment, including ambient air, soil, surface water or groundwater, subsurface strata, land, stream, sediments, health, safety or Hazardous Materials, as the same may be amended from time to time, including the following (including their implementing regulations and any state analogs): Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 3808 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 270 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1808 et seq.; and the Refuse Act of 1899, 33 U.S.C. § 407.

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made by a Governmental Authority pursuant to Environmental Law.

"**Equity Value**" has the meaning set forth in **Section 1.02(c)**.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**Final Order**" means an action taken or order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order, or protest of any kind, is pending before the Governmental Authority and the

46

time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"**Financial Statements**" means the Audited Financial Statements and the Interim Financial Statements.

"**Funds Flow Memorandum**" means an agreement of the parties concerning the Sellers' direction of the payment of the Closing Cash Payment at the Closing.

"**GAAP**" means United States generally accepted accounting principles applied on a basis consistent with the Audited Financial Statements.  For the avoidance of doubt, in any instance where financial matters are to be determined in accordance with GAAP, consistent with past practices, but GAAP and past practices are inconsistent, GAAP shall govern.

"**Governmental Authority**" means any federal, state, local, foreign, quasi-government, government or political subdivision thereof, or any agency, regulatory authority or instrumentality of such government, quasi-government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal.

"**Governmental Order**" means any order, writ, judgment, injunction (whether temporary, preliminary or permanent), decree, ruling, stipulation, determination or award (whether executive, judicial or otherwise) adopted, enacted, implemented, promulgated, issued, entered or deemed applicable by, under or with the authority of any Governmental Authority.

"**Hardy Employment Agreement**" means that certain Amended and Restated Executive Employment Agreement dated January 1, 2013 between Scott Hardy and PLR Brand Services, LLC.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or man-made, that is acutely hazardous, toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"**Holdback Amount**" has the meaning set forth in Section 1.02(c).

"**Holdings**" has the meaning set forth in the preamble.

"**Holdings LLC Agreement**" means the limited liability company agreement of Holdings dated as of the Closing Date to which Holdings and Rollover Holders will be parties.

"**Hong Kong Tax Liability**" has the meaning set forth on Section 2.12 of the Disclosure Schedules.

"**Indebtedness**" means, with respect to any Person at any date, without duplication:  (a) all obligations of such Person for borrowed money; (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments (including any seller notes, deferred purchase price obligations or earn-out obligations issued or entered into in connection with any acquisition undertaken by such Person); (c) all obligations in respect of letters of credit, to the extent drawn, and bankers' acceptances issued for the account of such Person; (d) all guaranties by such Person of indebtedness of any other Person and obligations of any other Person secured by an Encumbrance on the property of such first Person; (e) all obligations with respect to capital leases; and (f) any accrued interest, prepayment premiums or penalties related to any of the foregoing, whether arising from the transactions contemplated hereby or otherwise.

"**Indefinite Representations**" means the representations and warranties with respect to **Section 2.02** (Capitalization), **Section 2.18** (Brokerage), **Section 3.01** (Organization and Authority of the Members) and **Section 3.02** (Ownership of Units).

"**Indemnified Loss Percentage**" has the meaning set forth in Section 1.02(c).

"**Indemnified Party**" means the party making a claim under **Article VII**.

"**Indemnifying Party**" means the party against whom claims are asserted under **Article VII**; provided, however, in no event will a Company Entity be an Indemnifying Party.

"**Intellectual Property**" means any and all of the following in any jurisdiction throughout the world: (i) patents, trademarks, service marks, trade names, brand names, trade dress, slogans, logos and Internet domain names and uniform resource locators, and the goodwill associated with any of the foregoing; (ii) inventions (whether patentable or not and whether or not reduced to practice), industrial designs, discoveries, improvements, ideas, designs, models, formulae, patterns, compilations, data collections, drawings, blueprints, CAD/engineering drawings, product manuals, manufacturing notes and machinery information, mask works, devices, methods, techniques, processes, know how, proprietary information, customer lists, software (including data and related documentation), technical information, trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (iii) copyrights, copyrightable works, and rights in databases and data collections; (iv) moral and economic rights of authors and inventors; (v) other intellectual or industrial property rights and foreign equivalent or counterpart rights and forms of protection of a similar or analogous nature to any of the foregoing or having similar effect in any jurisdiction throughout the world; (vi) registrations and applications for registration of any of the foregoing, including any renewals, extensions, continuations (in whole or in part), revisions, divisionals, reexaminations or reissues or equivalent or counterpart thereof; (vii) all documentation and embodiments of the foregoing; (viii) all right, title and interest in and to any and all causes of action and rights of recovery for infringement of the foregoing; and (ix) any

48

licenses to, or covenants not to sue, with respect to any of the items described in clauses (i) – (vii) above.

"**Interim Balance Shee**t" means the balance sheet of the Company Entities as at the Interim Balance Sheet Date.

"**Interim Balance Sheet Date**" means September 30, 2014.

"**Interim Financial Statements**" means the Company Entities' unaudited financial statements consisting of the balance sheet of the Company Entities as at September 30, 2014 and the related statements of income and retained earnings, and cash flow for the nine (9) months then ended.

"**Knowledge**" or any other similar knowledge qualification, as it relates to any Person means the actual knowledge of such Person if the Person is an individual, or the actual knowledge of any officer, director, manager, governor or similar position of such Person if such Person is a corporation, partnership, association, limited liability company, trust, unincorporated organization, other entity or group and, in the case of the Company Entities, the knowledge of Scott Hardy, April Lunde and Kent Akervik, in each case, including such knowledge as has been, or would be reasonably likely to be, obtained in the normal course of business after the exercise of reasonable diligence; provided, that the representations and warranties of the Company relating to the Sellers that are qualified as to the Company Entities' Knowledge shall refer to the actual knowledge of Scott Hardy, April Lunde or Kent Akervik with no inquiry by such individuals.

"**Law**" means any statute, law (including common law), ordinance, regulation, rule, code or written policy, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority, or any judicial or administrative interpretation thereof, including any Governmental Order.

"**Leases**" means all leases pertaining to the Real Property.

"**LLC Agreement**" means the Company's Limited Liability Company Agreement, dated May 7, 2009.

"**LOI**" means that certain letter of intent dated July 21, 2014 by and among Marquette Companies, LLC and certain Sellers and Rollover Holders.

"**Losses**" means any and all losses, damages (including punitive damages awarded to third parties, lost profits, consequential, exemplary, incidental and special damages, but excluding damages to the extent calculated based upon a multiple of earnings), liabilities, costs or expenses (including reasonable attorneys' fees), claims, penalties, fines, judgments, awards, settlements, taxes, fees (including arbitration fees or costs, witness fees and reasonable investigation fees), and disbursements, incurred in connection with investigating, defending or settling any Action incident to any matter indemnified under this Agreement (including and reasonable fees and disbursements of legal counsel) without regard to any materiality, Material Adverse Effect, or similar qualifiers.

"**Manager**" means the "Manager" as defined in the LLC Agreement.

"**Material Adverse Effect**" means, with respect to the Company Entities, taken as a whole, any event, occurrence, fact, condition or effect, development or change that has or is reasonably likely to have a material adverse effect on the business, liabilities, results of operations, financial condition or assets of the Company Entities, taken as a whole; provided, however, that "Material Adverse Effect" shall not include any event, occurrence, fact, condition, effect, development or change (i) resulting from general local, domestic, foreign or international economic or political conditions, (ii) generally affecting the industries in which the Company Entities operate, (iii) resulting from any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates, (iv) resulting from any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof, or (v) acts of God, acts of war, sabotage, terrorism, military actions or the escalation thereof, except, with respect to clauses (i), (ii), (iii) and (v), to the extent the Company Entities, taken as a whole, suffer disproportionately from the foregoing as compared to other participants in the Company Entities' industry.

"**Material Contracts**" has the meaning set forth in **Section 2.08(a)**.

"**Material Licensees**" has the meaning set forth in **Section 2.21**.

"**Member**" means a Seller or a Rollover Holder and "**Members**" means collectively the Sellers and the Rollover Holders.

"**Member Indemnified Parties**" means the Members and their respective Affiliates, and their respective officers, directors, managers, employees, shareholders, members and agents, and each of their respective heirs, personal representatives, successors and assigns.

"**Member Transaction Expenses**" means any fees or expenses to any banker, broker, attorney, accountant, valuation firm or other person working on behalf of the Members or the Sellers Representative incurred in connection with the transaction contemplated by this Agreement.

"**Motion**" has the meaning set forth in **Section 1.03(a)**.

"**Mutual Release**" has the meaning set forth in **Section 6.02(m)**.

"**Option Agreement**" means a Membership Unit Option Agreement to be entered into by GBB PLR IP Holdings, LLC, PFCF and Picture Eagle, in a form and substance agreed to by such parties.

"**PBE**" means the bankruptcy estate of PBE Corporation, a Delaware corporation f/k/a Polaroid Corporation acting by and through the Trustee.

"**PBE Note**" has the meaning set forth in **Section 1.02(d)**.

"**Permits**" means all permits, licenses, registrations, certificates, franchises, approvals and authorizations required to be obtained from Governmental Authorities.

"**Permitted Encumbrances**" means (i) those items set forth in Section 2.09(a) of the Disclosure Schedules, including any Encumbrances related to Closing Date Indebtedness, (ii) Encumbrances for Taxes not yet due and payable, (iii) mechanics, carriers', workmen's, repairmen's or other like Encumbrances arising or incurred in the ordinary course of business if the underlying obligations are not delinquent, (iv) easements, rights of way, zoning ordinances and other similar Encumbrances affecting Real Property, (v) licenses granted to other Persons in the ordinary course of business, (vi) other than with respect to owned Real Property, Encumbrances arising under original purchase price conditional sales Contracts and equipment leases with third parties entered into in the ordinary course of business, or (vii) Encumbrances relating to the Closing Date Indebtedness.

"**Person**" means an individual, sole proprietorship, firm, corporation (including any non-profit corporation), partnership, joint venture, limited liability company, Governmental Authority, estate, unincorporated society or organization, trust, association or other entity.

"**PFCF**" has the meaning set forth in the preamble.

"**Picture Eagle**" has the meaning set forth in the preamble.

"**Polaroid Case**" means the bankruptcy case of Polaroid Corporation, et al., case no. 08-46617 pending in the Bankruptcy Court.

"**Pre-Closing Tax Period**" has the meaning set forth in **Section 5.13(a)**.

"**Purchase Price**" has the meaning set forth in **Section 1.01**.

"**Qualified Benefit Plan**" means each Benefit Plan that is intended to be qualified under Section 401(a) of the Code.

"**Real Property**" means the real property owned, leased or subleased by any Company Entity, together with all buildings, structures, facilities and other improvements located thereon.

"**Release**" means any release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, seeping, dispersing, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including soil, ambient air (indoor or outdoor), surface water, stream, sediments, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Period**" means the period of five (5) years commencing on the Closing Date.

"**Rollover Agreement**" has the meaning set forth in the recitals.

51

"**Rollover Amount**" means the aggregate amount set forth on **Exhibit A** hereto under the column titled "Rollover Equity Value."

"**Rollover Equity**" means the Units set forth on **Exhibit A** hereto under the column titled "Rollover."

"**Rollover Holders**" means the Members to the extent they own Rollover Equity.

"**Rollover Transaction**" has the meaning set forth in the recitals.

"**Sale Units**" means the Units set forth on **Exhibit A** hereto under the column titled "Sale Units."

"**Schedule Supplement**" has the meaning set forth in **Section 5.04**.

"**Seller**" means each of the Persons executing a signature page hereto under the heading "Seller."

"**Sellers' Representative**" means Kenny Finkelstein.

"**Sellers' Representative Fee**" means $125,000.

"**Straddle Period**" has the meaning set forth in **Section 5.13(c)**.

"**Subsidiaries**" means PLR Brand Services, LLC, a Delaware limited liability company, and PLR Ecommerce, LLC, a Delaware limited liability company, both of which are wholly-owned subsidiaries of the Company.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement or other document required to be filed with respect to Taxes, including any schedule or attachment thereto, and including any amendment thereof, filed or required to be filed by any Person.

"**Taxes**" means (a) any and all federal, state, local, foreign and other taxes, charges, fees, imposts, levies or other assessments, including all net income, gross receipts, capital, sales, use, production, ad valorem, value added, transfer, franchise, registration, profits, inventory, capital stock, license, lease, service, service use, withholding, payroll, employment, social security, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions, fines or penalties with respect thereto and any interest in respect of such additions, fines or penalties, and (b) any liability in respect of any items described in clause (a) payable by reason of Contract, assumption, transferee liability, operation of law, Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law) or otherwise.

"**Third Party Claim**" has the meaning set forth in **Section 7.05(a)**.

52

"**Transaction Documents**" means this Agreement, the Disclosure Schedules, the Option Agreement and any other schedules to this Agreement, the Employment Agreements, and the other documents, instruments and agreements to be executed and/or delivered by the parties pursuant to this Agreement.

"**Trustee**" means John R. Stoebner, as Chapter 7 Trustee of PBE Corporation and its affiliated debtors.

"**Units**" means the membership units of limited liability company interests of the Company.

**[SIGNATURE PAGE FOLLOWS]**

53

The parties hereto have executed this Agreement as of the date first written above.[9]

**BUYERS:**

**[HOLDINGS NEWCO], LLC**

By: _____
Name: _____
Title: _____

**[Signature page to Membership Unit Purchase Agreement]**

_____

[9] Signature blocks of Sellers to be updated to reflect ultimate identities of Members and all parties.

The parties hereto have executed this Agreement as of the date first written above.

**BUYERS:**

**PFCF, LLC**

By:_____

Name: _____

Title: _____


**PICTURE EAGLE, LLC**


By:_____

Name: _____

Title: _____

**[Signature page to Membership Unit Purchase Agreement]**

The parties hereto have executed this Agreement as of the date first written above.

**SELLER:**

**PBE Corporation, et al.**

By:_____

John R. Stoebner, solely as Chapter 7 Trustee of PBE Corporation formerly known as Polaroid Corporation, and its affiliated debtors

**TRUSTEE:**

_____

John R. Stoebner, solely as Chapter 7 Trustee of PBE Corporation formerly known as Polaroid Corporation, and its affiliated debtors

**[Signature page to Membership Unit Purchase Agreement]**

The parties hereto have executed this Agreement as of the date first written above.

**SELLER:**

**KPL, LLC**

By:_____
Name: _____
Title: _____

**[Signature page to Membership Unit Purchase Agreement]**

The parties hereto have executed this Agreement as of the date first written above.

**SELLER:**

**Infinity PLR 44, LLC**


By:_____
Name: _____
Title: _____

**[Signature page to Membership Unit Purchase Agreement]**

The parties hereto have executed this Agreement as of the date first written above.

**SELLER:**

**William Morris Endeavor Entertainment, LLC**

By:_____

Name: _____

Title: _____

**[Signature page to Membership Unit Purchase Agreement]**

The parties hereto have executed this Agreement as of the date first written above.

**ROLLOVER HOLDER:**

**Gordon Brothers Brands, LLC**

By:_____
Name: _____
Title: _____

**[Signature page to Membership Unit Purchase Agreement]**

The parties hereto have executed this Agreement as of the date first written above.

**COMPANY:**

**PLR IP HOLDINGS, LLC**

By:_____

Name: _____

Title: _____

**[Signature page to Membership Unit Purchase Agreement]**

The parties hereto have executed this Agreement as of the date first written above.

**SELLERS REPRESENTATIVE:**

_____
Kenny Finkelstein

**[Signature page to Membership Unit Purchase Agreement]**

**EXHIBIT A**

**UNITS, NET EQUITY VALUE, HOLDBACK, CLOSING CASH PROCEEDS**

A-1

# EXHIBIT A

| Member | Units | | | Net Equity Value By Member | Holdback | Indemnified Loss Percentage[3] | Closing Cash Proceeds[4] | Rollover Equity Value |
|---|---|---|---|---|---|---|---|---|
| | Sale | Rollover | Total | | | | | |
| GBB PLR IP Holdings, LLC[2] | 57.7579772 | 201.9089678 | 259.6669449 | 15,355,293.03 | 79,739.14 | 29.8741110% | 3,335,753.98 | 11,939,799.91 |
| GBB PLR IP Holdings, LLC (Affiliates)[2] | 115.3330551 | 0.0000000 | 115.3330551 | 6,820,170.58 | 159,225.77 | 13.2688143% | 6,660,944.80 | - |
| Hilco PLR Holdings, LLC | 0.0000000 | 67.0352381 | 67.0352381 | 3,964,717.80 | - | 7.7134587% | - | 3,964,717.80 |
| Hilco PLR Holdings, LLC (Affiliates) | 52.2647619 | 0.0000000 | 52.2647619 | 3,091,135.90 | 72,166.60 | 6.0138831% | 3,018,969.31 | - |
| KPL, LLC | 255.7000000 | 0.0000000 | 255.7000000 | 15,119,609.62 | 352,986.99 | 29.4155829% | 14,766,622.62 | - |
| PBE Corporation[1] | 250.0000000 | 0.0000000 | 250.0000000 | 7,049,073.07 | - | 0.0000000% | 7,049,073.07 | - |
| **Total** | **731.0557941** | **268.9442059** | **1000.0000000** | **51,400,000.00** | **664,118.50** | **86.2858501%** | **34,831,363.79** | **15,904,517.71** |

**_Footnotes:_**

(1) PBE Corporation has elected to take Closing Cash Proceeds in the form of a Note.

(2) Effective as of the Closing, GBB and/or its affiliates will grant certain equity owners of Holdings an option to acquire a portion of their sale
units, at the value set forth in the Exhibit A, which option is exercisable in 2015.

(3) This percentage reflects the indemnification percentages for losses under 7.02(ii) and (iii).

(4) Closing Cash Proceeds assumes total cash needed less Holdback and after exercise of Options

**EXHIBIT B**

**FORM OF PBE NOTE**

## PROMISSORY NOTE

$[7,049,073.07]                                                                [•], 2014

FOR VALUE RECEIVED, the undersigned, [NEWCO], a Delaware limited liability company ("*Maker*"), hereby promises to pay to the order of PBE CORPORATION, a Delaware corporation, f/k/a Polaroid Corporation ("*Holder*"), at [•] or at such other place as Holder may from time to time hereafter designate to Maker in writing, the principal sum of [SEVEN MILLION FORTY-NINE THOUSAND SEVENTY-THREE DOLLARS AND 07/100 CENTS ($7,049,073.07)] (the "*Principal Amount*"). This Promissory Note (this "*Note*") is being executed in connection with that certain Membership Unit Purchase Agreement effective as of [•], 2014 (the "*Purchase Agreement*") made by and among Maker, PFCF, LLC, a Delaware limited liability company, PICTURE EAGLE, LLC, a Delaware limited liability company, Holder and the other members of PLR IP Holdings, LLC, a Delaware limited liability company, JOHN R. STOEBNER, as Chapter 7 Trustee of Holder and its affiliated debtors, and KENNY FINKELSTEIN, as sellers' representative.

1.    <u>Interest</u>.  The unpaid principal balance hereof from time to time outstanding shall bear interest at a fixed rate of ten percent (10%) per annum.  Interest shall be computed on the basis of actual days elapsed in a year of 360 days.

2.    <u>Payment of Principal and Interest; Prepayment</u>.

(a)    Accrued interest on this Note shall be payable on [December 31, 2014], and on the last day of each March, June, September and December occurring thereafter during the term of this Note.  Subject to earlier prepayment as provided below, the entire unpaid Principal Amount and accrued but unpaid interest hereunder shall be due and payable in full on May [•], 2017 (the "*Maturity Date*").

(b)    Holder may, at any time during the term of this Note, elect to require Maker to prepay this Note in full, but not in part, by providing written notice of such election to Maker (such notice, a "*Put Notice*").  Such notice shall include a statement that such notice constitutes a 'Put Notice' under the provisions of this <u>Section 2(b)</u> and shall set forth a date, not earlier than sixty (60) days nor later than seventy-five (75) days after the effective date such notice, on which Holder is requiring this Note to be prepaid (the "*Put Date*").  Maker shall, on or before the Put Date, pay to Holder hereof the entire unpaid Principal Amount and accrued but unpaid interest hereunder without premium or penalty.

(c)    Maker may not voluntarily prepay any of the Principal Amount of this Note except in accordance with this <u>Section 2(c)</u>. Maker may, at any time during the term of this Note elect to prepay the entire unpaid Principal Amount by providing written notice of such election to Holder (such notice, a "*Redemption Notice*").  Such notice shall include a statement that such notice constitutes a 'Redemption Notice' under the provisions of this <u>Section 2(c)</u> and shall set forth a date, not later than thirty (30) days after the effective date of such notice, on or before which Maker intends to prepay this Note (the "*Redemption Date*"). Maker shall, on or before the Redemption Date, pay to Holder hereof an amount equal to the sum of (i) the entire unpaid Principal Amount and

1

accrued but unpaid interest hereunder, (ii) an additional amount equal to the aggregate amount of all interest payments that would have become due hereunder at the non-default rate from the date immediately following the Redemption Date to and including the Maturity Date had this Note not been prepaid pursuant to this Section 2(c), and (iii) all amounts due and payable under that certain Loan Management Fee Agreement of even date herewith made by and between Holder and Maker (the "*LMF Agreement*") in the event a prepayment of the Note is made pursuant to this Section 2(c).

(d)     This Note shall be paid by Maker in lawful currency of the United States of America to Holder at the address of Holder specified above or at such other place as Holder shall direct in writing to Maker.  If payment or prepayment is due on a day that is not a Business Day, such payment shall be due on the next succeeding Business Day. The term "*Business Day*" means any day other than a Saturday, Sunday or other day on which commercial banks in Minneapolis, Minnesota are authorized or required by law to close.

3.     Limitation on Total Debt; Secured Indebtedness.

(a)     Maker shall not permit the ratio of (a) (i) Indebtedness of PLR IP HOLDINGS, LLC, a Delaware limited liability company ("*PLR*"), and its wholly-owned subsidiaries (PLR, together with its wholly-owned subsidiaries, the "*PLR Entities*") as of the last day of each fiscal month of PLR occurring during the term of this Note, beginning with the fiscal month ending December 31, 2014, *plus* (ii) the unpaid Principal Amount of this Note as of such date, to (b) EBITDA of PLR and its wholly-owned subsidiaries for the period of twelve (12) consecutive fiscal months of the PLR Entities ending on such date (such ratio, as of any date of determination, the "*Total Debt to EBITDA Ratio*"), to be greater than 4.00 to 1.00.  For purposes hereof:

"*EBITDA*" shall mean, with regard to the PLR Entities for any period, the sum of (a) net income (or loss) of the PLR Entities for such period (excluding extraordinary gains and losses), *plus* (b) all interest expense of the PLR Entities for such period, *plus* (c) all charges against income of the PLR Entities for such period for federal, state and local taxes, *plus* (d) depreciation and amortization expenses of the PLR Entities for such period, *plus* (e) with respect to any period that includes all or any portion of the PLR Entities' fiscal year ending December 31, 2014, acquisition transaction-related costs and expenses incurred by the PLR Entities and its consolidated subsidiaries during such period consisting of (i) amounts paid or payable to employees with respect to or in connection with the change of control contemplated by the Purchase Agreement, including payments in respect of employees' value appreciation rights, in an aggregate amount not to exceed $1,400,000, (ii) amounts paid or payable by Maker pursuant to the LMF Agreement in respect of the Loan Origination Fee, and (iii) fees, costs and expenses of attorneys, accountants, tax specialists and other advisors paid or payable in connection with the transactions contemplated by the Purchase Agreement, and other transaction-related fees, costs and expenses paid or payable pursuant to or in connection with the Purchase Agreement or the transactions contemplated thereunder, in an aggregate amount not to exceed $500,000.  For

2

purposes of this definition, non-cash gains or losses associated with mark-to-market transactions with respect to interest rate hedging agreements and foreign exchange transactions shall be excluded in determining consolidated net income.

"*GAAP*" means generally accepted accounting principles, applied on a consistent basis, as set forth in Opinions of the Accounting Principles Board of the American Institute of Certified Public Accountants or in statements of the Financial Accounting Standards Board or their respective successors and that are applicable in the circumstances as of the date in question, *provided*, that if Maker notifies Holder that Maker desires to amend the financial covenant or any related definition set forth in this Section 3 to eliminate the effect of any change in GAAP occurring after the date of this Note, or if Holder notifies Maker that Holder desires to amend any financial covenant or any related definition set forth in this Section 3 for such purpose, then compliance with such financial covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to Maker and Holder.

"*Indebtedness*" means, with regard to the PLR Entities: (a) all indebtedness, whether or not represented by bonds, debentures, notes, securities or other evidences of indebtedness, for the repayment of money borrowed, (b) all indebtedness representing deferred payment of the purchase price of property or assets, (c) all indebtedness under any lease that, in conformity with GAAP, is required to be capitalized for balance sheet purposes and leases of property or assets made as a part of any sale and lease-back transaction that in conformity with GAAP is required to be capitalized, (d) all indebtedness under guaranties, endorsements, assumptions, or other contractual obligations, including any letters of credit, or the obligations in respect of, or to purchase or otherwise acquire, indebtedness of others, (e) all indebtedness secured by a Lien existing on property owned, subject to such Lien, whether or not the indebtedness secured thereby shall have been assumed by the owner thereof, (f) trade accounts payable more than ninety (90) days past due to the extent not subject to dispute or a payment plan with a third-party vendor, and (g) all amendments, renewals, extensions, modifications and refundings of any indebtedness or obligations referred to in clauses (a), (b), (c), (d), (e) or (f). "Indebtedness" includes Secured Indebtedness as defined below.

"*Lien*" means any lien, mortgage, pledge, hypothecation, collateral assignment (including any collateral assignment of rights to receive payments of money), security interest, charge, or encumbrance of any kind (including any conditional sale or other title retention agreement or any capital lease having substantially the same economic effect as any of the foregoing) whether arising by agreement, operation of law or otherwise.

(b)     Maker shall not permit the aggregate amount of all Secured Indebtedness (defined below), as of the last day of any fiscal month, to exceed $34,000,000.  For purposes hereof, the term "*Secured Indebtedness*" means, as of any date of determination,

(i) all Indebtedness of each PLR Entities secured by a Lien against any of the assets of any of the PLR Entities as of such date, *plus* (ii) the unpaid Principal Amount of this Note as of such date.

(c)     Maker shall provide, or shall cause PLR to provide (a) as soon as available and in any event within one hundred twenty (120) days after the end of each fiscal year of PLR, beginning with the fiscal year ending December 31, 2014, a copy of the annual audit report of the PLR Entities for such fiscal year (each such audit report, an "*Annual Financial Statement*") containing consolidated and consolidating balance sheets, statements of income, statements of members' equity, and statements of cash flow as at the end of such fiscal year and for the fiscal year then ended, all in reasonable detail and audited and certified by independent certified public accountants to the effect that such financial statements have been prepared in accordance with GAAP, and (b) as soon as available and in any event within twenty-five (25) days after the end of each fiscal month of PLR, a copy of an unaudited financial report of the PLR Entities as of the end of such fiscal month (each such financial report, a "*Monthly Financial Statement*"), containing consolidated balance sheets, statements of income, and statements of cash flow (and, as to the balance sheets and statements of income, supporting consolidating schedules). Each of the Monthly Financial Statements shall be accompanied by a certificate from an authorized officer of Maker or PLR as to compliance with the financial covenants set forth in this <u>Section 3</u> and in <u>Section 4</u> which shall include in reasonable detail the calculations of the Total Debt to EBITDA Ratio and the GAAP Net Worth determined on a pro-forma basis pursuant to <u>Section 4</u>.  In addition, Maker shall provide, or shall cause PLR to provide, (a) such financial and other information concerning Maker, PLR and other PLR Entities and their affairs, as PBE may from time to time reasonably require, and (b) promptly inform PBE of any occurrence of any fact, circumstance or event which it becomes aware which might adversely effect its ability to perform its obligations under the Note, the LMF Agreement or that certain Membership Interests Pledge Agreement of even date herewith made by and between Maker and Holder (the "*Membership Interests Pledge Agreement*") and of any Event of Default forthwith upon becoming aware thereof.

4.     <u>Limitations on Distributions</u>.  Except as expressly permitted under this <u>Section 4</u>, Maker shall not cause or permit PLR to at any time make, directly or indirectly, any declaration of any dividend on, or any other payment or distribution in respect of, any Equity Interests of PLR.  So long as no Default or Event of Default shall have occurred and be continuing, or would result therefrom, Maker may cause and permit PLR to make, and Maker may receive, retain and distribute or otherwise use Cash Distributions, *provided*, that the GAAP Net Worth of PLR as of the last day of the most recent fiscal month for which a Monthly Financial Statement has been delivered to Holder, determined on a pro-forma basis as if such Cash Distribution (together with all other Cash Distributions made on or after the date of such financial statements) had been made on the last day of such fiscal month, is not less than $42,000,000.  For purposes hereof:

"*Cash Distribution*" means any cash dividend or cash distribution made in respect of Equity Interests in PLR.

"*Equity Interests*" means all securities, shares, units, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a corporation,

4

partnership, limited liability company, or other entity, whether voting or nonvoting, certificated or uncertificated, including general partner partnership interests, limited partner partnership interests, limited liability company interests, common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

"*GAAP Net Worth*" means, as of any date of determination, the PLR's members' equity as of such date, as determined in conformity with GAAP.

5.    Related-Party Transactions.  Maker shall not permit PLR to enter into or cause, suffer or permit to exist any transaction, arrangement or contract with any of its Affiliates (defined below) except (a) in the ordinary course of business on terms not less favorable to PLR than could be obtained on an arm's-length basis from unrelated third parties, which agreements the Holder acknowledges includes a sublease by one or more PLR Entities of a portion of the space leased by Gordon Brothers Group, LLC ("*Gordon Brothers*") or one of its Affiliates in New York, New York at the same per square foot rent paid by Gordon Brothers for such space, (b) Cash Distributions permitted under Section 4 hereof, (c) between or among PLR Entities not involving any other Affiliate; *provided*, that PLR shall not sell, transfer, assign, license, pledge, encumber or grant any Lien with respect to any material portion of its assets to any Affiliate pursuant to the exception set forth in this subparagraph (c) without the prior written consent of Holder, which consent may be withheld, conditioned or delayed by Holder in its sole and absolute discretion, (d) payment of reasonable compensation in the ordinary course of business to officers, directors and employees for services actually rendered to any PLR Entity, and (e) management, advisory and similar fees payable to (i) Hilco Global ("*Hilco*") and/or one or more of its Affiliates in an amount not to exceed an aggregate amount of $125,000 per calendar year, (ii) Gordon Brothers Group, LLC ("*Gordon Brothers*") and/or one or more of its Affiliates in an amount not to exceed an aggregate amount of $125,000 per calendar year, and (iii) Marquette Companies ("*Marquette*") and/or one or more of its Affiliates in an amount not to exceed an aggregate amount of $100,000 per calendar year.  For purposes of this Section 5, the term "*Affiliate*" shall mean, with respect to any natural person, corporation, limited partnership, general partnership, limited liability company, limited liability partnership, joint stock company, joint venture, association or other organization (each, a "*Person*"), any other Person directly or indirectly Controlling, Controlled by or under common Control with such first Person, and with respect to PLR shall include without limitation Hilco, Gordon Brothers and Marquette, and each of their respective Affiliates.  "*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "*Controlling*" and "*Controlled*" have meanings correlative thereto.

6.    Events of Default.  Maker shall be in default under this Note upon the occurrence of any of the following events, circumstances or conditions ("*Events of Default*"):

(a)    If any payment required under this Note is not paid when due and Maker does not cure that payment default within ten (10) days after receipt by Maker of written notice from Holder thereof; *provided*, that Maker shall not be entitled to receive more

5

than two (2) such notices and cure periods during the term of this Note, and thereafter an Event of Default shall be deemed to have occurred if any payment required under this Note is not paid when due and such failure continues for ten (10) days following the date due; or

(b)    If (i) Maker fails to own and hold one hundred percent (100%) of the issued and outstanding membership units in PLR, or (ii) PLR fails to own and hold, directly or indirectly, one hundred percent (100%) of the issued and outstanding membership units or other equity interests in each other PLR Entity; or

(c)    If Maker (i) fails to comply or cause compliance with the Total Debt to EBITDA Ratio covenant in Section 3(a), the Secured Indebtedness covenant in Section 3(b) or the limitation on distributions in Section 4, or (ii) fails to comply or cause compliance with any other covenant or agreement of Maker or PLR set forth herein, the LMF Agreement or in the Membership Interests Pledge Agreement, and, with respect to clause (ii), such failure continues for ten (10) Business Days after written notice from Holder to Maker of such failure; or

(d)    If any representation or warranty made by Maker in Membership Interests Pledge Agreement is not true and correct in any material respect; or

(e)    If Maker or any PLR Entity shall fail to pay Indebtedness in excess of $250,000 in the aggregate as and when due, whether by acceleration, upon the stated maturity thereof or otherwise, and such failure continues for ten (10) Business Days after the date the same became due; or

(f)    If any one or more judgment(s) or order(s) for the payment of money in excess of $250,000 in the aggregate shall be rendered against the Maker or any PLR Entity and either: (i) enforcement proceedings shall have been commenced by any creditor upon any such final or nonappealable judgment or order, or (ii) there shall be any period of thirty (30) consecutive days during which a stay or enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; *provided*, however, that, for purposes of determining whether an Event of Default has occurred under this Section 6(f), the amount of any such judgment or order shall be reduced to the extent that (i) such judgment or order is covered by a valid and binding policy of insurance between the defendant and the insurer covering payment thereof, and (ii) such insurer, which shall be rated at least "A" by A.M. Best Company, has been notified of, and has not disputed the claim made for payment of, such judgment or order; or

(g)    If Maker or any PLR Entity shall become insolvent or generally fail to pay, or admit in writing such party's inability to pay, its debts as they become due or applies for, consents to or acquiesces in the appointment of a trustee, receiver or other custodian for Maker or any PLR Entity or any property or assets of Maker or any PLR Entity, or makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for Maker or any PLR Entity or for a substantial part of the property or assets

6

of Maker or any PLR Entity and is not discharged within sixty (60) days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding, is commenced in respect of Maker or any PLR Entity and if such case or proceeding is not commenced by Maker or any PLR Entity it is consented to or acquiesced in by Maker or any PLR Entity or if such case or proceeding is not vacated, stayed or dismissed within sixty (60) days of such commencement; or

      (h)    If Maker fails to make any payment required under the LMF Agreement as and when due, and Maker does not cure that payment default within ten (10) days after receipt by Maker of written notice from Holder thereof; *provided*, that Maker shall not be entitled to receive more than two (2) such notices and cure periods during the term of this Note, and thereafter an Event of Default shall be deemed to have occurred if any payment required under the LMF Agreement is not paid when due and such failure continues for ten (10) days following the date due.

For purposes hereof, "*Default*" means any event, circumstance or condition that, with the giving of notice or the passage of time or both would constitute and Event of Default.

      7.    <u>Remedies; Default Interest Rate</u>.  Upon the occurrence of an Event of Default the unpaid principal balance due hereunder shall bear interest at a "*Default Rate*" equal to twelve percent (12%) per annum until such Event of Default is cured.  Upon the occurrence of an Event of Default, or at any time thereafter, Holder may at its option (and in addition to any other rights and remedies available to it) by providing written notice to Maker, declare immediately due and payable all unpaid principal of and accrued interest on the Note, together with all other sums payable hereunder and under the LMF Agreement and, without duplication, all other amounts due under the Note and the LMF Agreement in the same manner and calculated in accordance with <u>Section 2(c)</u> as if Maker had elected to prepay this Note, whereupon the entire Principal Amount and accrued interest on the Note and all such other sums and amounts shall thereupon be immediately due and payable without presentment or other demand, protest, notice of dishonor or any other notice of any kind, all of which are hereby expressly waived.

      8.    <u>Secured Obligations</u>.  All indebtedness, liabilities and obligations of Maker arising under or evidenced by the Note, the LMF Agreement and the Membership Interests Pledge Agreement, including without limitation the payment of all principal, interest and other amounts due and payable, or becoming due and payable, thereunder (collectively, the "*Obligations*") are secured by the Collateral set forth in the Membership Interests Pledge Agreement.

      9.    <u>Notice</u>.  All notices, requests, consents, claims, demands, waivers and other communications to be given or delivered under or by reason of the provisions of this Note  shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.

7

10.     <u>GOVERNING   LAW</u>.   THE   VALIDITY,   CONSTRUCTION   AND
ENFORCEABILITY OF THIS NOTE SHALL BE GOVERNED BY THE INTERNAL LAWS
OF THE STATE OF MINNESOTA, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS
PRINCIPLES THEREOF.

11.     <u>Collection Costs</u>.  If any Obligations, including amounts under this Note or the
LMF Agreement, are not paid when due, Maker shall pay all of Holder's actual out-of-pocket
costs of collection, including reasonable attorneys' fees.

12.     <u>Amendment; Assignment</u>.   The provisions contained in this Note may not be
amended, except through a written amendment which is signed by Maker and Holder.  Holder may
not sell, transfer, endorse or otherwise assign this Note, whether by operation of law or otherwise, or
any rights or duties hereunder, without the prior written consent of Maker, which consent may
withheld or delayed by Maker in its sole discretion; *provided*, however, that such consent shall not
be required upon the occurrence of an Event of Default.

13.     <u>Integration</u>.  This Note, the LMF Agreement and the Membership Interests Pledge
Agreement, and all documents executed in connection herewith and therewith, represent the
entire understanding between the parties as to the Obligations evidenced hereby and thereby and
may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements
of the parties.

*[Remainder of page left blank;
signature page follows]*

8

IN WITNESS WHEREOF, the parties have executed this Note, intending to be legally bound hereby, by their duly authorized representatives as of the date first set forth above.

MAKER:

[NEWCO], a [Delaware] limited liability company

By:_____
Name:_____
Title:_____

HOLDER:

PBE CORPORATION, a Delaware corporation, f/k/a Polaroid Corporation

By:_____
Name:_____
Title:_____

[*Signature page to Promissory Note*]

**EXHIBIT C**

**FORM OF MEMBER INTERESTS PLEDGE AGREEMENT**

6695142v8

## MEMBERSHIP INTERESTS PLEDGE AGREEMENT

THIS MEMBERSHIP INTERESTS PLEDGE AGREEMENT (this "*Agreement*") is made as of this [•] day of November, 2014, by [NEWCO], a Delaware limited liability company ("*[NewCo]*"), PFCF, LLC, a Delaware limited liability company ("*PFCF*"), and Picture Eagle, LLC, a Delaware limited liability company ("*Picture Eagle*"), together with [*NewCo*] and PFCF, each a "*Pledgor*" and collectively, the "*Pledgors*") in favor of PBE CORPORATION, a Delaware corporation, f/k/a Polaroid Corporation ("*PBE*").

### RECITALS:

A.    Pledgors and PBE are parties to a certain Membership Unit Purchase Agreement effective as of [•], 2014 (the "*Purchase Agreement*") made by and among Maker, PFCF, Picture Eagle, Holder and the other members of PLR IP HOLDINGS, LLC, a Delaware limited liability company, JOHN R. STOEBNER, as Chapter 7 Trustee of Holder and its affiliated debtors, and KENNY FINKELSTEIN, as sellers' representative, pursuant to which Pledgors acquired all of the issued and outstanding membership units of PLR IP HOLDINGS, LLC, a Delaware limited liability company ("*PLR*").

B.    In connection with the transactions contemplated under the Purchase Agreement, [*NewCo*] agreed to issue its Promissory Note of even date herewith made payable to the order of PBE in the original principal amount of $[7,049,073.07] (the "*Note*") and deliver a Loan Management Fee Agreement of even date herewith in favor of PBE (the "*LMF Agreement*").

C.    In connection with the transactions contemplated under the Purchase Agreement, the Note and the LMF Agreement, Pledgors further agreed to pledge to PBE all of the issued and outstanding membership interests in PLR to secure the payment and performance of all indebtedness, liabilities and obligations of [*NewCo*] to PBE under the Note, the LMF Agreement and this Agreement.

D.    It is a condition precedent to consummation of the transactions contemplated by the Purchase Agreement that each Pledgor execute and deliver this Agreement in favor of PBE.

### AGREEMENTS:

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1.      Definitions and Construction.

(a)    Definitions.  All capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Note.  As used in this Agreement:

"*Applicable Statutes*" means 6 Del. C. § 18-101, et. seq., as amended from time to time, or any successor statute governing the establishment and governance of limited liability companies organized under the laws of the State of Delaware.

"*Bankruptcy Code*" means United States Bankruptcy Code (11 U.S.C. Section 101 et seq.), as in effect from time to time, and any successor statute thereto.

"*Code*" means the Uniform Commercial Code as in effect from time to time in the State of Delaware or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"*Collateral*" means, collectively, the Pledged Interests, the Future Rights, and the Proceeds (whether now owned or hereafter acquired), together with all rights (including, without limitation, financial and governance rights), titles, privileges and preferences pertaining or incidental to any of the foregoing.

"*Default*" has the meaning ascribed to the term in Section 6 of the Note.

"*Equity Interests*" means all securities, shares, units, options, warrants, interests, participations, or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company, or other entity, whether voting or nonvoting, certificated or uncertificated, including general partner partnership interests, limited partner partnership interests, limited liability company interests, common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934).

"*Event of Default*" means the occurrence and continuance of an "Event of Default", as that term is defined in the Note.

"*Future Rights*" means, collectively, all right, title and interest of each Pledgor in and to the following: (a) all Equity Interests (other than Pledged Interests) of Issuer, including, without limitation, all Equity Interests of Issuer created after the date of this Agreement, and all securities convertible or exchangeable into, and all warrants, options, or other rights to purchase, Equity Interests of Issuer; and (b) the certificates or instruments representing such Equity Interests, convertible or exchangeable securities, warrants, and other rights and all dividends, distributions, cash, options, warrants, rights, instruments, and other property or proceeds from time to time received, receivable, or otherwise distributed in respect of or in exchange for any or all of such Equity Interests.

"*Holder*" has the meaning ascribed thereto in Section 3 of this Agreement.

"*Issuer*" means PLR and any successors thereto, whether by merger or otherwise.

"*Issuer Organizational Documents*" means, collectively, (a) the Certificate of Formation of the Issuer filed with the Delaware Secretary of State on [•], (b) the [Operating Agreement] of Issuer, dated as of [•], and (c) each other agreement, instrument or document affecting Issuer's organization, management

2

or governance, as each of the foregoing may be amended, restated or otherwise modified from time to time.

"*Lien*" means any lien, mortgage, pledge, hypothecation, assignment (including any assignment of rights to receive payments of money), security interest, charge, or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, or any agreement to give any security interest) whether arising by agreement, operation of law or otherwise.

"*Obligations*" means, collectively, all indebtedness, liabilities and obligations of Maker arising under or evidenced by the Note, the LMF Agreement and this Agreement, including without limitation the payment of all principal, interest and other amounts due and payable, or becoming due and payable, thereunder.

"*Pledged Interests*" means, collectively, all right, title and interest of each Pledgor in and to the following: (a) all Equity Interests of Issuer including, without limitation, those identified on Schedule 1 attached hereto, and all Equity Interests of Issuer that are replacements, substitutions or reissuances of the foregoing; and (b) the certificates or instruments representing such Equity Interests described in clause (a), in each case together with rights to participate in voting, management and control of Issuer.

"*Pledgor Organizational Documents*" means, collectively, (a) the Certificate of Formation of each Pledgor, (b) the Operating Agreement of each Pledgor, and (c) each other agreement, instrument or document affecting each Pledgor's organization, management or governance, as each of the foregoing may be amended, restated or otherwise modified from time to time.

"*Proceeds*" means, collectively, all right, title and interest of each Pledgor in and to all proceeds (including proceeds of proceeds) of the Pledged Interests and Future Rights including without limitation, to the extent and only to the extent of the right, title and interest of such Pledgor therein, all: (a) rights, benefits, distributions, premiums, profits, dividends, interest, cash, instruments, documents of title, accounts, contract rights, inventory, equipment, general intangibles, payment intangibles, deposit accounts, chattel paper, and other property from time to time received, receivable, or otherwise distributed in respect of or in exchange for, or as a replacement of or a substitution for, any of the Pledged Interests, Future Rights, or proceeds thereof (including any cash, Equity Interests, or other securities or instruments issued after any recapitalization, readjustment, reclassification, merger or consolidation with respect to Issuer and any security entitlements, as defined in Section 8-102(a)(17) of the Code, with respect thereto); (b) "proceeds," as such term is defined in Section 9-102(a)(64) of the Code; (c) proceeds of any insurance, indemnity, warranty, or guaranty (including guaranties of delivery) payable from time to time with respect to any of the Pledged Interests, Future Rights, or proceeds thereof; (d) payments (in any form

3

whatsoever) made or due and payable to such Pledgor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Pledged Interests, Future Rights, or proceeds thereof; and (e) other amounts from time to time paid or payable under or in connection with any of the Pledged Interests, Future Rights, or proceeds thereof.

"*Registered Organization*" has the meaning ascribed thereto in Section 9-102(a)(70) of the Code.

"*Securities Act*" has the meaning ascribed thereto in Section 9(c) of this Agreement.

(b)     <u>Construction</u>.    Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular and to the singular include the plural, the part includes the whole, the term "including" is not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and other similar terms in this Agreement refer to this Agreement as a whole and not exclusively to any particular provision of this Agreement.  Article, section, subsection, exhibit, and schedule references are to this Agreement unless otherwise specified.   All of the exhibits or schedules attached to this Agreement shall be deemed incorporated herein by reference. Any reference to any of the following documents includes any and all alterations, amendments, restatements, extensions, modifications, renewals, or supplements thereto or thereof, as applicable: this Agreement, the Issuer Organizational Documents and the Note.

Section 2.      <u>Pledge</u>.   As security for the full, prompt and complete payment and performance of the Obligations (whether now existing or arising hereafter) in full by [*NewCo*] when due, whether at stated maturity, by acceleration or otherwise (including amounts that would become due but for the operation of the provisions of the Bankruptcy Code), each Pledgor hereby pledges, grants, transfers, and assigns to, and creates in favor of, PBE a continuing security interest in and Lien on all of such Pledgor's right, title, and interest in and to the Collateral (whether now existing or arising hereafter).

Section 3.      <u>Delivery and Registration of Collateral</u>.

(a)     All certificates or instruments representing or evidencing the Collateral shall be promptly delivered by each Pledgor to PBE or PBE's designee pursuant hereto at a location designated by PBE and shall be held by or on behalf of PBE pursuant hereto, and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed indorsement certificate in the form attached hereto as <u>Exhibit A</u> or other instrument of transfer or assignment in blank, in form and substance satisfactory to PBE.

(b)     If, at any time and from time to time, any Collateral (including any certificate or instrument representing or evidencing any Collateral) is in the possession of a Person other than PBE or a Pledgor (a "*Holder*"), then each Pledgor shall immediately, at PBE's option, either cause such Collateral to be delivered into PBE's possession, or

cause such Holder to enter into a control agreement, in form and substance satisfactory to PBE, and take all other steps deemed necessary by PBE to perfect the security interest of PBE in such Collateral, all pursuant to Sections 9-106 and 9-313 of the Code or other applicable law governing the perfection of PBE's security interest in the Collateral in the possession of such Holder; *provided*, however, that so long as no Event of Default has occurred and is continuing, or would result therefrom (and subject to the terms and conditions of the Note), each Pledgor may receive, retain and distribute or otherwise use cash dividends and cash distributions (collectively, the "*Cash Distributions*"), free and clear of any Lien or other claim in favor of PBE, whether arising under this Agreement or otherwise.

(c)     If at any time, and from time to time, any Pledged Interests or Future Rights consists of an uncertificated security or a security in book entry form, then Pledgors shall immediately cause such Collateral to be registered or entered, as the case may be, in the name of PBE, or otherwise cause PBE's security interest thereon to be perfected in accordance with applicable law.

Section 4.     <u>Cash Distributions and Voting Rights</u>.

(a)     So long as no Default or Event of Default shall have occurred and be continuing, or result therefrom (and subject to the terms and conditions of the Note), Pledgors shall be the sole parties entitled to (i) receive, retain and distribute or otherwise use Cash Distributions free and clear of any Lien or other claim in favor of PBE, and (ii) exercise all voting rights with respect to the Collateral (*provided*, however, that neither Pledgor shall exercise such rights or consent to any action of Issuer that would be in contravention of the provisions of, or constitute a Default or an Event of Default under, this Agreement, the Note or the LMF Agreement).

(b)     Upon the occurrence and during the continuance of a Default or an Event of Default, all rights of each Pledgor to receive Cash Distributions shall cease, and all such rights shall thereupon become vested in PBE, who shall thereupon have the sole right to receive and retain such Cash Distributions.  Each Pledgor shall, to the extent necessary, execute and deliver (or cause to be executed and delivered) to PBE all such instruments as PBE may reasonably request for the purpose of enabling PBE to receive Cash Distributions that it is entitled to receive and retain.  To the extent necessary, this Agreement shall constitute a "control agreement" for purposes of Section 8-106(c)(2) of the Code.

(c)     Upon the occurrence and during the continuance of a Event of Default, all voting rights of each Pledgor shall, on the date of receipt by such Pledgor of written notice from PBE of its election to exercise such voting rights, become vested in PBE, and PBE shall thereafter have the sole and exclusive right and authority to exercise such voting rights and powers.  Each Pledgor agrees that Issuer may rely conclusively upon any notice from PBE that PBE has the right and authority to exercise all rights and powers of such Pledgor as a member under the Issuer Organizational Documents.  Each Pledgor irrevocably waives any claim and cause of action against Issuer for dealing

5

directly with PBE following receipt of such notice from PBE of PBE's election to exercise such voting rights.

Section 5.      Representations and Warranties.  Each Pledgor represents, warrants, and covenants as follows:

(a)      Such Pledgor has taken all steps it deems necessary or appropriate to be informed on a continuing basis of changes or potential changes affecting the Collateral (including rights of conversion and exchange, rights to subscribe, payment of dividends, reorganizations or recapitalization, tender offers and voting and registration rights), and such Pledgor agrees that PBE shall have no responsibility or liability for informing such Pledgor of any such changes or potential changes or for taking any action or omitting to take any action with respect thereto.

(b)      Such Pledgor is a Registered Organization, organized under the laws of the state set forth on Schedule 1.  Such Pledgor's type of organization is set forth on Schedule 1.

(c)      All information herein or hereafter supplied to PBE by such Pledgor in writing with respect to the Collateral is, or in the case of information hereafter supplied will be, accurate and complete in all material respects.

(d)      Such Pledgor is and will be the sole legal, equitable and beneficial owner of the Collateral owned by such Pledgor (including the Pledged Interests and all other Collateral acquired by such Pledgor after the date hereof) free and clear of any adverse claims, Liens or other right, title, or interest of any party, other than the Liens in favor of PBE.

(e)      Such Pledgor has good right and legal authority to pledge the Collateral in the manner hereby done or contemplated and will defend its title thereto against the claims of all persons whomsoever.

(f)      The execution and delivery of this Agreement, and the performance of its terms, does not and will not (i) result in any violation of any provision of the Issuer Organizational Documents or of any provision of the Pledgor Organizational Documents, or (ii) violate or constitute a default under the terms of any agreement, indenture or other instrument, license, judgment, decree, order, law, statute, ordinance or other governmental rule or regulation applicable to such Pledgor or to Issuer or to any of such Pledgor's or Issuer's property, except to the extent such violation or default does not affect the Lien or rights granted to PBE hereunder and do not otherwise have a material adverse effect on such Pledgor or PLR.

(g)      Such Pledgor and Issuer hereby waives, to the fullest extent permitted by law, any and all restrictions on the transfer of the Collateral to PBE, whether under the Pledgor Organizational Documents, the Issuer Organizational Documents or otherwise (as well as restrictions on the subsequent transfer of the Collateral) that would otherwise prohibit, restrict or impair the transfers and transactions set forth and contemplated in this Agreement and the rights granted to PBE hereunder.

6

(h)     This Agreement, and the delivery to PBE of the Pledged Interests representing Collateral (or the control agreements referred to in Section 3 of this Agreement), is a legal, valid and binding agreement of such Pledgor, enforceable against such Pledgor in accordance with its terms, and creates a valid, perfected, and first priority security interest in the Pledged Interests and other Collateral in favor of PBE securing payment of the Obligations, and all actions necessary to achieve such perfection have been duly taken.

(i)     Schedule 1 to this Agreement is true and correct and complete in all material respects. Without limiting the generality of the foregoing: (i) except as set forth on Schedule 1 to this Agreement, all the Pledged Interests are in certificated form, and, except to the extent registered in the name of PBE or its nominee or designee pursuant to the provisions of this Agreement, are registered in the name of such Pledgor; and (ii) the Pledged Interests as to Issuer constitute at least the percentage of all the fully diluted issued and outstanding Equity Interests of such Issuer as set forth in Schedule 1 to this Agreement.

(j)     The Pledged Interests have been duly authorized and validly issued and are fully paid and nonassessable.  The character of the Pledged Interests is that of a "general intangible", and neither the Issuer nor the members have elected in any Issuer Organizational Document to have such Pledged Interests treated as a "security" under Section 8-103 of the Code, as in effect in the State of Delaware.

(k)     Neither the pledge of the Collateral pursuant to this Agreement nor the extensions of credit represented by the Obligations violates Regulation T, U or X of the Board of Governors of the Federal Reserve System.

Section 6.     Further Assurances.

(a)     Each Pledgor agrees that from time to time, at the expense of such Pledgor, such Pledgor will promptly execute and deliver, and will cause Issuer to promptly execute and deliver, all further instruments and documents, and take all further action, within the control of such Pledgor or Issuer, that PBE reasonably determines to be necessary in order to perfect and protect any security interest granted or purported to be granted hereby, or to enable PBE to exercise and enforce its rights and remedies hereunder with respect to any Collateral.   Without limiting the generality of the foregoing, such Pledgor will, and will cause Issuer to: (i) at the request of PBE, mark conspicuously each of its records pertaining to the Collateral with a legend, in form and substance reasonably satisfactory to PBE, indicating that such Collateral is subject to the security interest granted hereby; (ii) execute such instruments or notices, as may be necessary or reasonably desirable, or as PBE may request, in order to perfect and preserve the first priority security interests granted or purported to be granted hereby; (iii) allow inspection of the Collateral by PBE or Persons designated by PBE; and (iv) appear in and defend any action or proceeding that may affect such  Pledgor's title to or PBE's security interest in the Collateral.

7

(b)     Each Pledgor hereby authorizes PBE to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral.  A carbon, photographic, or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

Section 7.     Covenants of Pledgors.  Each Pledgor shall:

(a)     Not grant any Person other than the PBE "control" over any Collateral.

(b)     Not permit any Liens to exist with respect to, or transfer, pledge, assign, encumber or dispose of any rights in, any Collateral other than those in favor of PBE.

(c)     Not amend or otherwise modify, or permit the amendment or modification of, Issuer's certificate of formation or any other Issuer Organizational Documents to elect to treat the Equity Interests of Issuer as a "security" under Section 8-103 of the Code as in effect in the State of Delaware, without the prior written consent of PBE.

(d)     Not change such Pledgor's name in any manner which might make any financing or continuation statement filed hereunder seriously misleading within the meaning of the Code, unless such Pledgor shall have given PBE at least thirty (30) days prior written notice thereof.

(e)     Not consent to, approve or permit the grant or issuance of any additional Equity Interests of Issuer or Future Rights or certificates representing such Equity Interests or Future Rights.

(f)     Not authorize, approve, consent or vote to or cause (i) such Pledgor to dissolve or liquidate, merge or consolidate, or (ii) Issuer or any other PLR Entity to dissolve, liquidate, merge or consolidate with any other entity; *provided*, however, that any PLR Entity other than Issuer may (A) merge or consolidate with Issuer or any other PLR Entity, and (B) liquidate or dissolve provided that all or substantially all of the PLR Entity's assets have been assigned or transferred to Issuer or any other PLR Entity.

(g)     Not authorize, approve, consent or vote to or cause such Pledgor, Issuer or any other PLR Entity to commence any bankruptcy, reorganization, case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding (except to the extent permitted under subparagraph (f) above).

Section 8.     PBE as Pledgors' Attorney-in-Fact.

(a)     Each Pledgor hereby irrevocably constitutes and appoints PBE as such Pledgor's attorney-in-fact, with full authority in the place and stead of such Pledgor and in the name of such Pledgor, PBE or otherwise, from time to time at PBE's discretion, to: (i) upon the occurrence and during the continuance of a Event of Default, to ask for, demand, sue for, receive and collect all moneys due or to become due under and by virtue of any of the Collateral and to endorse checks, drafts, orders and other instruments made payable to such Pledgor representing any dividend, interest payment or other distribution

8

in respect of the Collateral or any part thereof and to give full discharge for the same, to settle, compromise, prosecute, pledge, transfer and make any agreement respecting, or otherwise deal with, the same, and to execute and file governmental notifications and reporting forms, and (ii) to do anything which such Pledgor is required to do under this Agreement but has failed to do promptly following written notice of such failure from PBE to such Pledgor.

(b)     The power of attorney granted in Section 8(a) shall be deemed coupled with an interest and shall be irrevocable and shall survive and not be affected by the subsequent disability, incapacity, dissolution, bankruptcy or termination of each Pledgor.

Section 9.     Remedies upon a Event of Default.  Upon the occurrence and during the continuance of a Event of Default:

(a)     PBE or PBE's designee, may, at PBE's option and in furtherance of the exercise of its rights and remedies upon the sale or other transfer of the Pledged Interests pursuant to the exercise of the remedies and other rights of PBE hereunder, elect to become the substituted member of Issuer with respect to the Collateral and Issuer shall execute or cause to be executed all documents requested by PBE necessary or desirable to evidence PBE or PBE's designee so becoming the substituted member. PBE may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under the Code (irrespective of whether the Code applies to the affected items of Collateral), and PBE may also without notice (except as specified below) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any exchange, broker's board or at any of PBE's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as PBE may deem commercially reasonable, irrespective of the impact of any such sales on the market price of the Collateral. To the maximum extent permitted by applicable law, PBE may be the purchaser of any or all of the Collateral at any such sale and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply all or any part of the Obligations as a credit on account of the purchase price of any Collateral payable at such sale. Each purchaser, including PBE, at any such sale shall hold the property sold absolutely free from any claim or right on the part of each Pledgor, and each Pledgor hereby waives and releases (to the maximum extent permitted by law) all rights of redemption, stay, or appraisal that it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Each Pledgor agrees that, to the extent notice of sale shall be required by law, at least ten (10) calendar days notice to such Pledgor of the time and place of any public sale or the time after which a private sale is to be made shall constitute reasonable notification. PBE may disclaim any warranties that might arise in connection with any sale or other disposition of the Collateral and has no obligation to provide any warranties at such time.  PBE shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. PBE may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)     Pledgors shall pay all reasonable costs of PBE, including reasonable attorneys' fees and expenses, incurred with respect to the collection of any of the Obligations, the disposition of any of the Collateral or the enforcement of any of PBE's rights hereunder.

(c)     Each Pledgor hereby agrees that any sale or other disposition of the Collateral conducted in conformity with reasonable commercial practices of banks, insurance companies, or other financial institutions in the city and state, or country, as applicable, where PBE is located in disposing of property similar to the Collateral shall be deemed to be commercially reasonable.

(d)     Each Pledgor hereby acknowledges that the sale by PBE of any Collateral pursuant to the terms hereof in compliance with the Securities Act of 1933 as now in effect or as hereafter amended, or any similar statute hereafter adopted with similar purpose or effect (the "*Securities Act*"), as well as applicable "Blue Sky" or other state securities laws, may require strict limitations as to the manner in which PBE or any subsequent transferee of the Collateral may dispose thereof. Each Pledgor acknowledges and agrees that in order to protect PBE's interest it may be necessary to sell the Collateral at a price less than the maximum price attainable if a sale were delayed or were made in another manner, such as a public offering under the Securities Act. Each Pledgor has no objection to sale in such a manner and agrees that PBE shall have no obligation to obtain the maximum possible price for the Collateral. Without limiting the generality of the foregoing, Each Pledgor agrees that, upon the occurrence and during the continuation of a Event of Default, PBE may, subject to applicable law, from time to time attempt to sell all or any part of the Collateral by a private placement, restricting the bidders and prospective PBEs to those who will represent and agree that they are purchasing for investment only and not for distribution. In so doing, PBE may solicit offers to buy the Collateral or any part thereof for cash, from a limited number of investors reasonably believed by PBE to be institutional investors or other accredited investors who might be interested in purchasing the Collateral. If PBE shall solicit such offers, then (to the extent permitted by law) the acceptance by PBE of one of the offers shall be deemed to be a commercially reasonable method of disposition of the Collateral.

Each Pledgor acknowledges that there is no adequate remedy at law for failure by it to comply with the provisions of this Section 9 and that such failure would not be adequately compensable in damages, and therefore agrees that, to the maximum extent permitted by law, its agreements contained in this Section may be specifically enforced.

Section 10.     <u>Application of Proceeds</u>.  Upon the occurrence and during the continuance of a Event of Default, any cash held by PBE as Collateral and all cash Proceeds received by PBE in respect of any sale of, collection from, or other realization upon all or any part of the Collateral pursuant to the exercise by PBE of its remedies as a secured creditor as provided in Section 9 shall be applied from time to time by PBE to the Obligations in such order as PBE may elect in its sole discretion, to the extent permitted by applicable law.

Section 11.     <u>Duties of PBE</u>.  The powers conferred on PBE hereunder are solely to protect its interests in the Collateral and shall not impose on it any duty to exercise such powers.

10

No action taken by PBE or omitted  to be taken with respect to the Collateral or any part thereof shall give rise to any defense, counterclaim or offset in favor of either Pledgor or to any claim or action against either Pledgor, except to the extent the same arises from the willful misconduct of PBE. Except as provided in Section 9-207 of the Code, PBE shall have no duty with respect to the Collateral or any responsibility for taking any necessary steps to preserve rights against any Persons with respect to any Collateral.

Section 12.    Choice of Law and Venue; Submission to Jurisdiction; Service of Process.

(a)    Governing Law.  THIS AGREEMENT HAS BEEN DELIVERED AND ACCEPTED AT AND SHALL BE DEEMED TO HAVE BEEN MADE AT MINNEAPOLIS, MINNESOTA. THIS AGREEMENT SHALL BE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (BUT OTHERWISE WITHOUT REGARD TO THE CONFLICT OF LAWS PROVISIONS) OF THE STATE OF MINNESOTA.

(b)    WAIVER OF JURISDICTION.   EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR MINNESOTA STATE COURT SITTING IN MINNEAPOLIS, MINNESOTA IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE LMF AGREEMENT OR THE NOTE, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.

(c)    WAIVER OF JURY TRIAL.   EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE, THE LMF AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE RELATED AGREEMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 13.    Counterparts; Integration; Amendments; No Waiver.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement constitutes the entire contract among the parties relating to the subject matter hereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other digital means (e.g., .pdf) shall be effective as delivery of a manually executed counterpart of this Agreement.  The terms of this Agreement

11

may be amended, waived or modified only by an instrument in writing duly executed by Pledgors and PBE.   Any such amendment, waiver or modification shall be binding upon Pledgors, PBE and each holder of the Obligations.  No failure on the part of PBE to exercise, and no delay in exercising any right under this Agreement, the Note, or otherwise with respect to any of the Obligations, shall operate as a waiver thereof; nor shall any single or partial exercise of any right under this Agreement, the Note, or otherwise with respect to any of the Obligations preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies provided for in this Agreement or otherwise with respect to any of the Obligations are cumulative and not exclusive of any remedies provided by law.  No enforcement of any remedy shall constitute an election of remedies.

Section 14.   Notices.   Any notice, certificate, request, notification and other communication required, permitted or contemplated hereunder must be in writing and given in accordance with the Note.

Section 15.   Continuing Security Interest.  This Agreement shall create a continuing security interest in the Collateral and shall be binding upon Pledgors and its successors and assigns, and inure to the benefit of PBE and its successors, transferees, and assigns.  Upon the payment in full of the Obligations, the security interests granted herein shall automatically terminate and all rights to the Collateral shall revert to Pledgors.   Upon any such termination, PBE will, at Pledgors' expense, deliver the Collateral to Pledgors and execute and deliver to Pledgors such documents as either Pledgor shall reasonably request to evidence such termination. Such documents shall be prepared by Pledgors and shall be in form and substance reasonably satisfactory to PBE.

Section 16.   Headings.   Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement or be given any substantive effect.

Section 17.   Severability.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity, illegality or unenforceability of a particular provision in a particular jurisdiction shall not invalidate such provision or cause such provision to be illegal or unenforceable in any other jurisdiction.

Section 18.   Waiver of Marshaling.  Each Pledgor and PBE acknowledges and agrees that in exercising any rights under or with respect to the Collateral, PBE (a) is under no obligation to marshal any Collateral; (b) may, in its absolute discretion, realize upon the Collateral in any order and in any manner it so elects; and (c) may, in its absolute discretion, apply the proceeds of any or all of the Collateral to the Obligations in any order and in any manner it so elects.  Each Pledgor and PBE waive any right to require the marshaling of any of the Collateral.

*[Remainder of page left blank;
signature pages follow]*

DOCS-#4376895-v6
6803073v3

IN WITNESS WHEREOF, Pledgors and PBE have caused this Agreement to be duly executed and delivered by their duly authorized representatives as of the date first written above.

[NewCo],
a Delaware limited liability company


By:_____
Name:
Title:



PFCF, LLC,
a Delaware limited liability company


By:_____
Name:
Title:



Picture Eagle, LLC,
a Delaware limited liability company


By:_____
Name:
Title:



PBE Corporation,
a Delaware corporation, f/k/a Polaroid Corporation


By:_____
Name:
Title:

**SCHEDULE 1**

Pledged Interests

| NAME OF PLEDGOR | JURISDICTION AND TYPE OF ORGANIZATION | ORGANIZATIONAL ID NUMBER | TYPE OF INTEREST | NUMBER OF SHARES/UNITS (IF APPLICABLE) | CERTIFICATES NUMBER(S) (IF ANY) | PERCENTAGE OF OUTSTANDING INTERESTS IN ISSUER |
|---|---|---|---|---|---|---|
| [NEWCO] | | | Membership Units of Issuer | | | 99% |
| PFCF, LLC | | | Membership Units of Issuer | | | 0.5% |
| PICTURE EAGLE, LLC | | | Membership Units of Issuer | | | 0.5% |

**EXHIBIT A**

<u>Form of Assignment</u>

**IRREVOCABLE ASSIGNMENT IN BLANK**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to
_____ the following [membership units]
[shares] of _____, a _____:

<u>No. of [Membership Units] [Shares]</u>                              <u>Certificate No.</u>

and irrevocably appoints _____ its agent and attorney-in-fact
to transfer all or any part of such membership units and to take all necessary and appropriate
action to effect any such transfer.  The agent and attorney-in-fact may substitute and appoint one
or more persons to act on its behalf.

_____,
a _____

By:_____
Name:_____
Title:_____

## CONSENT OF ISSUER

The undersigned, PLR IP HOLDINGS, LLC, a Delaware limited liability company ("*Issuer*") (a) acknowledges receipt of the Membership Interests Pledge Agreement to which this consent is attached (the "*Pledge Agreement*") made by each Pledgor in favor of PBE, and (b) hereby consents to and approves the terms of such Pledge Agreement and hereby consents to the transfer of the Collateral to PBE as contemplated hereby and the exercise by PBE of the remedies and other rights set forth in the Pledge Agreement for all purposes of the Issuer Organizational Documents, Applicable Statutes (as such terms are defined in the Pledge Agreement) and any other applicable law.  Issuer further agrees and covenants for the benefit of the PBE that it accedes and will accede to the provisions of the Pledge Agreement as they may affect Issuer and shall take no action or permit any action to be taken that interferes with or impairs the rights of PBE under the Pledge Agreement.

Upon the occurrence and during the continuance of a Event of Default, all rights of each Pledgor to receive cash dividends or distributions that it would otherwise be entitled to receive shall cease, and all such rights shall thereupon become vested in the PBE who shall thereupon have the sole right to receive and retain such cash dividends and distributions.  Further, PBE, its designee, or any other transferee or assignee of the Pledged Interests, upon the sale or other transfer of the Pledged Interests pursuant to the exercise of the remedies and other rights by PBE under the Pledge Agreement shall, at its option, become a member of Issuer to the extent of the Pledged Interests and other Collateral, entitled to participate in the management and governance thereof to the full extent as each Pledgor was so entitled.  Issuer consents to the transfer of the Pledged Interests and other Collateral to the PBE, any designee of PBE or any other transferee or assignee of PBE as contemplated by the Pledge Agreement and the exercise by PBE, of the remedies and other rights set forth in the Pledge Agreement for all purposes of the Issuer Organizational Documents, Applicable Statutes and any other applicable law.  Issuer hereby waives, to the fullest extent permitted by law, any and all restrictions on the transfer of the Collateral to PBE, whether under the Issuer Organizational Documents or otherwise (as well as restrictions on the subsequent transfer of the Collateral) that would otherwise prohibit, restrict or impair the transfers and transactions set forth and contemplated in the Pledge Agreement and the rights granted to PBE thereunder. To the extent necessary, the Pledge Agreement shall constitute a "control agreement" for purposes of Section 8-106(c)(2) of the Code as in effect in the State of Delaware for purposes of the Applicable Statutes and any other applicable law.  All capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Pledge Agreement.

PLR IP HOLDINGS, LLC, a Delaware limited
liability company


By:_____
Name:
Title:

**EXHIBIT D**

**FORM OF LOAN MANAGEMENT FEE AGREEMENT**

6695142v8

[NEWCO LETTERHEAD]

[•], 2014

PBE Corporation
c/o John Stoebner, Trustee
Lapp, Libra, Thomson, Stoebner & Pusch Chtd.
120 South Sixth Street, Suite 2500
Minneapolis, MN 55402

Re:    Loan Management Fee Agreement (the "*LMF Agreement*")

Ladies and Gentlemen:

Reference is made to that certain Promissory Note of even date herewith made payable by [NEWCO], a Delaware limited liability company ("*Maker*"), to the order of PBE CORPORATION, a Delaware corporation, f/k/a Polaroid Corporation ("*PBE*"), in the original principal amount of $[7,049,073.07] (as the same may be amended, extended, restated, supplemented or otherwise modified from time to time, the "*Note*").   Capitalized terms not defined herein shall have the meanings given to them in the Note.

To induce PBE to provide to Maker the financial accommodations evidenced by the Note, Maker hereby absolutely and unconditionally agrees to pay to PBE (a) on the date hereof, a loan origination fee (the "*Loan Origination Fee*") in an amount equal to $400,000, and (b) for the period beginning on the date hereof and ending on May [•], 2017 (the "*Loan Term*"), a loan management fee (the "*Loan Management Fee*") in an amount equal to $25,000 for each calendar month occurring during the Loan Term.   The Loan Management Fee with respect to each calendar month during the Loan Term shall be earned on the last day of such calendar month (except for the Loan Management Fee for the last month of the Loan Term, which shall be earned on the last day of the Loan Term), and shall be payable quarterly beginning on December 31, 2014 and continuing on the last day of each March, June, September and December thereafter, with a final payment due on the last day of the Loan Term.

In the event that the Note is prepaid under Section 2(b) or Section 2(c) of the Note or in the event that the payment of the Note is accelerated and becomes due and payable under Section 6 of the Note, the remaining payments of the Loan Management Fee that would have been due and payable during the remainder of the Loan Term shall be due and payable on the date of such prepayment or acceleration.

If any of the amounts due and payable under this LMF Agreement are not paid when due, Maker shall pay all of PBE's actual out-of-pocket costs of collection, including reasonable attorneys' fees.

The obligations of Maker under this LMF Agreement to pay the Loan Origination Fee, the Loan Management Fees and other amounts hereunder are secured by the Collateral (as defined in the Membership Interests Pledge Agreement dated of even date herewith and delivered by Maker to PBE in connection with this LMF Agreement).

[NewCo], LLC,
a Delaware limited liability company


By _____
Its _____


Accepted as of this [•] day of [•], 2014:

PBE CORPORATION, a Delaware corporation,
f/k/a Polaroid Corporation


By _____
  John R. Stoebner, as Trustee of the Bankruptcy Estate
of *In re Polaroid Corporation*, Bky. Case No. 08-46617

# Exhibit 2

## Waterfall Under LLC Agreement

| | Total | GBB PLR IP Holdings, LLC | GBB PLR IP Holdings, LLC (Affiliates) | Hilco PLR Holdings, LLC | Hilco PLR Holdings, LLC (Affiliates) | KPL, LLC | PBE Corporation |
|---|---|---|---|---|---|---|---|
| Units | 1,000.0000000 | 259.6669449 | 115.3330551 | 67.0352381 | 52.2647619 | 255.7000000 | 250.0000000 |
| Percentage Ownership | 100.00% | 25.97% | 11.53% | 6.70% | 5.23% | 25.57% | 25.00% |

**Transaction**

| | | |
|---|---|---|
| Enterprise Value | 70,000,000.00 | |
| Less: Senior Debt | (18,000,000.00) | |
| Equity Value | 52,000,000.00 | |
| Less: Company Transaction Expenses | (600,000.00) | |
| Net Equity Value | 51,400,000.00 | |

**Waterfall under LLC Agreement**

| | | Total | GBB PLR IP Holdings, LLC | GBB PLR IP Holdings, LLC (Affiliates) | Hilco PLR Holdings, LLC | Hilco PLR Holdings, LLC (Affiliates) | KPL, LLC | PBE Corporation |
|---|---|---|---|---|---|---|---|---|
| (A) | Net Equity Value | 51,400,000.00 | | | | | | |
| (B) | First: Return of Capital to Capital Members | 21,417,002.51 | 7,415,050.25 | 3,293,451.15 | 1,914,876.35 | 1,492,954.44 | 7,300,670.32 | - |
| (C) | Second: Return of Prior Cash Distribution to Estate | 595,568.40 | 154,649.43 | 68,688.72 | 39,924.07 | 31,127.24 | 152,286.84 | 148,892.10 |
| (A)-(B)=(D) | Third: Excess Cash to Distribute to All Members | 29,982,997.49 | 7,785,593.36 | 3,458,030.70 | 2,009,917.38 | 1,567,054.22 | 7,666,652.46 | 7,495,749.37 |
| (E) | Fourth: Recapture of Prior Cash Distribution to Estate | (595,568.40) | - | - | - | - | - | (595,568.40) |
| (B)+(C)+(D)+(E)=(F) | Net Equity Value By Member | 51,400,000.00 | 15,355,293.03 | 6,820,170.58 | 3,964,717.80 | 3,091,135.90 | 15,119,609.62 | 7,049,073.07 |

# Exhibit 3

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

|  |  |
|---|---|
| In re: | **Jointly Administered under Case No. 08-46617** |
| Polaroid Corporation, et al., | Court Files No.'s: |
| Debtors. | 08-46617 (GFK) |
| (includes: | |
| Polaroid Holding Company; | 08-46621 (GFK) |
| Polaroid Consumer Electronics, LLC; | 08-46620 (GFK) |
| Polaroid Capital, LLC; | 08-46623 (GFK) |
| Polaroid Latin America I Corporation; | 08-46624 (GFK) |
| Polaroid Asia Pacific LLC; | 08-46625 (GFK) |
| Polaroid International Holding LLC; | 08-46626 (GFK) |
| Polaroid New Bedford Real Estate, LLC; | 08-46627 (GFK) |
| Polaroid Norwood Real Estate, LLC; | 08-46628 (GFK) |
| Polaroid Waltham Real Estate, LLC) | 08-46629 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

---

### UNSWORN DECLARATION OF ALLEN ARNETT

---

I, Allen Arnett, hereby state that:

1.      I  am  a  Valuation  Principal  in  Transaction  Services  at
PricewaterhouseCoopers LLP ("PwC"). PwC is one of the largest professional services
firms in the world and provides a wide range of auditing, accounting, tax and valuation
services to its clients in 158 countries.

2.      I have a Master of Business Administration, Finance from Indiana
University and I am a Chartered Financial Analyst (CFA).  I have over 20 years of
experience in performing valuation services that includes advising clients in a variety of

industries on valuation matters and finance related issues, including providing valuations of business and intangible assets. Prior to joining PwC, I was a Managing Director at Huron Consulting Group where I led the firm's bankruptcy valuation practice. Prior to joining Huron, I was a Senior Manager in PwC's Corporate Value Consulting practice.

3.      I was retained by John R. Stoebner, as chapter 7 bankruptcy trustee for the above-referenced bankruptcy estates (the "Trustee"), to perform various financial and valuation services in order to assist the Trustee in evaluating proposals that were made by certain parties to purchase the membership interests or units of PLR IP Holdings, LLC, d/b/a Polaroid ("PLR IP" or the "Company") owned by the bankruptcy estate of PBE Corporation and other members of the Company (the "Proposed Transaction").

4.      I submit this Declaration in support of the Trustee's *Motion to Sell the Bankruptcy Estate's Membership Units in PLR IP Holdings, LLC Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. §§ 105 and 363*.  Except where specifically noted, the statements in this Declaration are based on either my personal knowledge, information supplied or verified by the PwC team that I supervise, my review of relevant documents, or my opinion based upon my experience and knowledge acquired during the course of my professional career.

5.      As part of our engagement, I have reviewed documents and information related to the Proposed Transaction as well as documents and information related to the Company that included, among other things, the Company's Limited Liability Company Agreement dated May 7, 2009, historical financial statements, projections and

2

long-range business plan information, a valuation analysis of the Company prepared by the Gordon Brothers Group, a confidential intellectual property appraisal/brand valuation report and other information that we deemed relevant to our engagement.  In addition, I have prepared a discounted cash flow analysis based upon the Company's long-range plan.

6.      PLR IP is a brand management Company.  As a result, a valuation of the Company is primarily based upon an income approach that capitalizes the anticipated income streams derived from the royalties received from the licenses in place net of the expense needed to support the brand.  A determination of these future cash streams is based on numerous factors, including projections of license revenue and expenses, discount interest rate and retail conditions.

7.      Based on my review of the analysis prepared by others and my own analysis, it is my opinion that the proposed enterprise value ascribed to the Company for the Proposed Transaction of $70 million is within a reasonable range for a fair market sale of the Company, one in which there is a willing buyer and seller and neither party is under financial stress or a compulsion to consummate a transaction.

8.      Further, based on discussions with counsel and the Trustee, I understand that during the initial auction for most, but not all, of the assets of the company then known as Polaroid Corporation in 2009, the bankruptcy court was presented with an indicated value of the estate's 25% membership interest in PLR IP Holdings of approximately $16.25 million.  I have not been provided with the full analysis underlying this value indication, however this indicated value was based on

3

DOCS-#4412268-v2

information known as of the date of the auction as well as certain assumptions and projections based on anticipated future events. The current value of the estate's 25% membership interest in PLR IP Holdings, nearly six years later, is based on the Company's current financial condition, current business plan, and current estimates of future cash flows and other factors, all of which are different from that which existed in 2009. In addition, it appears likely that the indication of value in 2009 may not have reflected the preferences in distributions provided to the members of the limited liability Company who are entitled to repayment of their capital investment before the bankruptcy estate is entitled to its full 25 percent share of any distributions for its membership interests.

9.      I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated: November 26, 2014

_____

Allen Arnett

4

## <u>VERIFICATION</u>

I, John R. Stoebner, am the Chapter 7 Trustee of PBE Corporation, f/k/a Polaroid Corporation and affiliated debtors in the jointly-administered bankruptcy cases captioned *In re Polaroid Corporation, et al.*, and declare under penalty of perjury that the facts set forth in the *Motion to Sell the Bankruptcy Estate's Membership Units in PLR IP Holdings, LLC Free and Clear of Liens, Claims, Encumbrances and Interests and Outside the Ordinary Course of Business Pursuant to 11 U.S.C. §§ 105 and 363* are true and correct according to the best of my knowledge, information and belief.

Dated: November 26, 2014.

John R. Stoebner

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | **Jointly Administered under Case No. 08-46617** |
| Polaroid Corporation, et al., | Court Files Nos.: |
| Debtors. | 08-46617 (GFK) |
| (includes: | |
| Polaroid Holding Company; | 08-46621 (GFK) |
| Polaroid Consumer Electronics, LLC; | 08-46620 (GFK) |
| Polaroid Capital, LLC; | 08-46623 (GFK) |
| Polaroid Latin America I Corporation; | 08-46624 (GFK) |
| Polaroid Asia Pacific LLC; | 08-46625 (GFK) |
| Polaroid International Holding LLC; | 08-46626 (GFK) |
| Polaroid New Bedford Real Estate, LLC; | 08-46627 (GFK) |
| Polaroid Norwood Real Estate, LLC; | 08-46628 (GFK) |
| Polaroid Waltham Real Estate, LLC) | 08-46629 (GFK) |
| | Chapter 7 Cases |
| | Judge Gregory F. Kishel |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SELL THE BANKRUPTCY ESTATE'S MEMBERSHIP UNITS IN PLR IP HOLDINGS, LLC FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS AND OUTSIDE THE ORDINARY COURSE OF BUSINESS PURSUANT TO 11 U.S.C. §§ 105 AND 363

John R. Stoebner ("Trustee"), the Chapter 7 Trustee for the bankruptcy estates of the above-captioned debtors (the "Debtors"), by and through his legal counsel, respectfully submits this Memorandum of Law in support of his verified Motion to Sell the Bankruptcy Estate's Membership Units in PLR IP Holdings, LLC Free and Clear of Liens, Claims, Interests, Encumbrances and Interests and Outside the Ordinary Course of Business Pursuant to 11 U.S.C. §§ 105 and 363. Capitalized terms not otherwise

defined herein shall have the meanings given to such terms in the verified motion filed in connection herewith (the "Motion"), unless the context requires otherwise.

## FACTS

The factual basis for this Memorandum is set forth in the verified Motion and is incorporated as though fully set forth herein.

## DISCUSSION

**I.    THE SALE OF THE PLR MEMBERSHIP UNITS IS IN THE BEST INTERESTS OF THE BANKRUPTCY ESTATE.**

Section 363 of the Bankruptcy Code governs the sale of property of the estate outside of the ordinary course of business. 11 U.S.C. § 363(b)(1). Although this section does not set forth a standard for determining when it is appropriate to authorize such a sale, courts have uniformly held that such a sale should be approved when it is justified by a sound business purpose. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n.16 (8th Cir. 1997); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Industries, Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991); *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Crystalin LLC*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003). As long as the sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D. Puerto Rico 1991) ("The trustee has

2

ample discretion to administer the estate, including authority to conduct public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

### A.   THE SALE IS IN THE BEST INTERESTS OF THE BANKRUPTCY ESTATE.

Applying § 363, the proposed sale of the PBE Units should be approved. The Proposed Transaction is supported by the Manager and the other economic stakeholders of the Company, each of whom made independent assessments of value. The sale was extensively negotiated at arm's-length and contains customary terms and conditions and is fair and reasonable. The PBE Units are an illiquid, minority interest in a privately-held company subject to transfer restrictions and other limitations impacting the marketability of the units, including a right of first refusal and drag-along rights. The Proposed Transaction does not reflect a minority discount often attendant to transactions of a similar nature. The Trustee has engaged in substantial due diligence and engaged PwC to review the Proposed Transaction. The anticipated consideration, including the negotiated enhancements to value, represent the best prospect for the Trustee to maximize the value of the PBE Units for benefit of the bankruptcy estates, creditors and other parties in interest.  The Proposed Transaction is supported by ample business justification.

DOCS-#4406469-V7

### B.    THE PROPOSED TRANSFER(S) WILL RESULT IN A GOOD FAITH SALE OF THE ASSETS.

Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith." 11 U.S.C. § 363(m). As such, a prospective purchaser is afforded a safe-harbor and related protections when a purchase is made in "good faith." *See id*. This provision serves the important purpose of encouraging good-faith transactions and preserving the finality of the bankruptcy court's order unless stayed pending an appeal. *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986). Here, the PBE Units will be sold through an arm's length, negotiated private sale where the Buyers have had no unfair advantage. The Trustee will have entered into such sale with the intention of maximizing the return to the bankruptcy estates. If the Court approves the Motion, it should also invoke § 363(m) to protect each Buyer's acquisition by explicitly finding that each Buyer has acted in good faith. *See In re Apex Oil Co.*, 92 B.R. 847, 874 (Bankr. E.D. Mo. 1988).

### C.    THE PROPOSED TRANSACTIONS SATISFY ALL APPLICABLE LEGAL STANDARDS FOR A SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS.

The Trustee believes this Motion and the transactions contemplated thereby are in the best interests of the bankruptcy estates and in the best interests of all interested parties in these Chapter 7 bankruptcy cases. Section 363 of the Bankruptcy Code authorizes the use, sale or lease property of the estate outside of the ordinary course of

4

business, free and clear of any claim or interest in such property. 11 U.S.C. § 363(f). The

Trustee requests authority to sell the PBE Units free and clear of all liens, claims,

encumbrances and interests. Any such liens, claims, encumbrances and interests would

attach to the proceeds of such transfer ultimately attributable to the property against or

in which such lien, claim encumbrance or interest is asserted with the same validity,

priority, force and effect that such liens, claims encumbrances and interests had against

the items sold.

Pursuant to § 363(f) of the Bankruptcy Code, a trustee may sell property free and

clear of liens, claims and encumbrances if *one* of the following conditions is met:

(1)    applicable nonbankruptcy law permits sale of such property free and clear
       of such interest;
(2)    such entity consents;
(3)    such interest is a lien and the price at which such property is to be sold is
       greater than the aggregate value of all liens on such property;
(4)    such interest is in bona fide dispute; or
(5)    such entity could be compelled, in a legal or equitable proceeding, to
       accept a money satisfaction of such interest.

11 U.S.C. § 363(f). The existence of any one of the five conditions provides authority to

sell free and clear of liens. *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R.

343, 345 (E.D. Pa. 1988).

Under § 363(f)(2) of the Bankruptcy Code, a sale free and clear of all liens, claims,

encumbrances and interests is permissible if all parties asserting liens on or other

interests in the assets to be sold consent. The Trustee is providing proper notice of this

Motion to creditors claiming an interest in the assets, thereby giving them the

opportunity to object to this transaction. *See* Dkt. No. 2250. Provided that no creditors

having an interest in the PBE Units object, § 363(f)(2) will be satisfied. *See, e.g., Veltman v. Whetzal*, 93 F.3d 517, 521 n.5 (8th Cir. 1996) (in a Chapter 7 case, stating that "some courts have found implied consent, however, when a party with an interest in the bankruptcy estate fails to object after receiving notice of the sale under subsection 363(f)(2)") (citing *In re Tabone, Inc.*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988); *In re Shary*, 152 B.R. 724, 725-26 (Bankr. N.D. Ohio 1993).

Under § 363(f)(4) of the Bankruptcy Code, a sale free and clear of all liens, claims, encumbrances and interests is permissible if the interest of any entity is in bona fide dispute. The Bankruptcy Code does not define the phrase "bona fide dispute." The courts have, however, found that the inquiry for § 363(f)(4) is "whether there is an objective basis for either a factual or legal dispute as to the validity of debt" or the lien. *In re Gaylord Grain, L.L.C.*, 306 B.R. 624, 627 (B.A.P. 8th Cir. 2004). "Clearly this standard does not require the court to resolve the underlying dispute, just to determine its existence." *Id.* at 627; *In re Octagon Roofing, L.P.*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1995) (A court does not "need to determine the probable outcome of the dispute, but merely whether one exists."). Indeed, courts have dispensed with evidentiary hearings into such matters in § 363 sales, particularly in instances where such hearings would operate only to delay a sale of property and the price and process relative to the sale is designed to ensure that the value of the property is maximized. *See, e.g., In re Collins*, 180 B.R. 447, 452 n.7 (Bankr. E.D. Va. 1995). As such, the propriety of the lien does not need to be the subject of an immediate or concurrent adversary proceeding in order to determine whether a bona fide dispute exists. *Gaylord Grain*, 306 B.R. at 628; *In re Collins*, 180 B.R.

6

at 452 n.8; *In re Oneida Lake Dev., Inc.*, 114 B.R. 352, 357-58 (Bankr. N.D.N.Y. 1990); *In re Bedford Square Assocs., L.P.*, 247 B.R. 140, 145 (Bankr. E.D. Pa. 2000). Here, however, the interests of the Asserted Secured Claimants are subject to bona fide dispute as the Trustee has commenced adversary proceedings seeking to avoid such interests, meeting the requirements of § 363(f)(4).

Under § 363(f)(5) of the Bankruptcy Code, lien extinguishment is permissible if any party asserting an interest in the assets could be compelled to accept money satisfaction of such interest in a legal or equitable proceeding without full satisfaction of the debt. Courts have found potential causes of action under Chapter 5 of the Bankruptcy Code to qualify as such a legal proceeding that permits a sale free and clear of liens and interests under § 363(f)(5). *See, e.g., In re James*, 203 B.R. 449, 454 (Bankr. W.D. Mo. 1997) (finding a potential cause of action under § 547 to qualify as a "legal or equitable proceeding" that can force a sale free and clear).

Approval of the sale of the PBE Units free and clear of all interests, liens, claims and encumbrances in these bankruptcy cases is in the best interests of the estate and all of its constituents. The relief requested is appropriate and is consistent with the letter and spirit of § 363(f).

## CONCLUSION

The Trustee believes that selling the PBE Units will benefit of the bankruptcy estates and all constituencies. Therefore, in his considered business judgment, the Trustee seeks authorization to sell all of the PBE Units free and clear of any liens,

DOCS-#4406469-V7

claims, encumbrances and interests and as more fully described above and in the Motion.

Therefore, the Trustee respectfully requests that the Court grant the Motion and enter an Order (i) authorizing the Trustee to sell the PBE Units to the Buyers, free and clear of all liens, claims, interests and encumbrances with such liens, claims, interests and encumbrances attaching to the proceeds of the sale ultimately attributable to the property against or in which such liens, claim, interests and encumbrances are asserted, all with the same validity, dignity, priority, effect and to the same extent as existed prior to the sale and in all cases subject to any and all rights, claims and defenses that the Trustee may have with respect thereto; (ii) waiving the requirements of Bankruptcy Rules 6004(g) and 6006(d); and (iii) granting such further, different or additional relief as is just and proper.

DATED: November 26, 2014        **LINDQUIST & VENNUM LLP**


By:  /s/ George  H. Singer
George H. Singer (#262043)
Jeffrey D. Smith (#387035)

4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)
www.lindquist.com

ATTORNEYS FOR JOHN R. STOEBNER
CHAPTER 7 TRUSTEE

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| In re: | **Jointly Administered under Case No. 08-46617** |
| Polaroid Corporation, et al., | Court File Nos.: |
| Debtors. | 08-46617 (GFK) |
| (includes: | |
| Polaroid Holding Company; | 08-46621 (GFK) |
| Polaroid Consumer Electronics, LLC; | 08-46620 (GFK) |
| Polaroid Capital, LLC; | 08-46623 (GFK) |
| Polaroid Latin America I Corporation; | 08-46624 (GFK) |
| Polaroid Asia Pacific LLC; | 08-46625 (GFK) |
| Polaroid International Holding LLC; | 08-46626 (GFK) |
| Polaroid New Bedford Real Estate, LLC; | 08-46627 (GFK) |
| Polaroid Norwood Real Estate, LLC; | 08-46628 (GFK) |
| Polaroid Waltham Real Estate, LLC) | 08-46629 (GFK) |
| | Chapter 7 Cases |
| | Judge Gregory F. Kishel |

## ORDER AUTHORIZING SALE, ASSIGNMENT OR TRANSFER OF BANKRUPTCY ESTATE'S MEMBERSHIP UNITS OF PLR IP HOLDINGS, LLC FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS

This matter came on before the Court on December 17, 2014 on the verified motion (the "Motion") filed by John R. Stoebner as Trustee (the "Trustee") of the Chapter 7 bankruptcy estate of PBE Corporation, formerly known as Polaroid Corporation, and the other above-captioned debtors, for an order to sell, assign or transfer the bankruptcy estate's membership units of PLR IP Holdings, LLC free and clear of liens, claims and interests under 11 U.S.C. §§ 105 and 363. Appearances were as

noted on the record. Capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Motion or in the Bankruptcy Code unless the context requires otherwise. Based on the arguments of counsel, moving documents and the record made at the hearing, and the Court's findings of fact and conclusions of law, if any, having been recorded in open court following the close of evidence,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Trustee's notice of the Motion and the sale is appropriate and reasonably calculated to provide interested parties with timely and proper notice, and no further notice is required.

3.      The Trustee is hereby authorized and empowered to sell, assign or transfer the bankruptcy estate's membership units of PLR IP Holdings, LLC outside the ordinary course of business pursuant to 11 U.S.C. § 363(b) in accordance with the Purchase Agreement and free and clear of liens, claims, encumbrances and interests.

4.      Pursuant to Section 363(f) of the Bankruptcy Code, the bankruptcy estate's membership units of PLR IP Holdings, LLC shall be sold, assigned or transferred free and clear of any and all liens, claims and interests of any kind or nature whatsoever and all such liens, claims, encumbrances and interests shall attach to the proceeds of the sale with the same validity, priority, dignity and effect and to the same extent that existed immediately prior to the consummation of the sale and in all cases subject to any and all rights, claims and defenses that the Trustee or the bankruptcy estates may have with respect thereto.

2

DOCS-#4406469-V7

5.      The Trustee is hereby authorized and empowered to execute and deliver the Purchase Agreement any other agreements, documents or instruments, that the Trustee deems necessary or appropriate to implement the agreements with Buyers and to effectuate the sale, assignment or transfer of the PBE Units and to take such other actions as may be reasonably necessary or desirable for the purpose of assigning, transferring, granting, conveying and conferring to, or as may be necessary or appropriate for the performance of the obligations and transactions contemplated by the Purchased Agreement and Motion.

6.      The Buyers are and shall be deemed to be good faith purchasers under Section 363(m) of the Bankruptcy Code and, as such, are and shall be entitled to all of the protections afforded thereby.  In the absence of a stay pending appeal, the Buyers will be acting in good faith within the meaning of Section 363(m) of the Bankruptcy Code in closing on the sale, assignment other transfer of the PBE Units any time after entry of this Order, notwithstanding the provisions of Bankruptcy Rule 6004(h).

7.      Notwithstanding Fed. R. Bankr. P. 6004(h), this Order shall take effect immediately upon entry.


Dated: _____        _____
                                    Gregory F. Kishel
                                    Chief United States Bankruptcy Judge

DOCS-#4406469-V7